**Renato P. MARIANI, Plaintiff,**

v.

**UNITED STATES of America, Defendant,**

**Federal Election Commission, Intervenor–Defendant.**

**No. 3:CV–98–1701.**

United States District Court, M.D. Pennsylvania.

Oct. 27, 1999.

Eli C. Schulman, Floyd Abrams, Susan Buckley, James E. Roser Feld, Cahill, Gordon & Reindel, New York, NY, Thomas C. Carroll, Mark Cedrone, Carroll & Cedrone, Philadelphia, PA, for plaintiff.

Bcuce Brandler, Asst.U.S.Atty., Theodore C. Hirt, Martha E. Rubio, Dept. of Justice, Lawreace Noble, Richard Bader, Stephen Hershkowitz, David Kolker, FEC, for defendant.

## *MEMORANDUM*

VANASKIE, Chief Judge.

### INTRODUCTION

This action under 2 U.S.C. § 437h challenges the constitutionality of provisions of the Federal Election Campaign Act ("FECA" or "Act"), 2 U.S.C. §§ 431, *et seq.*, which ban corporate contributions to candidates for federal elective office, 2 U.S.C. § 441b (the "corporate contribution ban"), and prohibit making campaign contributions in the name of another person, 2 U.S.C. § 441f (the "conduit contribution ban"). Section 437h of Title 2 U.S.C. assigns to the *en banc* court of appeals the role of decision maker on constitutional challenges to FECA provisions, with the district court's task being relegated to determining, in the first instance, whether the constitutional challenge is frivolous. *See California Med. Ass'n v. FEC*, 453 U.S. 182, 193–94 n. 14, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981). If the issues presented are not frivolous, the district court is to make findings of fact and certify the issues to be resolved to the appellate court. *See Buckley v. Valeo*, 519 F.2d 817, 818 (D.C.Cir.1975) (*en banc*) (*per curiam*) (remanding to district court for findings of fact before reaching merits).

Plaintiff Renato P. Mariani's constitutional challenges to the corporate and conduit contribution bans arise in the context of a criminal prosecution against him and others in connection with contributions made to several candidates for federal elective office, including the presidential candidacies of Bob Dole and Bill Clinton. Essentially, the indictment in question charges that between August of 1994 and December of 1996, Mariani, who was then president of Empire Sanitary Landfill, Inc. ("Empire") and Danella Environmental Technologies, Inc. ("Danella"), as well as other officers of Empire and Danella, used various employees and others associated with Empire and Danella as conduits for contributions to the campaigns of Dole, Clinton and others, with the ultimate source of the campaign contributions being Empire's corporate treasury.

Mariani contends that the ability of corporations to make contributions to political parties and political action committees ("soft money") in unlimited amounts undermines the justification for the corporate contribution ban—eliminating corruption and the appearance of corruption arising from financing campaigns from large aggregations of wealth embodied in corporate treasuries. As explained by Mariani:

> Because a statute that limits First Amendment interest (as FECA concededly does) can only survive the strict scrutiny imposed by law if it directly advances a compelling state interest in a narrow and precise way, . . . the easy availability of the elephantine soft money loophole leaves the statute one that simultaneously—and thus unconstitutionally—limits First Amendment interests *and* fails directly to advance its goals.

(Brief in Opposition to Defendants' Motion to Dismiss, Dkt. Entry 32 at 6 (emphasis in original).)

By Memorandum and Order filed on March 25, 1999, I determined that Mariani's challenge to the corporate contribution ban was not legally frivolous. In making this determination, I observed that "Mariani has presented facts on which to base a rational argument that the ostensible pur-

poses of a ban on corporate contributions to candidates for federal elective office—eliminating the corruption and appearance of corruption resulting from corporate contributions to individual candidates, *see, e.g., FEC v. National Right to Work Comm.,* 459 U.S. 197, 207–08, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982)—is completely undermined by the allowance of 'soft money' contributions by corporations." (*Id.* at 4.) Because the challenge to the corporate contribution ban was not frivolous, I declined to make a separate determination as to the challenge to the conduit contribution ban, finding that interests of judicial economy and expedition militated against such a separate determination. *Id.* at 9 n. 3.

Having decided that this action is not frivolous, I must now make findings of fact pertinent to the issues to be certified to the Third Circuit for *en banc* resolution. In connection with this endeavor, the parties were directed to submit proposed findings of fact following the completion of pertinent discovery.

As a result of the process established by Court Order, the parties have stipulated to 117 proposed findings of fact and agreed to the inclusion of 279 documents in the evidentiary record for this case. *See* Joint Stipulation of Facts filed on July 26, 1999, Dkt. Entry 53. The United States and intervenor-defendant Federal Election Commission ("FEC") (referred to jointly as the "Government"), submitted 36 separate proposed findings of fact, a number of which are admitted by Mariani. In addition to the 117 findings of fact to which he

has stipulated, Mariani has also proposed 468 additional findings of fact. In addition to the 279 documents to which the parties had stipulated, Mariani has also filed "Supplemental Exhibits."

I have carefully reviewed the parties' submissions and find that many proposed findings, particularly those that are not disputed as to factual accuracy, may be adopted verbatim.[1] A number of proposed findings, particularly those that merely quote or restate another person's testimony or statement, however, are not appropriate as findings of fact.[2] As argued by the Government, a number of Mariani's proposed findings are also redundant and have not been adopted for that reason.[3]

While both the United States and FEC have agreed to the accuracy of an overwhelming majority of the remainder of Mariani's proposed findings, they have contested the relevancy and materiality of all but six of Mariani's factual assertions. The United States and/or the FEC have also objected to particular findings on the grounds that the evidence proffered by Mariani in support of particular assertions is not admissible. Examples of purportedly inadmissible evidence include documents that had been filed by the FEC in other litigation; an FEC Notice of Proposed Rulemaking; the Minority Report of the *Final Report of the Committee on Governmental Affairs: Investigation of Illegal or Improper Activities in Connection With 1996 Federal Election Campaigns,* S.Rep. No. 105–167 (1998) [Joint Exhibit ("JEx.")] 21;[4] statistics from a study con-

---

1. As pointed out by Mariani, he and the FEC are actually in agreement on the accuracy of 361 of the additional 468 findings of fact he has proposed. (Reply Brief in Support of Plaintiff's Proposed Findings of Fact, Dkt. Entry 93, at 2.) The United States, although not in agreement with as many factual assertions as FEC has agreed to, nonetheless does not dispute the accuracy of an overwhelming majority of Mariani's proposed findings.

2. *E.g.,* Mariani's Proposed Findings of Fact, 24, 30, 31, 33–37, 83, 117, 132–134, 237, 262–65, 270, 282, 292–94, 297, 299, 301, 310, 330, 469, 500, 507, 510, 517, 556, 566, 568–70,

580–82, and the Government's Proposed Findings of Fact 27 and 31–36.

3. *E.g.,* Mariani's Proposed Findings of Fact 85, 86, 116, 118, 120, 123, 124, 129–31, 135, 144–47, 152–55, 158, 160–66, 170, 182–83, 189, 196, 225 260, 261, 271, 273, 274, 276, 277–81, 291, 296, 302, 309, 317–20, 322, 323, 327, 339–42, 391, 421, 425, 431, 433, 442, 445–56, 484, 503, 505, 509, 512–15, 534, 535, and 574.

4. Senator Fred Thompson chaired the Committee on Governmental Affairs that under-

ducted by the Center for Responsive Politics; and testimony of several witnesses, including former United States Senator Alan K. Simpson.

Some objections have merit; for example, hearsay objections where Mariani is relying on out of court statements for the truth of the matter asserted.[5] Generally speaking, however, the Government's objections are meritless. Indeed, only a few of the particular objections warrant any substantial discussion. Before proceeding to making my findings of fact, I will briefly explain my rulings on evidentiary objections.

## RULINGS ON EVIDENTIARY OBJECTIONS

### A. Relevance and Materiality

The Government contends that in light of its concession "that soft money donations, and expenditures of soft money on issue advertisements and party-building activities, may influence federal elections to some degree, no evidentiary record, or at least not the incredible detail regarding those activities proposed by plaintiff (particularly the witness statements and expert testimony), is necessary to decide whether the existence of soft money donations and expenditures renders sections 441b and 441f unconstitutional." Joint Response to Plaintiff's Proposed Findings of Fact, Dkt. Entry 69, at 2–3. The Government thus contends that all but 6 of Mariani's 585 proposed findings are irrelevant and/or lack sufficient probative value. The Government makes this argument despite having stipulated to 117 of Mariani's 585 separate statements of fact and notwithstanding the fact that it does not contest

the factual accuracy of the overwhelming majority of Mariani's assertions.

Mariani's non-frivolous constitutional challenge concerns the impact of corporate soft money contributions on federal elections and the public's perception of the influence of such contributions. Any evidence that has a tendency to prove that impact and/or the public's perception of the influence of such soft money contributions is plainly relevant. FRE 401; *Failla v. City of Passaic,* 146 F.3d 149, 159 (3d Cir.1998).

The Government does not seriously contest the obvious fact that the evidentiary materials tendered in this case do indeed have a tendency to show the influence of soft money contributions and/or the public perception of those contributions. Instead, the Government essentially maintains that the corporate contribution ban is unassailable in light of existing case law precedents. As pointed out by Mariani, the Government is essentially rehashing arguments I considered in determining that Mariani's claims are non-frivolous. Now that this threshold question has been answered in favor of Mariani, the Government's efforts to avoid findings of fact pertinent to the existing political contribution scheme is unavailing. The general objections of irrelevance and immateriality are, therefore, overruled.[6]

The Government has argued in the alternative that, rather than making any findings of fact, I should simply certify a documentary record to the Court of Appeals, thereby allowing it in the first instance to draw factual conclusions from the voluminous record. While this proposal has some attraction, it is inconsistent with what I understand to be the role of the

---

took the investigation. The Final Report will sometimes be referred to as the "Thompson Committee Report." The Minority Report will sometimes be referred to a the "Thompson Committee Minority Report."

**5.** *E.g.,* Mariani's Proposed Findings of Fact, 208, 259, 289, 365, 501, 502, 519, 520, and 524.

**6.** Some proposed findings, however, are not particularly relevant or material, and therefore will not be adopted. *E.g.,* Mariani's Proposed Findings of Fact 11–13, 69, 142, 150, 151, 203, 204, 238, 348, 360–64, 464, 473, 522, 523, 544, 549 and 553.

district court in this legislative review mechanism. Because it is incumbent upon the district judge to make findings of fact, *Bread Political Action Comm. v. FEC,* 455 U.S. 577, 580, 102 S.Ct. 1235, 71 L.Ed.2d 432 (1982); *Khachaturian v. FEC,* 980 F.2d 330, 331 (5th Cir.1992) (*en banc* ) (*per curiam* ); *Buckley v. Valeo,* 519 F.2d 821 (D.C.Cir.1975) (*en banc* ) (*per curiam* ), the Government's request that I simply certify a documentary record must be rejected.

### B. *FEC Filings in Other Cases*

■ Also without merit is the objection interposed by the United States to every fact proffered by Mariani that relies upon the FEC's submissions in other litigations. Mariani has tendered a number of proposed findings that are based upon filings made by the FEC in cases pending in other jurisdictions pertaining to the impact of soft money contributions. Notably, the FEC has not objected to such proposed findings of fact. The FEC contends in those other cases that its factual assertions are correct and that the underlying source materials are competent evidence. Furthermore, it is clear that FEC statements made in other litigations constitute "admissions of a party opponent" under FRE 801(d)(2). While the United States itself may not be "bound" by FEC's admissions, they are nonetheless admissible in this case. The United States was, of course, free to offer countervailing evidence, but it cannot compel exclusion of FEC's admissions.

Likewise, the United States' objections to statements made by FEC witnesses in other cases are generally meritless. As pointed out by Mariani, the declarations from which these statements were taken are among the documents to which the parties jointly stipulated, reserving the right to object only to relevance and materiality. As further pointed out by Mariani, these declarations were submitted by the FEC in other cases and were relied upon by the FEC in those cases in submitting "Statements of Material Fact Not in Genuine Dispute." [7] Under these circumstances, it is appropriate for Mariani to present these declarations as evidentiary support for proposed findings of fact.

### C. *The Competence of Various Witnesses*

Objections interposed only on behalf of the United States to various proposed findings of fact on the grounds that the witness declarations underlying the factual assertions are not based upon personal knowledge or reflect incompetent opinions are generally without merit. Mariani has sufficiently demonstrated that witnesses such as Leon Billings, formerly Executive Director of the Democratic Senatorial Campaign Committee, Alan Hassenfeld, Chairman of the Board of Hasbro, Inc. who has conveyed personal and corporate monies to political party committees, and others possess the requisite personal knowledge for the factual assertions contained in their declarations.[8] Moreover, Mariani has shown that the opinions of these and other witnesses are both rationally based on their perceptions and helpful to a clear understanding of their testimony or to the determination of facts in issue so as to be admissible under FRE 701. The fact that the FEC has not joined in the United States' challenge to the adequacy of the foundation for the testimony provided by these witnesses buttresses the con-

---

7. Mariani's Proposed Findings 82, 85, 136, 220, 221, 269, 271, 275, 277, 278, 280–82, 285, 286, 343, 354, 475, 484, 499, 503, 506, 507, 509, 516, 540, 545, 556, 559, 562, 575, and 579 are based on FEC statements in other cases that, in turn, rely upon witness declarations challenged by the United States in this case.

8. In those instances where I have found a witness' statement or a particular assertion to be without adequate foundation, I, of course, have not adopted a corresponding proposed finding of fact. *E.g.,* Mariani's Proposed Findings 103, 125, 126, 138, 269 and 285.

clusion that their testimony is indeed competent.

### D. Admissibility of List of Top Soft Money Contributors

■ The Government's objection to the admissibility of the Center for Responsive Politics' ("CRP") "Top Fifty Soft Money Contributors" list is also without merit.[9] The Government contends that the CRP figures should be excluded because they purportedly aggregate permissible "hard money" and "soft money" contributions. The declaration of the CRP Executive Director, submitted as Joint Exhibit 6, however, points out that CRP separated hard from soft money contributions in compiling its list. The fact that the CRP grouped contributions from corporate donors with contributions made by employees of those corporations is supported by a rational inference that the intent of the donations is to benefit the corporate entity itself. That it may not be possible to divine the motivation of an individual contributor who is affiliated with a large corporate donor may serve to undermine the point sought to be made by the evidence, but it does not compel its exclusion.

### E. Admissibility of FEC Notice of Proposed Rulemaking

■ Another objection amenable to discussion in a generalized manner is the Government's contention that the FEC Notice of Proposed Rulemaking ("NOPR") cannot form the basis for factual findings in this case.[10] The Government points out that the NOPR "makes *tentative* conclusions and factual assumptions about the corrosive effects of soft money on the federal campaign finance system and the need for reform." (Joint Response to Plaintiff's Proposed Findings of Fact, Dkt. Entry 69,

at 16; emphasis added.) That the statements in the NOPR are "tentative," however, does not detract from the fact that they nonetheless constitute admissions of a party opponent under FRE 801(d)(2). While the Government is entitled to present evidence that may persuade a factfinder that the "tentative" conclusions and assumptions are erroneous, it cannot avoid the admissibility of the NOPR in the first instance.

### F. Admissibility of the Thompson Committee Minority Report

■ The final objection worthy of general discussion concerns the proposed findings that rely upon the Thompson Committee Minority Report. This objection, interposed on behalf of the United States only, pertains to Mariani's Proposed Findings 10, 11, 12–14, 34–36, 46, 94, 104, 106, 121, 126, 143, 172–181, 183–188, 191–99, 360, 361, 364, 438, 466, 467, 476–78, 521, 542, 581, and 583–85.

Mariani contends that this court should admit parts of the Thompson Committee Minority Report under the exception to the hearsay rule applicable to public records and reports set forth in Federal Rule of Evidence 803(8)(C). One scholar has noted that "[t]he Rule 803(8)(C) hearsay exception goes far beyond the common law exception for public records, is controversial and complex, [and] raises numerous difficult evidentiary issues...."[11] The rule, in pertinent part, states:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> (8) Public records and reports. Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... (C) in civil

---

9. These objections pertain to Mariani's Proposed Findings 61–62, 64–68, 70–72, 75 and 77–80.

10. The objection to the NOPR impacts Mariani's Proposed Findings 28, 29, 55, 211, 212, 578.

11. Martin A. Schwartz, *Admissibility of Investigatory Reports in 1983 Civil Rights Actions—A User's Manual,* 79 Marq. L.Rev. 453, 456-7 (1996).

actions and proceedings ... factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

Mariani claims that the Thompson Committee Minority Report falls squarely within this hearsay exception, while the United States claims that the report is inadmissible because the "Minority Report's findings and conclusions were not adopted by the majority." (Dkt. Entry 70 at 7.) The United States ties this argument to the fact that the "report's findings must be 'authorized by law.'" *Id.* The United States argues in the alternative that if the court admits the evidence, the court should give that evidence little weight. *Id.* (citing cases of statutory construction in which courts paid little heed to the minority view).

Mariani responds to these arguments on various levels. First he notes that many of the findings of the Minority and Majority Reports "overlap." (Reply Br. in Supp. of Pl.'s Proposed Findings of Fact and Proposed Certified Questions, Dkt. Entry 93 at 24.) Next, he notes that the FEC, an intervenor-defendant in this case, itself offered portions of the Minority Report in an ongoing case, *Federal Election Comm'n. v. Colorado Republican Fed. Campaign Comm.*, Civil Action No. 89–N–1159 (D.Colo.). *Id.* Third, Mariani cites a long line of decisions purporting to support the admissibility of congressional reports. Finally, Mariani argues that he offers the evidence, not for its truth, but to show the "appearance of corruption." (Dkt. Entry 93 at 24.)

The seminal Supreme Court case of *Beech Aircraft v. Rainey*, 488 U.S. 153, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988), helped clarify the law relating to Rule 803(8)(C). The Court unanimously held that the rule has a broad application that includes both the "factual findings" and the "opinions" that accompany such findings. And it went on to emphasize the mechanisms trial courts possess to protect the integrity of evidence. The Court, in an extensive analysis of the ramifications of a liberal policy of admission under Rule 803(8)(C), discussed the Advisory Committee's comments on the rule.

> Nowhere in its comments is there the slightest indication that it even considered the solution of admitting only "factual" statements from such reports. Rather, the Committee referred throughout to "reports" without any such differentiation regarding the statements they contained .... Its solution as to their admissibility is clearly stated in the final paragraph of its report on this Rule. That solution consists of two principles: First, "the rule ... assumes admissibility in the first instance ...." Second, it provides "ample provision for escape if sufficient negative factors are present."

*Id.* at 166–7, 109 S.Ct. 439 (internal notes omitted). The Court went on to discuss those important "escape" mechanisms, including "safeguards built into other portions of the Federal Rules, such as those dealing with relevance and prejudice." *Id.* at 167–8, 109 S.Ct. 439. The Court also laid great emphasis on the "trustworthiness" evaluation Rule 803 requires.[12] Fi-

12. "Factors which may be of assistance in passing upon the admissibility of evaluative reports include: (1) the timeliness of the investigation, (2) the special skill or experience of the official, (3) whether a hearing was held and the level at which conducted, and (4) possible motivation problems suggested by *Palmer v. Hoffman*. Others no doubt could be added." Notes of Advisory Committee on Proposed Rules, Fed. Rules Evid. Rule 803, 28 U.S.C.A. (internal notes omitted). In his district court opinion in *Zenith Radio Corp. v. Matsushita*, 505 F.Supp. 1125, 1147 (E.D.Pa. 1980), *rev'd in part on other grounds*, 723 F.2d 238 (3d Cir.1983), *rev'd on other grounds*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), Judge Becker identified other pertinent factors, including the finality of the findings, the extent to which the findings are based on inadmissible or biased evidence, the procedural safeguards utilized, the existence of a record on which the findings are based,

nally, the Court noted that "the admission of a report containing 'conclusions' is subject to the ultimate safeguard—the opponent's right to present evidence tending to contradict or diminish the weight of those conclusions." *Id.* at 168, 109 S.Ct. 439.

While the *Beech* decision is not precisely on point in this case because the report at issue was not congressional, its holding is central to resolving the government's objections. The *Beech* decision validates liberal admissibility and then recognizes the built-in protections against extraneous evidence. Much of the decision focuses on the trial court's superior vantage point and ability to regulate the evidence through its discretion. *Id.* at 162, 109 S.Ct. 439.

Lower courts have explicitly addressed the admission of congressional reports. In *Hobson v. Wilson,* 556 F.Supp. 1157 (D.D.C.1982), *aff'd in part, rev'd in part,* 737 F.2d 1 (D.C.Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985), the court admitted into evidence portions of the *Staff Report of Select Committee to Study Governmental Operations with respect to Intelligence Activities* ("Church Report"), S.Rep. No. 94–755, Supp. Vol. 3. *Hobson* focused on the fact that "[t]he segments of the Church Committee Report submitted to the jury reflected adherence to appropriate standards of scholarly responsibility, investigative integrity, and trustworthiness." *Id.* at 1181.

Other courts have excluded congressional reports. In *Anderson v. City of New York,* 657 F.Supp. 1571 (S.D.N.Y.1987), the district judge found a congressional subcommittee report inadmissible because it lacked the "ordinary [indicia] of reliability." *Id.* at 1579. That court's decision, although a pre-*Beech* ruling, relied on the four main criteria the Advisory Committee laid out in the notes to the rule—the same trustworthiness criteria on which *Beech* placed so much emphasis. *Anderson,* 657 F.Supp. at 1578–9.

Professor Schwartz notes that "because it is assumed that public officials perform their duties properly, investigatory reports encompassed within Rule 803(8)(C) are presumed to be trustworthy. The burden is thus placed upon the party opposing the admissibility of the report to demonstrate its lack of reliability," (citing *Miller v. Field,* 35 F.3d 1088, 1090 (6th Cir.1994); *Montiel v. City of Los Angeles,* 2 F.3d 335 (9th Cir.1993).[13] This meshes well with the *Beech* Court's holding that the rule "presumes admissibility." *Beech,* 488 U.S. at 167, 109 S.Ct. 439.

In the matter *sub judice,* the United States hints at the report's untrustworthiness, but does not directly address it. Instead, it suggests that the report be excluded because, according to the United States, the Minority Report is not "authorized by law as required by Rule 803(8)(C)." (Dkt. Entry 70 at 7.) In making this argument, the United States does *not* assert that the Thompson Committee Report itself was not authorized by law. Moreover, the United States offers no concrete support that a minority report is not authorized by law. Instead, the United States cites many courts that have ignored minority views in statutory construction. (Dkt. Entry 70 at 7–8.) These cases are inapposite; Mariani does not offer the Minority Report for statutory construction, but rather to address the subject of the investigation, *i.e.,* campaign finance.

Rule 803(8)(C) requires that the "factual findings" must result from "an investigation made pursuant to authority granted by law." The Rule does not, however, require that the "factual findings" represent a majority view.

The nature of Congress is such, of course, that opposing views tend to be separated for political reasons. The United States, however, has not established that the mere separation of the Minority Report from the Majority Report proves

and the extent to which the findings represent an attempt to implement government policy.

**13.** Schwartz, *supra,* note 2 at 451.

that the Minority Report is not "authorized by law." In fact, Senate rules explicitly allow minority reports:

> If at the time of approval of a measure or matter by any committee (except for the Committee on Appropriations), any member of the committee gives notice of intention to file supplemental, *minority,* or additional views, that member shall be entitled to not less than three calendar days in which to file such views, in writing, with the clerk of the committee. *All such views* so filed by one or more members of the committee shall be included within, *and shall be a part of, the report* filed by the committee with respect to that measure or matter.

Senate Rules, XXVI; Committee Procedures, 10(c), 105th Cong., Congressional Information Service, Inc. 1998 (emphasis added). Clearly, the Minority Report meets the threshold requirement of being authorized by law.

The "rule of completeness" embodied in FRE 106 buttresses the conclusion that the Minority Report is to be regarded as "authorized by law." FRE 106 requires that a court allow the parties to demonstrate the overall tenor of a document. "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." *Id.*

Acceptance of only the Majority Report would be directly contrary to the concerns that Rule 106 addresses.[14] In the context of congressional reports, one must expect at least some polarity between the majority and minority. Allowing in one side without the other might do violence to the completeness doctrine that Rule 106 supports.

The Joint Stipulation of Facts notes that the committee "held 32 days of hearings ... took 200 depositions ... [and] received more than 1,500,000 pages of documents." *Id.* at ¶ 105. The investigation was timely, comprehensive, conducted by those with special skill and experience, and employed procedural safeguards. An extensive record exists. Thus, circumstantial guarantees of trustworthiness and reliability abound. Accordingly, the Minority Report will be admitted and its contents considered to the extent they are probative of any fact material to the issues presented by Mariani.

### G. *Remaining Objections*

The remaining objections do not require extensive discussion. As to Mariani's objections to the Government's proposed findings of fact, I have sustained the objection to proposed finding 7 for lack of evidentiary support. I have also declined to adopt those proposed Government Findings of Fact that simply recite excerpts of testimony from former Senator Alan K. Simpson (Government Findings of Fact 27, 31–36.) I have also carefully considered objections to proposed Government findings that pertained to phraseology (e.g., Government Proposed Findings 21, 22 and 23) and have modified those proposed findings so they are consistent with the evidence and the law.

█ As to the remaining objections interposed by the FEC and/or the United States, I have carefully considered contentions that certain factual assertions were actually legal conclusions. I have also carefully considered how certain findings proposed by Mariani have been phrased. As noted above, I have generally not accepted proposed findings of fact that merely quote testimony or statements. I have also not accepted proposed findings that

---

**14.** The United States does not specifically address the Majority Report in its arguments, it objects only to the Minority Report. (See Joint Stipulation of Facts ¶ 104 *et seq.*, Dkt. Entry 53; Def.'s Mem. in Supp. of its Objec- tions to Pl.'s Proposed Findings of Fact, Dkt. Entry 70; and Def. and Intervenor–Def.'s Joint Resp. to Pl. Mariani's Proposed Findings of Fact and Proposed Certified Questions, Dkt. Entry 69 at Appendix 1.)

are vague or are otherwise inappropriate for a factual finding. (*E.g.*, Mariani's Proposed Findings 97, 214, 222, 257, 315, 324, 343, 471, 472, 541, 545 and 546.) As noted above, I have also eliminated a number of proposed findings of fact that, although not necessarily disputed by FEC and/or the United States, are cumulative and redundant. Objections to findings of fact that cite newspaper and magazine articles (Mariani's proposed findings 518–24, 534–535, 541, 560 and 561), interposed only on behalf of the United States, have been overruled to the extent that the articles have not been offered for the truth of the matter asserted, but instead to demonstrate the appearance of corruption created by soft money contributions. As explained in *Democratic Party v. National Conservative Political Action Committee*, 578 F.Supp. 797, 829 (E.D.Pa.1983), *aff'd in part, rev'd in part*, 470 U.S. 480, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985), "[t]he hearsay evidence rule does not bar ... the admissibility of ... authenticated news reports when used to show public perceptions of corruption, rather than corruption in fact." Objections that proposed findings mischaracterize evidence or are vaguely stated have also been taken into account in determining the facts to be found in this case.

## H. *Summary*

In summary, I have carefully parsed the parties' submissions and have rejected proposed findings to which meritorious objections pertain. Having eliminated the objectionable proposed findings, there remain more than 400 of the 600+ findings proffered by the parties. As noted above, the parties have stipulated to 117 facts, and the parties are in remarkable agreement as to the accuracy of an overwhelming majority of the additional statements of fact each side has proffered. Where there is no serious dispute as to the accuracy of a parties' proposed finding, I have relied upon the absence of dispute in making a particular finding. Where, however, there is a dispute, I have examined the underlying documents cited by the parties and have either adopted a proposed finding verbatim or modified it to reflect the contents of the underlying evidentiary submission.

After much deliberation as to the appropriate approach to be taken in this unusual posture of deciding only the facts, not the issues of law presented by the parties, I have opted to make detailed findings as opposed to conclusory, ultimate findings. While ultimate factual findings could be made (and are indeed set forth in the Conclusion section to this opinion), I determined that it was appropriate to defer to the approach advanced by the party challenging the validity of the corporate and conduit contributions bans, with the district judge's role being to resolve evidentiary objections and decide contested facts. The court of appeals will thus be presented with extensive findings that comprehensively describe the soft money system, setting forth in sometimes excruciating detail how corporations can give unlimited amounts of money that influence elections and grant the donors access to elected officials and those running for office.

Consistent with the foregoing, I now set forth as findings of fact the following:

## Findings of Fact

## I. *BACKGROUND FACTS*

### A. *The Litigation*

1. In October 1997, defendant UNITED STATES OF AMERICA filed an indictment in this Court charging plaintiff, RENATO P. MARIANI, a citizen and resident of the State of Pennsylvania who is eligible to vote for the office of President of the United States, and other individuals with, *inter alia,* violations of the Federal Election Campaign Act, as amended ("FECA"). That action, *United States v. Mariani,* No. 3:CR–97–225, is presently pending before this Court. Joint Stipulation of Facts ("Joint Stip.") ¶ 1. A copy of

the Indictment is Joint Exhibit ("JEx.") 264.[15]

2. According to the Indictment, Mr. Mariani was the president, treasurer and 25% shareholder of Empire Sanitary Landfill, Inc. ("Empire") and Danella Environmental Technologies, Inc. ("Danella"). The Indictment charges that between August 1994 and December of 1996, Mr. Mariani and other officers and employees of Empire and Danella sought to make campaign contributions to a number of candidates for federal election. The campaigns to which they allegedly contributed were those of Presidential hopefuls Bob Dole, Bill Clinton and Arlen Specter, Senatorial candidates Rick Santorum, Chuck Haytaian, Richard Duhaime and Max Baucus, and candidates for the House of Representatives Frank Pallone, Jr., Jon Fox and Bill Paxon. Indictment at ¶ 23; Joint Stip. ¶ 2.

3. The Indictment alleges that Mr. Mariani and the other Empire/Danella officers and employees solicited numerous Empire and Danella employees, business associates, friends and family members to make contributions of $1,000 per person (or in one case $5,000 in the name of a political action committee) to the campaigns of the chosen candidates. Indictment at ¶ 21 and Counts 14–134 (listing individual contributions). According to the Indictment, these contributions were reimbursed either directly or indirectly by Empire. Indictment at ¶ 21. It is also alleged that Mr. Mariani and other officers and employees at Empire and Danella made individual contributions to these federal candidates which were also reimbursed by Empire. *Id.;* Joint Stip. ¶ 3.

4. Paragraph 10 of the indictment in *United States v. Mariani*, 3:CR–97–225 (M.D.Pa.), alleges that in 1995, Empire retained a D.C. lobbying firm "to have an impact on legislation and policies which could affect the flow of interstate waste to the landfill. Specifically, Empire desired to have an impact on the reconfiguration of the Interstate Transportation of Municipal Waste bill which was pending in the 104th Congress." The Indictment alleges that in April 1995, Mr. Mariani and other officers and employees of Empire and Danella contacted employees, associates, friends and family members in an effort to raise funds for the New Jersey Steering Committee, a state fundraising arm of the Dole campaign. Indictment at ¶¶ 25–26. Contributors allegedly were asked to write personal checks in amounts of $1,000 (or, in the case of couples, $2,000) and were reimbursed with Empire corporate funds. *Id.* at ¶¶ 26, 28–31. It is also alleged that on April 29, 1995, Mr. Mariani and another defendant in the criminal case, Michael Serafini, attended a Steering Committee luncheon at which they handed over an envelope containing the contributions to Dole campaign officials. *Id.* at ¶ 27. When the Dole campaign reported the contributions to the Federal Election Commission ("FEC"), its filing allegedly attributed these $80,000 worth of contributions to the individual contributors, rather than Empire. *Id.* at ¶ 32; Joint Stip. ¶ 4. The Dole contributions came approximately 10 days prior to a crucial vote in the Senate on the Interstate Transportation of Municipal Waste bill. Dole was the Senate majority leader at the time.

5. As a result of this alleged conduct, the Indictment charges Mr. Mariani (and others) with criminal violations of FECA. Specifically, Mr. Mariani is charged with violations of 2 U.S.C. §§ 441b and 441f. *Id.;* Joint Stip. ¶ 5.

6. Empire had made substantial soft money contributions at about the same time it engaged in the hard money scheme alleged in the indictment. For example, Empire made a $ 50,000 contribution to the Democratic National Committee between November 28, 1995 and April 26,

---

**15.** References to "JEx." are to the exhibits the parties have jointly agreed should be included in the evidentiary record in this action. A complete list of those exhibits is set forth at pp. 40–75 of the Joint Stipulation of Facts.

1996; a $ 20,000 contribution to the Senate President's Committee on October 19, 1995; and, a $ 15,000 contribution to the Republican National Committee on February 1, 1995. These soft money contributions do not form part of the indictment.

7. Section 441b of FECA prohibits any corporation from making any contribution in connection with any campaign for federal office and provides that it is unlawful for any officer of a corporation to consent to any prohibited corporate contribution. Section 441f of FECA, the conduit contribution ban or "anti-conduit" provision, prohibits one from making a contribution "in the name of another person" or "knowingly permit[ting] his name to be used to effect such a contribution." 2 U.S.C. §§ 441b and 441f.

8. The purpose of the corporate contribution and conduit contribution bans is to avoid corruption and the appearance of corruption. Simpson Dep. at 66, [J.Ex. 38].

9. Mr. Mariani moved to dismiss all of the FECA charges in the Indictment, and simultaneously instituted this action against the United States seeking declaratory relief pursuant to 2 U.S.C. § 437h. The FEC was thereafter granted leave to intervene in this action as a defendant. Joint Stip. ¶ 6.

## B. *The Witnesses in this Case*

10. The parties have stipulated that the testimony of the following listed witnesses should be included in the evidentiary record in this action.[16]

(a) *Professor Paul S. Herrnson.* Professor Herrnson is a Professor of Government and Politics at the University of Maryland and a nationally recognized expert on campaign finance legislation. Professor Herrnson was retained by the FEC as an expert witness in this action and in *Repub-*

*lican National Committee v. Federal Election Commission* (No. 98–CV–1207 (WBB))(D.D.C.) (hereinafter "*RNC v. FEC*"), an action presently pending before the federal district court in the District of Columbia. Professor Herrnson's Professional Statement in *RNC v. FEC,* which was incorporated in his report in this action, is JEx. 17; his supplemental report in this action is JEx. 18. Drafts of both reports were submitted to FEC counsel for their review and comments before they were finalized. Deposition of Paul S. Herrnson, *Mariani v. United States* ("Herrnson Dep.") at 28, 32–33. Professor Herrnson's curriculum vitae is annexed to JEx. 17.

(b) *Alan K. Simpson.* Mr. Simpson, who served as a United States Senator from Wyoming from 1978–1996, was retained by plaintiff as an expert witness in this action. His affidavit is JEx. 1; his deposition transcript (with exhibits) is JEx. 38.

(c) *Daniel H. Murray.* Mr. Murray is a government relations specialist who has engaged in lobbying activities for corporate clients for more than 16 years. His affidavit, which was prepared at the request of plaintiff's counsel in this action, and which was also proffered by the FEC to the district court in support of its summary judgment motion in *RNC v. FEC,* is JEx. 2; his deposition transcript (with exhibits) is JEx. 37.

(d) *Dale Bumpers.* Dale Bumpers served as a United States Senator from the State of Arkansas from 1975 through 1998. Before being elected to the Senate, Mr. Bumpers also served as the Governor of Arkansas from 1971–1975. At the request of the FEC, Mr. Bumpers prepared a declaration, dated December 22, 1998, that was proffered by the FEC in support of its motion for summary judgment in *RNC v. FEC.* That declaration is JEx. 3.

---

**16.** The Government asserted an objection as to all of the witness statements, claiming that such factual materials are neither relevant nor material to the issues here. Joint Stip. at 40 n.2. For the reasons set forth above, those objections, for the most part, have been overruled.

(e) *Paul Simon.* Mr. Simon served in Congress for approximately 22 years, first as a Representative and then later as a Senator from Illinois. At the request of the FEC, Mr. Simon prepared a declaration, dated May 3, 1997, that was proffered by the FEC in support of its motions for summary judgment in both *FEC v. Colorado Republican Federal Campaign Committee* (Civil Action No. 89–N–1159) (D.Colo.) (hereinafter *"FEC v. CRFCC"*) and *RNC v. FEC.* That declaration is JEx 9.

(f) *Timothy E. Wirth.* Mr. Wirth served in Congress for approximately 18 years, first as a Representative and then later as a Senator from Colorado. At the request of the FEC, Mr. Wirth prepared a declaration, dated May 5, 1997, that was proffered by the FEC in support of its motions for summary judgment in both *FEC v. CRFCC* and *RNC v. FEC.* That declaration is JEx 10.

(g) *Christopher Shays.* Since August of 1987, Congressman Shays has served as a Member of the United States House of Representative, representing the Fourth District of the State of Connecticut. At the request of the FEC, Congressman Shays prepared a declaration, dated December 7, 1998, that was proffered by the FEC in support of its motion for summary judgment in *RNC v. FEC.* That declaration is JEx. 5.

(h) *Martin Meehan.* Congressman Meehan has served as a Member of the United States House of Representatives, representing the Fifth District of the State of Massachusetts, since January 1993. At the request of the FEC, Congressman Meehan prepared a declaration, dated November 6, 1998, that was proffered by the FEC in support of its motions for summary judgment in both *FEC v. CRFCC* and *RNC v. FEC.* That declaration is JEx. 4.

(i) *R. William Johnstone.* Mr. Johnstone served as Legislative Assistant and then Administrative Assistant to Congressman, and then Senator, Wyche Fowler from 1977 through January 1993. Mr. Johnstone also served as campaign manager for Mr. Fowler during his 1986 and 1992 Senate campaigns. At the request of the FEC, Mr. Johnstone prepared a declaration, dated April 7, 1997, that was proffered by the FEC in support of its motions for summary judgment in both *FEC v. CRFCC* and *RNC v. FEC.* His declaration is JEx. 15.

(j) *Leon G. Billings.* Mr. Billings was the Executive Director of the Democratic Senatorial Campaign Committee ("DSCC") from 1982–1983. At the request of the FEC, Mr. Billings prepared a declaration, dated April 15, 1997, that was proffered by the FEC in support of its motions for summary judgment in both *FEC v. CRFCC* and *RNC v. FEC.* That declaration is JEx 11.

(k) *Robert Hickmott.* Mr. Hickmott has served as an Associate Finance Director of the Democratic National Committee (1980), the Executive Director of the Democratic Business Council (1981), the National Finance Director for Timothy Wirth's Senatorial campaign (1985–1986) and the Deputy Executive Director of the Democratic Senatorial Campaign Committee ("DSCC") (1991–1992). At the request of the FEC, Mr. Hickmott prepared a declaration, dated April 8, 1997, that was proffered by the FEC in support of its motions for summary judgment in both *FEC v. CRFCC* and *RNC v. FEC.* That declaration is JEx 12.

(*l*) *Robert Rozen.* Mr. Rozen worked for Senator Wendell Ford (1980–1985) and Senator George Mitchell (1985–1995), handling a variety of financial legislative issues for both. Both Senator Ford and Senator Mitchell chaired the Democratic Senatorial Campaign Committee ("DSCC") while Mr. Rozen worked for them. At the request of the FEC, Mr. Rozen prepared a declaration, dated April 17, 1997, that was proffered by the FEC in support of its motions for summary judgment in both

*FEC v. CRFCC* and *RNC v. FEC*. That declaration is JEx 13.

(m) *Professor Clyde Wilcox.* Mr. Wilcox is a Professor of Government at Georgetown University specializing in public opinion research. At the request of the FEC, Mr. Wilcox prepared a statement offering his expert views about public perceptions concerning the campaign finance system that was proffered by the FEC in support of its motions for summary judgment in both *FEC v. CRFCC* and *RNC v. FEC*. His statement is JEx. 20.

(n) *Frank J. Sorauf and Jonathan S. Krasno.* Mr. Sorauf and Mr. Krasno are political science professors at the University of Minnesota and Princeton University, respectively. At the request of the FEC, they prepared a report entitled "Political Party Committees and Coordinated Spending", that was proffered by the FEC in support of its motions for summary judgment in both *FEC v. CRFCC* and *RNC v. FEC*. That report is JEx 19.

(o) *Charles E.M. Kolb.* Since September of 1997, Mr. Kolb has served as the President of the Committee for Economic Development ("CED"), an independent, non-partisan research and policy organization comprised of more than 250 prominent business leaders and educators. Between November 1997 and early 1999, the CED conducted a comprehensive study of the 1996 election specifically focusing on the campaign finance system. At the request of the FEC, Mr. Kolb prepared a declaration (attaching the CED's final report and policy statement), dated April 29, 1999, that was proffered by the FEC in support of its motion for summary judgment in *RNC v. FEC*. That declaration is JEx. 16.

(p) *Alan H. Hassenfeld.* Since 1989, Mr. Hassenfeld has served as Chairman of the Board and Chief Executive Officer of Hasbro, Inc., a global manufacturing company based in Rhode Island with annual revenues in excess of $3 billion. At the request of the FEC, Mr. Hassenfeld prepared a declaration, dated April 19, 1999, that was proffered by the FEC in support

of its motion for summary judgment in *RNC v. FEC*. That declaration is JEx. 14.

(q) *Larry Makinson.* Mr. Makinson has been a staff member since 1988 of the Center for Responsive Politics, a non-partisan non-profit research organization that monitors and analyzes campaign contributions in federal elections. He currently serves as its executive director. Mr. Makinson submitted a declaration in this action in response to a subpoena issued by plaintiff's counsel. That declaration is JEx. 6.

(r) *Pat Huyck.* Mr. Huyck has been an employee of the Republican National Committee for 16 years and currently serves as its Director of Accounting. Mr. Huyck submitted a declaration in this action in response to a subpoena issued by plaintiff's counsel. That declaration is JEx. 7.

(s) *Joseph E. Sandler.* Mr. Sandler was the General Counsel of the Democratic National Committee from 1995–1996. Mr. Sandler submitted a declaration in this action in response to a subpoena issued by plaintiff's counsel. That declaration is JEx. 8.

C. *The Documentary Evidence in this Case*

11. On March 11, 1997, the United States Senate voted unanimously to authorize the Governmental Affairs Committee to conduct an investigation of alleged illegal or improper activities in connection with 1996 federal election campaigns. Joint Stip. ¶ 104.

12. Over the course of nine and a half months, the Committee issued 427 subpoenas and held 32 days of hearings at which some 70 witnesses testified. Committee staff took 200 depositions, conducted more than 200 witness interviews, and received more than 1,500,000 pages of documents in response to the Committee's subpoenas. Finally, the Committee memorialized its findings in a report, including both Majority and Minority views. *See Investigation of Illegal or Improper Activities in Connection with 1996 Federal Election Cam-*

*paigns*, S.Rep. No. 105–167 (1998) (hereinafter "Report"). Joint Stip. ¶ 105.[17]

13. Currently, the Federal Election Commission is in the midst of a rulemaking proceeding concerning the use of soft money by political parties. Notice of Proposed Rulemaking, 63 Fed.Reg. 37721, 37722 (1998).

14. On July 13, 1998, the FEC issued its Notice of Proposed Rulemaking: "Prohibited and Excessive Contributions; Soft Money; Proposed Rule," 63 Fed.Reg. 37721 (1998) (to be codified at 11 C.F.R. Pts. 102, 103 & 106) ("FEC Notice of Proposed Rulemaking").[18]

15. In support of its motion for summary judgment in *FEC v. CRFCC*, the FEC submitted "Federal Election Commission's Statement of Material Facts Not in Genuine Dispute" to the district court ("FEC Statement of Facts I"). Joint Stip. ¶ 114. It is PSEx. 1.[19]

16. In support of its motion for summary judgment in *RNC v. FEC*, the FEC submitted "Defendant Federal Election Commission's Statement of Material Facts" to the district court ("FEC Statement of Facts II"). Joint Stip. ¶ 116. It is PSEx. 2.

17. In support of its motion for summary judgment in *RNC v. FEC*, the FEC submitted "Federal Election Commission's Memorandum In Support of its Motion for Summary Judgment" to the district court ("FEC RNC Mem."). Joint Stip ¶ 117. It is PSEx. 3.

## II. *THE FEDERAL ELECTION CAMPAIGN ACT*

### A. *Historical Background*

18. FECA, enacted by Congress in 1971, was a comprehensive attempt to regulate the financial aspects of federal political campaigns. *See* Federal Election Campaign Act of 1971, Pub.L. No. 92–225, 86 Stat. 3. FECA has since been amended a number of times.

19. In response to perceived abuses in the 1972 presidential election, in 1974 Congress enacted the Federal Election Campaign Act Amendments of 1974, Pub.L. No. 93–443, 88 Stat. 1263. The Amendments placed further restrictions on campaign contributions and expenditures and, among other things, adopted a system for public financing of presidential election campaigns.

20. Under FECA, it is illegal for individuals to make contributions of more than $1,000 to a candidate for federal office per election, $20,000 per year to a national party's political committees, $5,000 per year to any other political committee, and $25,000 per year in total contributions to all federal candidates, party committees, or political committees. 2 U.S.C. § 441a(1), (3).

21. Under FECA, it is illegal for political action committees ("PACs") to make contributions of more than $5,000 to a federal candidate per election, $15,000 per year to a national party's political committees and $5,000 per year to any other political committee. 2 U.S.C. § 441a(2).

22. Under FECA, it is illegal for corporations and labor unions to make any contributions in connection with a candidate's election for federal office from their own treasury funds. 2 U.S.C. § 441b(a).

23. The ban on corporate contributions to candidates for federal office has been in

---

17. The parties have stipulated that the Thompson Committee Report should be included in the evidentiary record in this action. It is JEx. 21. Volumes I–III of the Report, containing Statements by the Majority, are cited herein as "Majority Report." Volumes IV–VI, containing statements by the Minority, are cited herein as "Minority Report."

18. The parties have stipulated, subject to the Government's now overruled objections as to relevance and materiality, that the FEC Notice of Proposed Rulemaking should be included in the evidentiary record in this action. It is JEx. 39.

19. "PSEx." is the designation for Plaintiff's Supplemental Exhibits used herein.

effect for almost a century, since the Tillman Act became law in 1907. Professional Testimony of Paul S. Herrnson, *Mariani v. United States,* No. 3:CV–98–1701 (M.D.Pa.) Herrnson Report at 2 [JEx. 18].

24. The prohibitions in section 441b apply equally to both corporations and labor organizations, although its coverage of unions was added long after the original 1907 statute, which applied only to corporations.

25. 2 U.S.C. § 441b has always been applied only to federal elections.

26. The anti-conduit provision in 2 U.S.C. § 441f applies to *all* contributions, not just those from corporations.

27. One purpose of 2 U.S.C. § 441f is to prevent the circumvention of the ban on corporate and union contributions. Section 441f similarly helps to prevent circumvention of the limits on contributions by individuals and groups in 2 U.S.C. § 441a and the prohibition on contributions by foreign nationals in 2 U.S.C. § 441e. Section 441f also ensures that proper disclosure of the actual sources of campaign contributions occurs in federal elections. These provisions of the law, as well as section 441b, are intended to promote a fair, open, and legitimate campaign finance system and to prevent corruption or the appearance of corruption in federal elections. Herrnson Report at 3 [JEx. 18].

28. FECA also contains extensive disclosure and reporting requirements for candidates and political committees, as well as for other entities that make independent expenditures.

29. In 1976, the United States Supreme Court issued its decision in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). In upholding FECA's individual contribution limits while striking down the statute's corresponding expenditure limits, the Court drew a distinction between contributions to candidates and independent political spending.

30. As a result of numerous judicial decisions and FEC advisory opinions following the Supreme Court's decision in *Buckley,* by 1980 a distinction had developed between what is often referred to as "hard" and "soft" money in the campaign finance context.

**B. *The Distinction Between "Hard" and "Soft" Money***

31. Entities that are prohibited from making contributions to a federal (*i.e.,* "hard money") account and individuals wishing to make donations in excess of the contribution limits set forth in FECA have generally been permitted to direct those donations to a nonfederal (*i.e.,* "soft money") account, even though donations to nonfederal accounts are often used for activities that have an impact on federal elections. FEC Notice of Proposed Rulemaking at 37727 [JEx. 39].

32. Many political party committees (such as the Republican or Democratic National Committees) solicit two kinds of contributions: those that can permissibly be used under the Federal Election Campaign Act "for the purpose of influencing" federal elections, 2 U.S.C. § 431(8)(A)(i), and those that may not be used for that purpose. Contributions that are permissible under the Act are often referred to as "hard money" contributions. Contributions that are not permissible—*e.g.,* contributions in excess of the section 441a dollar limits, all contributions from corporate and labor organization general treasuries, and contributions from federal contractors— are commonly known as "soft money." Although this soft money cannot be contributed to federal candidates or otherwise used to influence federal elections, political party committees may deposit such funds in a separate account to be used for state and local campaign activity to the extent allowed by state law, and for limited, party-building activities specifically designated in the statute. *See Colorado Republican,* 518 U.S. at 616, 116 S.Ct. 2309; 2 U.S.C. § 431(8)(B); 11 C.F.R. § 102.5.

33. All contributions to federal candidates' campaigns are by definition hard

money contributions. *See* 2 U.S.C. § 431(8)(A); *California Medical Ass'n. v. FEC,* 453 U.S. 182, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981); *FEC v. Ted Haley Congressional Comm.,* 852 F.2d 1111 (9th Cir.1988).

34. Corporations cannot give money to federal candidates.

35. Corporate donations to political party committees have never been prohibited by FECA.

36. There are important legal distinctions among 1) expenditures made from the treasuries of corporations, labor unions, or other groups that are intended to influence the outcome of a federal election without expressly advocating a federal candidate's election or defeat, 2) corporation and union treasury funds that are contributed to political parties that later use these monies to influence the outcome of a federal election without expressly advocating a federal candidate's election or defeat, 3) hard money contributions from individuals, political parties, or PACs to federal candidates, 4) monies from the treasuries of corporations, labor unions, or other groups if contributed directly to a federal candidate, and 5) monies from the treasuries of corporations, labor unions, or other groups that are given to an individual who serves as a conduit for contributing the money to a federal candidate. Herrnson Report at 3–4 [Jex 18].

37. An important legal distinction among the preceding activities is based on the amount of control that the candidate has over them. Party funds that originate as contributions from corporation or union treasuries are at no time directly under the candidate's control. Nonetheless, candidates often are involved in the collection of party soft money, and many candidates expect that some of the party monies they help collect will be used to help their election efforts. *Id.* at 4.

38. Money that a federal candidate has complete control over, including hard money raised from individuals, parties, PACs,

or the candidate himself or herself, is money that a candidate can spend any way that he or she wishes (within the confines of the law). Money that both a candidate and a party have some control over, such as coordinated expenditures (referenced as § 441a(d) under FECA), is often subject to some negotiation. The fact that party committees usually influence how these funds are spent occasionally leads to friction between a candidate's campaign and the party organization making the expenditure. *Id.* at 4.

39. Candidates have less control over party soft money expenditures than funds contributed to them directly. Party soft money that is raised with the assistance of a federal candidate may be spent, in conjunction with hard money, in accordance with allocation formulas promulgated by the FEC, for party-building activities, agenda-setting efforts, issue advocacy ads, voter mobilization drives, and a variety of other activities designed to help the election of candidates apart from the candidate who helped raise the money. Moreover, some party agenda-setting efforts, issue ads, and other activities may actually be contrary to a candidate's wishes. For example, the issue ads that the Democratic Senatorial Campaign Committee spent to help reelect Wisconsin Democrat Russell Feingold to the Senate were made over the candidate's objections. Feingold stated that outside spending was against his principles. It also was not consistent with his image and campaign message. *Id.* at 4–5; 11 C.F.R. Part 106.

40. Hard money can be spent to explicitly advocate the election of a federal candidate; "expenditures," as defined in FECA, from corporation or union treasuries cannot presently be used directly for that purpose. Herrnson Report at 5 [JEx. 18].

41. Under the current rules, parties can only use soft money to finance issue advocacy advertisements and other campaign activities carried out in a specific state using a ratio of hard to soft money

that reflects the number of federal, state, and local offices that are on the ballot in a particular state. *Id.*

42. Although there are important legal distinctions between "hard" and "soft" money contributions, soft money plays an important role in contested races for federal elective offices. Soft money is, in essence, the "black market" economy of campaign finance. Ceilings on individual contributions to federal candidates and the party's federal campaign accounts have encouraged wealthy individuals to look for alternative ways to spend money in elections. Prohibitions against corporations, trade associations and unions contributing or spending funds from their treasuries have had similar effects. Dep. of Prof. Paul S. Herrnson in *Mariani v. United States* ("Herrnson Dep.") at 51–52 [JEx. 36]. Soft money has proved to be the means by which wealthy individuals and corporations evade FECA restrictions in order to influence elections and secure access to elected officials and candidates for federal elective office.

## III. *RAISING SOFT MONEY*

### A. *Soft Money Is Easier To Raise Than Hard Money*

43. Soft money is much easier to raise than hard money because it can be donated in large sums. Because parties can raise more soft money, they spend more soft money. Herrnson Dep. at 81 [JEx. 36].

44. One reason soft money is easier to raise is that entities such as corporations, which are barred from contributing directly to campaigns, are permitted to donate soft money. *Id.*

45. Although corporations are flatly barred from making any contributions to campaigns in hard money, they may at the same time make gifts in literally unlimited amounts to political parties via soft money. Herrnson Dep. at 91–92 [JEx. 36].

46. Some soft money contributions are collected from corporations, unions and wealthy individuals in excess of $1 million. *Id.* at 40.

47. Although FECA bans businesses and unions from making contributions directly to candidates, and limits individuals to contributions of $1,000 and PACs to contributions of $5,000 per candidate during each phase of the election, the law has not prevented wealthy individuals, corporations, and other collective entities from playing important roles in campaign finance. *Id.* at 48–49.

48. A 1992 DNC fundraising guide entitled "Democratic National Committee DNC Victory Fund '92" stated as follows:

*"HOW TO WRITE THE CHECK(S)*

(A) Federal Contributions from individuals of up to $20,000 should be made by personal check payable to:

*DNC VICTORY '92/FEDERAL ACCOUNT*

(B) Non–Federal Contributions from individuals can be made payable to:

*DNC VICTORY '92/NON–FEDERAL ACCOUNT"*

*Democratic National Committee Fund–Raising Guide, 1992,* Fig. 5.1 *in* Herbert E. Alexander & Anthony Corrado, *Financing the 1992 Election* 112 (1995); Joint Stip. ¶ 81.

49. The same document stated:

*"HOW TO WRITE CORPORATE/UNION CHECK(S)*

Checks from corporate treasury funds or labor union treasury funds may be written in an *unlimited* amount to:

*DNC VICTORY '92/NON–FEDERAL ACCOUNT"*

*Id.* at 113 (emphasis in original); Joint Stip. ¶ 82.

50. Soft money contributions have provided corporations, labor unions, and wealthy individuals with a way around FECA's restrictions on the amounts that may be contributed by individuals and the ban on corporate contributions to candidates for federal elective office. Minority Report at 7516 [JEx. 21].

## B. *The Growth of Soft Money*

51. It is estimated that in the 1980 election cycle, the national party committees raised and spent approximately $19 million in soft money funds. Anthony Corrado, *Giving, Spending and "Soft Money"*, 6 J.L. & Pol'y 45, 50–51 (1997) [JEx. 33].[20]

52. In the 1987–1988 election cycle, it is estimated that approximately $45 million was raised and spent in soft money funds. *Id.* at 51.

53. The RNC estimates that it raised and spent approximately $22 million in nonfederal funds during the 1987–1988 election cycle. Huyck Decl. at ¶ 7 [JEx. 7].

54. In the 1991–1992 election cycle, the total amount of soft money raised by the national party committees, as set forth in their reports to the FEC, was approximately $86 million ($49.8 million by the Republican national party committees and $36.3 million by the Democratic national party committees). Federal Election Commission, *National Party Nonfederal Activity* (visited April 13, 1999) <http://www.fec.gov/finance/softsum.htm> [JEx. 40]; Joint Stip. ¶ 9.

55. In the 1993–1994 election cycle, the total amount of soft money raised by the national party committees, as set forth in their reports to the FEC, was approximately $101.7 million ($52.5 million by the Republican national party committees and over $49.1 million by the Democratic national party committees). *Id.;* Joint Stip. ¶ 10.

56. During the 1995–1996 election cycle, the Republican national party committees reported receipts of approximately $138.2 million and expenditures of approximately $149.7 million in soft money, increases of 178 percent and 224 percent respectively, when compared to the similar period in 1991–1992. Federal Election Commission, *FEC Reports Major Increase in Party Activity for 1995–96* (FEC press release), March 19, 1997, at 1 [JEx. 47]; Joint Stip. ¶ 11.

57. During the 1995–1996 election cycle, the Democratic national party committees reported approximately $123.9 million in receipts and approximately $121.8 million in expenditures of soft money, increases of 242 percent and 271 percent respectively, from the similar period in 1991–1992. *Id.;* Joint Stip. ¶ 12.

58. The growth in soft money since 1980 has been fueled by the solicitation of large contributions of $100,000 or more from corporations, as well as from wealthy individuals and labor unions, and the corresponding ability of the party committees to spend such funds. Herrnson Dep. at 94–95 [JEx. 36].

59. In addition to the increase in the total dollar amount of soft money contributions over the last decade, there was also an increase in the number of contributions made to the party committees' nonfederal accounts that would have been prohibited under FECA if they had been made to a

20. As used herein, the term "election cycle" refers to the period from January 1 of the year preceding the election through December 31 of the year during which the election occurs. Joint Stip. ¶ 7. The term "national party committees" refers to the Republican National Committee ("RNC"), National Republican Senatorial Committee ("NRSC"), National Republican Congressional Committee ("NRCC"), Democratic National Committee ("DNC"), Democratic Senatorial Campaign Committee ("DSCC") and Democratic Congressional Campaign Committee ("DCCC"). The term "Republican Party committees" refers to the RNC, NRSC and NRCC. The term "Democratic Party committees" refers to the DNC, DSCC and DCCC. Joint Stip. ¶ 8.

federal account. FEC Notice of Proposed Rulemaking at 37727 [JEx. 39].

60. During the 1992 presidential election cycle, the national party committees' nonfederal accounts received at least 381 individual contributions of more than $20,000. During the 1992 presidential election cycle, the national party committees' nonfederal accounts received about 11,000 soft money contributions from sources that are prohibited from making contributions under federal law into federal accounts. Joint Stip. ¶¶ 14–15.

61. In the 1995–1996 election cycle, the national party committees' non-federal accounts received close to 1,000 individual contributions in excess of $20,000, and approximately 27,000 contributions from sources that are prohibited from contributing to federal accounts. Joint Stip. ¶ 16.

### C. *Sources of Soft Money*

62. According to reports filed with the FEC, during the 1994 and 1998 election cycles, corporations donated over 50% of all itemized soft money contributions. Committee for Economic Development, *Investing in the People's Business: A Business Proposal for Campaign Finance Reform* at 26 (1999) ("[f]igures based on unadjusted FEC data"). Declaration of Charles E.M. Kolb in *RNC v. FEC*, Attachment at 26 [JEx. 16].

63. Corporate donations were especially important to the growth of soft money in 1996. For example, a 1997 analysis conducted by the *Los Angeles Times* of the political donations made by the 544 largest public and private companies revealed that soft money donations by these corporations had more than tripled between 1992 and 1996, growing from $16 million to $51 million. Herrnson Dep. at 98 [JEx. 36].

64. Common Cause compiled the following list of soft money donors of $250,000 or more to Republican party committees from January 1, 1995, through June 30, 1996, including how much they contributed, and sent the list to various newspapers. (The dollar figures encompass donations from subsidiaries and company executives).

Philip Morris Co. Inc.–1,632,283

RJR Nabisco Inc.–970,450

Amer. Financial Group–794,000

Atlantic Richfield Co.–615,175

US Tobacco Co.–448,768

Joseph E. Seagram & Sons Inc.–435,000

Eli Lilly & Co. 425,000

AT & T–417,590

Brown & Williamson Tobacco Corp.–400,000

Burlington Northern Santa Fe Corp.–367,000

Bristol–Meyers Squibb Co.–355,000

Cintas Corp.–355,000

News Corp.–351,500

Amway Corp.–350,000

Reliance Group Holdings Inc.–340,000

Tele–Communications Inc.–340,000

Chevron Corp.–336,650

AG Spanos Construction–335,000

Anschutz Corp.–335,000

Archer Daniels Midland Co.–335,000

Enron Corp.–320,000

Limited Inc.–320,000

Nynex Corp.–313,505

Forstman Little & Co.–309,000

Pfizer Inc.–306,000

Tobacco Institute–303,250

Coca–Cola Co.–292,580

PaineWebber Group Inc.–290,000

Time Warner Inc.–290,000

Travelers Group–284,025

Anheuser–Busch Co. Inc.–281,250

WMX Technologies Inc.–278,600

MCI Telecommunications Corp.–270,000

Blue Cross & Blue Shield Assn.–255,078

AFLAC Inc–251,752

Druckenmiller, Stanley F.–250,000

Kellet, Stiles A–250,000

Pilgrim's Pride Corp.–250,000

FEC Statement of Material Facts II at ¶ 217 [PSEx. 2]; Common Cause List of Soft Money Donors [JEx. 26].

65. The Center for Responsive Politics compiled a list of the "Top 50 Soft Money Contributors" in the 1995–1996 election cycle. Declaration of Larry Makinson in *Mariani v. United States* ("Makinson Decl.") [JEx. 6] The list, which was recently updated to include all amendments to FEC filings, and which aggregates corporate contributions with contributions from individuals associated with a particular corporation, is as follows:

| CONTRIBUTOR | SOFT TOTAL |
| --- | --- |
| Philip Morris | $3,018,036 |
| Joseph E. Seagram & Sons | $2,035,583 |
| RJR Nabisco | $1,442,931 |
| Walt Disney Co. | $1,347,000 |
| Atlantic Richfield | $1,250,843 |
| Communications Workers of America | $1,150,300 |
| American Fedn of St/Cnty/Munic Employees | $1,134,962 |
| AT & T | $ 999,524 |
| Federal Express Corp. | $1,157,044 |
| MCI Telecommunications | $1,005,418 |
| News Corp. | $ 869,700 |
| Assn. of Trial Lawyers of America | $ 803,400 |
| Lazard Freres & Co. | $ 758,956 |
| Anheuser–Busch | $ 766,057 |
| MacAndrews & Forbes | $ 779,649 |
| Eli Lilly & Co. | $ 746,835 |
| United Food & Commercial Workers Union | $ 727,550 |
| Time Warner | $ 736,250 |
| Chevron Corp | $ 702,306 |
| Archer–Daniels Midland Co. | $ 700,000 |
| Enron Corp. | $ 686,900 |
| UST Inc/US Tobacco | $ 725,250 |
| NYNEX Corp. | $ 652,802 |
| Textron Inc. | $ 654,227 |
| American Financial Group | $ 645,000 |
| Brown & Williamson Tobacco | $ 642,500 |
| Laborers Union | $ 634,588 |
| Loral Corp. | $ 632,000 |
| Integrated Health Services Inc. | $ 609,000 |
| American Defense Institute | $ 600,000 |
| Goldman, Sachs & Co. | $ 600,230 |
| Entergy Corp. | $ 592,371 |
| Northwest Airlines | $ 609,445 |
| Blue Cross/Blue Shield | $ 577,688 |
| WMX Technologies | $ 576,500 |
| PaineWebber | $ 560,750 |
| Travelers Group | $ 562,344 |
| FreddieMac | $ 558,250 |
| Bristol–Myers Squibb | $ 552,400 |
| BankAmerica Corp. | $ 552,379 |
| Tobacco Institute | $ 537,357 |
| DreamWorks SKG | $ 702,400 |
| Milberg, Weiss et al. | $ 530,000 |
| Coca–Cola Co. | $ 519,640 |
| Pfizer Inc. | $ 514,971 |
| Glaxo Wellcome Inc. | $ 510,322 |
| General Motors | $ 504,150 |
| Stride–Rite Foundation | $ 500,000 |
| Hayes, Mariam Cannon | $ 500,000 |
| Public Securities Assn. | $ 507,313 |

Makinson Decl. at ¶ 13 & Attachment [JEx. 6].

### E. Soft Money Donations: Industries with Pressing Legislative Concerns

#### An Overview

66. As a general rule, in the 1995–1996 election cycle, the largest soft money gifts came from corporations or interest groups that faced pressing issues in Washington. Herrnson Dep at 98, J.Ex. 36. For example:

- Tobacco companies contributed huge sums of soft money to both of the major parties. Philip Morris and its executives gave a total of more than $3 million in soft money, including about $2.5 million to the Republicans, and close to $500,000 to the Democrats. RJR Nabisco contributed over $1.4 million, including almost $1.2 million to Republican committees and $255,000 to the Democrats. US Tobacco donated $675,000, of which $556,000 went to the Republicans. Brown and Williamson Tobacco gave about $642,000, almost all of which, $635,000, went to the Republicans. And the Tobacco Institute gave $531,000, with $425,000 going to the Republicans and $106,000 to the Democrats.

- AT & T gave almost $1 million in soft money, with $552,000 going to the Republicans and $447,000 to the Democrats. AT & T's major competitor, MCI Telecommunications, contributed $966,000, $607,000 of which went to the Democrats. NYNEX Corporation, a regional telecommunications company, donated $651,000, with $411,000 given to the Republicans and $240,000 to the Democrats.

- The Association of Trial Lawyers of America gave over $800,000, with approximately $606,000 donated to the Democrats and $197,000 to the Republicans.

- Blue Cross/Blue Shield donated almost $578,000 in soft money, giving $438,000 to the Republican Party and

about $140,000 to the Democratic Party. Integrated Health Services, Inc., contributed $609,000, $574,000 of which went to the Democrats. Eli Lilly & Co. donated $747,000, with $507,000 given to the Republicans and $240,000 to the Democrats. Another pharmaceutical giant, Bristol–Myers–Squibb, gave $552,000, with $438,000 going to the Republicans and over $114,000 to the Democrats.

Center for Responsive Politics, "Top 50 Soft Money Contributors," *The Big Picture: Who Won the Last Election* (visited October 8, 1998) <http://www.crp.org/pubs/ bigpicture/top/bp.top50soft.html> (hereinafter "Top 50 Contributors List"); Herrnson Dep. Ex. 10 [JEx. 36]. *See* Herrnson Dep. at 98–101, 105–106 [JEx. 36].

### The Tobacco Industry

67. National party committee reports filed with the FEC indicate that during the 1995–1996 election cycle the total amount of soft money donated by five tobacco companies (Brown & Williamson, Lorillard Tobacco, Philip Morris, RJR Nabisco, and U.S. Tobacco Co.) to the national party committees was approximately $5,304,508. Joint Stip. ¶ 17.

68. National party committee reports filed with the FEC indicate that during the 1995–1996 election cycle Philip Morris gave a total of $3 million in soft money to the national party committees, including $2.5 million to the Republican national party committees, and one half million to the Democratic national party committees. Top 50 Contributors List.

69. National party committee reports filed with the FEC indicate that during the 1995–1996 election cycle RJR Nabisco donated $1.4 million in soft money to the national party committees, including $1.2 million to Republican national party committees and $255,000 to Democratic national party committees. *Id.*

70. National party committee reports filed with the FEC indicate that during the

1995–1996 election cycle U.S. Tobacco donated $675,000 in soft money to national party committees, of which $556,000 went to the Republican national party committees. *Id.*

71. National party committee reports filed with the FEC indicate that during the 1995–1996 election cycle Brown & Williamson Tobacco donated $643,000 in soft money to national party committees, of which $635,000 went to Republican national party committees. *Id.*

72. National party committee reports filed with the FEC indicate that during the 1995–1996 election cycle the Tobacco Institute, a trade organization of the tobacco industry, gave $531,000 in soft money to the national party committees, with $425,000 going to the Republican national party committees and $106,000 to the Democratic national party committees. *Id.*

### The Telecommunications Industry

73. National party committee reports filed with the FEC indicate that during the 1996 election cycle AT & T donated approximately $1 million in soft money to the national party committees, with $552,000 going to Republican national party committees and $447,000 to Democratic national party committees. Top 50 Contributors List.

74. National party committee reports filed with the FEC indicate that during the 1996 election cycle MCI Telecommunications donated $966,000 in soft money to the national party committees, $607,000 of which went to Democratic national party committees. *Id.*

75. National party committee reports filed with the FEC indicate that during the 1996 election cycle NYNEX Corporation, a regional telecommunications company, donated $651,000 in soft money to national party committees, with $411,000 going to Republican national party committees and $240,000 to Democratic national party committees. *Id.*

76. Telecommunications legislation governing the entry of the seven local "Baby Bell" telephone companies into the long-distance telephone service market was drafted and signed into law during the 1996 election cycle. Common Cause, *Local & Long Distance Telephone Companies Give Record Soft Money During Final Months of Telecommunications Overhaul* (February 9, 1996) <http: //www. commoncause. org/publications /296com. htm> [JEx. 25].

77. Certain telephone companies donated large sums of soft money during the drafting of the proposed telecommunications legislation. On October 17, 1995, the week after House–Senate telecommunications bill conferees were named and a week before their negotiations began, MCI donated $100,000 in soft money to the DNC. On December 20, 1995, the conferees' reached agreement on the bill. On December 21, AT & T gave $190,000 to the DNC. The same day, the agreement was put on hold because House Republican conferees objected to certain provisions and to Clinton Administration statements claiming victory. On December 28, AT & T donated $200,000 to the RNC. On December 29, MCI gave $100,000 to the DNC and $20,000 to the NRCC. The final version of the bill was subsequently passed by the House and Senate, and President Clinton signed it into law on February 8, 1996. *Id.*

### The Association of Trial Lawyers

78. National party committee reports filed with the FEC indicate that during the 1996 election cycle the Association of Trial Lawyers of America donated $803,000 in soft money to the national party committees, with approximately $606,000 donated to Democratic national party committees and $197,000 to Republican national party committees. Top 50 Contributors List.

79. A series of legal reform initiatives, including tort reform legislation, were introduced in Congress during the 1996 election cycle. *See* Herrnson Dep. at 101 [JEx. 36].

### The Health Care Industry

80. National party committee reports filed with the FEC indicate that during the 1996 election cycle Blue Cross/Blue Shield donated almost $578,000 in soft money to the national party committees, giving $438,000 to Republican national party committees and about $140,000 to Democratic national party committees. Top 50 Contributors List.

81. National party committee reports filed with the FEC indicate that during the 1996 election cycle Integrated Health Services, Inc. contributed $609,000 in soft money to the national party committees, $574,000 of which went to Democratic national party committees. *Id.*

82. National party committee reports filed with the FEC indicate that during the 1996 election cycle Eli Lilly & Co. donated $747,000 in soft money to the national party committees, with $507,000 given to Republican national party committees and $240,000 to Democratic national party committees. *Id.*

83. National party committee reports filed with the FEC indicate that during the 1996 election cycle, Bristol–Myers–Squibb gave approximately $552,000 in soft money to the national party committees, with $438,000 going to Republican national party committees and $115,000 to Democratic national party committees. *Id.*

84. Members of Congress proposed numerous health care reform initiatives, including potential changes in Medicare and managed care regulations, during the 1996 election cycle. *See* Herrnson Dep. at 105–106 [JEx. 36].

### F. Corporate Donors Give Soft Money to Both Democrats and Republicans

85. The business community quite often makes soft money donations to both the Democratic and Republican parties because they feel they are buying access. FEC Statement of Material Facts II at

¶ 339 [PSEx. 2]; Declaration of Hon. Dale Bumpers, *RNC v. FEC* ("Bumpers Decl.") at ¶ 15 [JEx. 3].

86. Some donors give to whichever party is in power. FEC Statement of Material Facts II at ¶ 340 [PSEx. 2]; Declaration of Hon. Martin Meehan, *RNC v. FEC* ("Meehan Decl.") at ¶ 9 [JEx. 4].

87. Contributions by individuals, organizations and companies to both Republican and Democratic political parties is pervasive and gives the impression that the purpose of the contributors' goal is "making political investments and protecting their flanks." FEC Statement of Material Facts II at ¶ 343 [PSEx. 2] (quoting Richmond Times Dispatch, Editorial, "Cash Cows," August 6, 1997 [JEx. 195]).

88. A study conducted by the Center for Responsive Politics found that donors representing five traditionally Republican industries shifted their patterns of soft money giving in the period after the 1992 Democratic convention: three shifted from an average of 3 to 1 or 4 to 1 in favor of the Republicans to an advantage in favor of the Democrats, while in the cases of the other two the gap between Republicans and Democrats narrowed significantly. Herbert E. Alexander & Anthony Corrado, *Financing the 1992 Election* 156 (1995); Joint Stip. ¶ 18.

89. Some corporations observing shifts in power have made adjustments in their soft money giving. In the 1992 election, for instance, the Democrats received sizable contributions from individuals or corporations that had donated funds to the RNC earlier in the election cycle. In most instances, these gifts were offered late in the race, as the likelihood of a Democratic victory increased. Herrnson Dep. at 107 [JEx. 36].

90. During December 1995, Eli Lilly contributed $20,000 to the DCCC, $25,-000 to the NRSC, $20,000 to the DSCC, and $20,000 to the NRCC, because these congressional committees "represent the major party Congressional campaign committees and will provide a premier opportunity for us [Eli Lilly] to interact with senior Congressional and Administration officials. These organizations are important and our participation in them will have an immediate value." FEC Statement of Material Facts II at ¶ 344 [PSEx. 2]; Eli Lilly Proposed Corporate Political Contributions, November 15, 1995 [JEx. 155].

91. When the Republican Party took control of the U.S. House and Senate in 1994, the tobacco industry dramatically increased its soft money donations to the Republican Party, including the Republican National Committee. The industry also gave to the Democratic Party, but in significantly smaller amounts. This was part of a tobacco industry strategy to avoid what it regarded as undue regulation at a time when there was much discussion of such regulation, in view of the settlements of pending tobacco-related disputes then being negotiated with state attorneys general around the country. FEC Statement of Material Facts II at ¶ 522 [PSEx. 2]; Meehan Decl at ¶ 11.

92. Although in the 1994 cycle MCI reportedly gave comparable amounts of soft money to Republicans (over $168,000) and Democrats (over $188,000), during the 1996 cycle the company's giving did tilt heavily away from the Republicans (over $358,000) and toward the Democrats (over $607,000). However, in the 1998 cycle, the company's soft money giving swung back again, with over $719,000 reportedly going to Republicans and over $422,000 to Democrats. FEC Brief, *RNC v. FEC*, at 28 n.21 [PSEx. 3].

93. Microsoft Corporation, which played little role in political giving for years—reportedly giving only $10,000 in soft money in the 1994 election cycle—radically changed its approach and became a major donor to both parties when its activities came under intense federal scrutiny. *Id.* at 32.

## IV. ISSUE ADVOCACY ADVERTISE-MENTS [21]

### A. Issue Ads Are Funded with Soft Money

94. Corporations, unions and individuals who are not candidates are permitted to spend unlimited amounts on issue advocacy so long as those expenditures are neither coordinated with nor earmarked for a particular candidate. Herrnson Statement at 61 [JEx. 17]; Minority Report at 7522 [JEx. 21].

95. Under current FEC regulations, national party committees are permitted to spend unlimited amounts of soft money on issue advocacy, subject to FEC allocation formulas, so long as those expenditures are not coordinated with a candidate. 11 C.F.R. § 106.5(b); FEC Statement of Material Facts II at ¶ 99 [PSEx. 2].

96. Under current FEC guidelines, state party committees are permitted to spend unlimited amounts of soft money on issue advocacy, subject to even more permissive allocation formulas, so long as those expenditures are not coordinated with a candidate. 11 C.F.R. § 106.5(c); Herrnson Dep. at 111 [JEx. 36]; FEC Statement of Material Facts II at ¶ 369 [PSEx. 2]. National party "issue advocacy" advertising is often bought by state parties but funded by national party committees, who transfer the funds needed to the state parties. Id.

97. Most issue ads are financed in large part with soft money that is raised outside of the federal system from sources and in amounts that the FECA was meant to prohibit. Herrnson Dep. at 50–51 [JEx. 36].

98. For example, the great bulk of issue ads paid for by the Democratic National Committee are funded with soft money. Id. at 73.

### B. Increase in the Use of Issue Advocacy

99. In recent federal election cycles, the national party committees have increasingly used so-called "issue advocacy" that promotes their federal candidates or criticizes the opposing candidates as a tool to influence federal campaigns, while carefully avoiding particular words expressly advocating the candidates' election or defeat. This use of soft money to influence federal campaigns has led to a shift in the parties' fundraising focus from hard to soft money. FEC RNC Brief at 8–9 [PSEx. 3].

100. The race to air issue ads has encouraged national party committees, especially national party organizations, to focus more of their efforts on raising soft money contributions from individuals and groups. Herrnson Statement at 61. [JEx. 17]

101. The political parties are increasingly using so-called issue advocacy campaigns to influence federal elections. Herrnson Statement at 21–22 [JEx. 17]; FEC Statement of Material Facts II at ¶ 382 [PSEx. 2].

102. In the 1996 election cycle, the use of issue ads increased dramatically, as many groups ran advertisements that appeared to favor one candidate over another. Minority Report at 6301 [JEx. 21].

103. While the national party organizations had engaged in issue advocacy before the 1996 election cycle, the amounts that they spent during that cycle to promote the parties' respective presidential candidates was unprecedented. Herrnson Dep. at 114 [JEx. 36].

104. Political parties, unions, corporations and tax-exempt organizations all paid for issue ads during the 1996 election cycle. Minority Report at 7522 [JEx. 21].

---

21. As used herein, the terms "issue ad" and "issue advocacy" refer to advertisements that do not in express terms advocate the election or defeat of a clearly identified candidate for federal office, i.e., advertisements that do not contain express words of advocacy of election or defeat such as "vote for," "elect," "support," "cast your ballot for," "Smith for Congress," "vote against," "defeat" or "reject."

105. The DNC estimates that it and state Democratic party committees spent approximately $42 million on issue advertising during the 1995–1996 election cycle. Declaration of Joseph Sandler, *Mariani v. United States* ("Sandler Decl.") at ¶ 12 [JEx. 8].

106. All six national party committees, as well as many state party committees, sponsored issue advocacy ads during the 1996 elections. Herrnson Statement at 43 [JEx. 17].

107. The 1996 election shows that parties can use issue advocacy ads to influence the national campaign agenda and the agendas in individual House and Senate contests. *Id.* at 46.

### C. *Tactical Advantages of Using Issue Ads*

108. An advantage of airing issue ads against an opposing party's candidates, including safe incumbents, is that the ads can encourage the candidates to spend more time at home and less time traveling the country raising money for challengers and needy colleagues. Herrnson Statement at 47 [JEx. 17].

109. The effect of issue advocacy ads is usually magnified many times over because they routinely receive free media coverage. *Id.*

110. Issue advocacy is a preferred campaign approach by the party committees, because their staffs are heavily involved in Members' campaigns and it would therefore be difficult for the party to run television ads as independent party expenditures. FEC Statement of Material Facts II at ¶ 357 [PSEx. 2]; Herrnson Statement at 44 [JEx. 17].

111. Party issue advocacy ads are important late in the election. The ads can supplement a candidate's advertisements and catch an opponent off guard and without the funds needed to respond. The ads also have the benefit of limiting the media time that might otherwise be purchased by an opponent. FEC Statement of Material Facts II at ¶ 362 [PSEx. 2]; Herrnson Statement at 48 [JEx. 17].

### D. *Issue Advocacy Advertisements Are Extremely Similar to Express Advocacy and Are Designed to Influence Elections*

112. During the 1996 elections, the parties spent record sums of soft money on issue advocacy ads that presented the names and likenesses of federal candidates. Many of these ads bore similarities to candidate ads and were intended to influence the election prospects of individual federal candidates despite the fact that they did not expressly call for a candidate's election or defeat. Herrnson Statement at 2 [JEx. 17].

113. Issue advocacy ads that are communicated during the election season and present the names or likenesses of federal candidates are intended to influence federal elections. Herrnson Statement at 43, 61–62 [JEx. 17]; Herrnson Dep. at 145, 147 [JEx. 36].

114. Most issue advocacy ads are nearly identical to hard money ads in that they praise or criticize federal candidates by name or feature their likeness. The only major visible difference is that the issue advocacy ads cannot expressly call for a candidate's election or defeat. Herrnson Dep. at 45 [JEx. 36].

115. As used in 1996, many televised ads were characterized as issue ads but appeared to function as attack ads on candidates. By claiming the ads to be discussions of issues, the ad sponsors were able to evade federal election law contribution limits and disclosure requirements applicable to candidate ads. Since no disclosure laws apply, issue ads run by unknown organizations leave the public in the dark in terms of knowing who is financing candidate attack ads. Minority Report at 7521; FEC Statement of Material Facts II at ¶ 431 [PSEx. 2].

116. Many party committee "issue ads" have compared the positions or past ac-

tions of two competing federal candidates, rather than focusing on pending federal legislation. FEC Statement of Material Facts II at ¶ 451 [PSEx. 2]; FEC RNC Mem. at 24–25 [PSEx. 3].

117. The overwhelming majority of the RNC's "issue ads" in the last two election cycles named specific federal candidates. FEC RNC Mem. at 21 [PSEx. 3].

118. The RNC estimated that between 1995 and 1998 it spent $8,109,516 in soft money on "issue ads" that identified a federal candidate, $539,053 on ads that identified a federal officeholder not seeking election, and $1,108,194 on ads that identified no federal candidates or office holders but that may have identified a party. Thus, of all the soft money issue ad spending during the period that RNC did identify, at least 83% was on ads that identified a federal candidate. *Id.* at 21 n. 13.

119. The parties use the very large soft money donations to fund issue ad campaigns that are clearly designed to influence federal elections. FEC Statement of Material Facts II at ¶ 353; Shays Decl. ¶ 8 [JEx. 5].

### E. *Democratic Issue Ads During the 1995–96 Election Cycle*

120. In 1995, President Clinton's re-election team came up with an innovative strategy through which to spend millions of dollars on televisions ads to bolster Clinton's popularity heading into the 1996 election year without using the campaign's precious, and limited, spending capabilities: they would use the resources of the DNC and other party organizations. Those millions of dollars were indeed spent by the DNC and other party organizations for television advertisements as planned. Herrnson Dep. at 110 [JEx. 36].

121. The Democrats' issue ads largely targeted states related to the presidential campaign, including $4 million in California and several million dollars each in Illinois, New York, and some other key electoral states, including Pennsylvania. The ads were used to deliver the Democrats' basic message, policy proposals, and accomplishments, and to criticize Senator Dole's views and record, and the record of the Republican controlled Congress. *Id.* at 115.

122. These party-sponsored issue ads that were broadcast in late 1995 and throughout 1996 were designed to promote specific federal candidates, especially the parties' respective presidential nominees and House and Senate candidates, and thus build electoral support for their candidacies. The Democrats aired an extensive series of commercials that sought to advance the Democratic legislative agenda and improve the reelection prospects of President Clinton. The Democrats broadcast ads in 24 states, focusing on the Republican Congress's role in the government shutdown, the Clinton Agenda to protect Social Security and Medicare, and the strength of the economy. Herrnson Dep. at 115–118.

123. During the 1996 election cycle, the DNC was the first national party committee to broadcast issue advocacy ads to help a candidate. It began televising ads in mid-October 1995 in order to counteract President Clinton's low standing in the polls. Don Fowler and presidential adviser Dick Morris advocated using TV to get out the message that the president was doing a good job and to paint the Republican-controlled Congress as a group of radical extremists who wanted to help large corporations and wealthy individuals at the expense of working people. TV ads focusing on GOP proposals to downsize the growth of Medicare and Medicaid, cut spending on education, allow corporations to pollute the environment, and out taxes for the wealthy were aired in states critical to the president's reelection prospects, and their impact on congressional elections was unmistakable. The $42.4 million that the DNC spent on issue advocacy ads over the course of the election helped set the national political agenda and the tone for

many House and Senate campaigns. Herrnson Statement at 21–22 [JEx. 17].

124. Because the cost of DNC ads did not count as expenditures by the Clinton campaign, the DNC's media effort allowed the Clinton campaign to benefit from favorable advertising without depleting its scarce, federally-capped campaign coffers. The DNC's advertisements were shown in states considered key to the President's reelection, and funds were transferred from the DNC to the state parties in order to take advantage of the state parties' ability to spend a larger percentage of soft money on the advertisements. While the transfers were made to take advantage of the state parties' greater ability to spend soft money, there were no restrictions on this type of transfer. Minority Report at 8286, 8336–37 [JEx. 21]; FEC Statement of Material Facts II at ¶ 387 [PSEx. 2].

125. The DNC ran an expensive issue advocacy campaign in 1996. The DCCC and the DSCC ran issue advocacy campaigns that complemented those spearheaded by the DNC. The DCCC transferred $8.5 million to Democratic state committees to help finance television ads that were aired in the districts of sixty marginal House members, most of whom were Republican freshmen. In addition to criticizing House Republicans, many of the ads touted the congressional Democrats' Families First Agenda. Herrnson Statement at 44–45 [JEx. 17].

126. The DSCC transferred an additional $10 million for issue advocacy ads to fourteen states that hosted the nation's closest Senate races. *Id.* at 45. FEC Statement of Material Facts II at ¶ 465 [PSEx. 2].

### F. *Republican Issue Ads During the 1995–96 Election Cycle*

127. The day after nominee Bob Dole decided to resign from the Senate to devote himself to full-time campaigning, RNC Chairman Haley Barbour announced a $20 million issue advocacy campaign. In addition, the Republicans later mounted another effort costing approximately $20 million to counteract the $21 million issue advocacy advertising campaign launched by labor unions. The Republicans similarly made transfers to state parties to take advantage of beneficial allocation formulas. Herrnson Dep. at 111–112 [JEx. 36].

128. The Republican Party waited until March 1996, when Senator Robert Dole of Kansas had clinched the nomination, prior to launching their issue advocacy ad campaign. From late March through the Republican national convention, the RNC spent approximately $20 million on ads designed to boost Dole's image. The party's initial ads were financed by the RNC and designed to boost Dole's image at a time when he had virtually run out of federal matching primary funds. The RNC spent $20 million between March 1996 and its August 1996 national convention, when the Dole campaign received its general election funds. Although these ads were primarily intended to influence the presidential contest, their impact reverberated in campaigns at all levels. Herrnson Statement at 22 [JEx. 17].

129. The Republican national party committees spent approximately $34 million on issue advertising in 1996, $14 million of which was used to fund ads in support of the Dole campaign. Herrnson Dep. at 79–81 [JEx. 36] Some portion of these expenditures was funded by soft money. *Id.*

130. The RNC's issue advocacy ads in 1996 were supplemented by ads financed by the GOP Hill committees. The NRCC televised six issue advocacy ads in the districts of Republican candidates involved in competitive elections. The first three ads were designed to remind voters of GOP accomplishments and to clarify for the public its positions on welfare reform, congressional reform, and Medicare. They cost $7 million and were aired in thirty House districts from the third week in July through Labor Day. The second three ads sought to counter the anti-Re-

publican media campaign waged by organized labor and the Democrats, to remind voters of some of the policy failures of the Clinton administration, and to discourage them from electing a Democratic Congress. These ads, which were cosponsored by the RNC, cost roughly $20 million and were broadcast in fifty-eight districts from October 5 through election day. Herrnson Statement at 45 [JEx. 17]; FEC Statement of Material Facts II at ¶ 421 [PSEx. 2].

131. The NRSC took a different route from that of its House counterpart or Democratic rival, setting up a special division composed of twelve full-time staffers to handle its issue advocacy and independent expenditure advertising. Herrnson Statement at 45–46 [JEx. 17].

132. The NRSC spent about $2 million to televise issue advocacy ads in five states during the 1996 elections. The ads focused on welfare reform, the Republican plan to balance the budget, and Republican spending priorities. Between April and October 3, 1996, which marked the end of the Senate session, the NRSC aired prime-time ads in Iowa, Minnesota, and Montana that were tailored to highlight vulnerabilities in Democratic candidates' records. Herrnson Statement at 46 [JEx. 17].

### G. Independent Groups' Issue Ads

133. Corporations, unions and other groups, although prohibited from spending money from their treasuries or operating accounts expressly to advocate voting for or against a particular candidate, may conduct "issue advocacy" campaigns intended to harm or help a candidate without directly telling people to vote for or against that candidate Herrnson Dep. at 66–67 [JEx. 36].

134. During the 1996 election cycle, both parties benefited from the expenditures and activities of independent groups. The most visible example is televised ads. A study conducted by a nonpartisan organization, the Annenberg Public Policy Center, estimated that, during the 1996

election cycle, independent groups spent between $67 and $82 million on televised ads that split about evenly in their support of the two parties. Almost 90 percent of these ads named specific candidates. Groups like the AFL–CIO, Citizen Action, Citizens for Reform, and Citizens for the Republic Education Fund each spent millions of dollars on these televised ads. Minority Report at 5927 [JEx. 21].

135. Contributors are able to avoid limits on campaign contributions by donating to ostensibly "nonpolitical" groups engaged in issue advocacy. Since these donations are not classified as campaign contributions, corporations, which are forbidden to contribute to candidates, are free to donate; there are no limits on the size of contributions; and donors can hide their identities. *Id.* at 5969–70 (footnote omitted).

136. Triad Management Services ("Triad") is a for-profit business established in the Washington area in 1995 by Carolyn Malenick, a former fundraiser for Oliver North, a figure in the Iran–Contra scandal and, in 1994, an unsuccessful candidate for a Senate seat in Virginia. *Id.* at 5982.

137. Triad held itself out as a consulting business that provides advice to conservative donors about how to maximize their political contributions. *Id.* at 6289.

138. In addition to providing advice and fundraising assistance to candidates, Triad worked to raise funds for individual candidates. *Id.* at 6296.

139. Triad managed two tax-exempt organizations whose names suggested they were large, grassroots organizations: Citizens for Reform and Citizens for the Republic Education Fund. In fact, both entities were shell companies with no offices, no employees, and no members. They were established in the spring of 1996 for the sole purpose of running attack ads under the guise of "issue advocacy" to help

Republican candidates win election to Congress. *Id.* at 5982.

140. The primary means by which Triad assisted in the election of conservative candidates was by overseeing millions of dollars' worth of advertising placed by these two nonprofit organizations. *Id.* at 6301.

141. Citizens for Reform and Citizens for the Republic spent a combined total of between $3 million and $4 million on advertising in 29 races. *Id.* at 6304.

142. Like other groups running so-called issue advertisements in the 1996 campaign, Triad carefully avoided the words "vote for," "support," or "defeat," in the advertisements it funded, but otherwise attacked the positions, ideology, and frequently, the character of candidates. The advertising created by Triad focused on no single set of issues. It more closely resembled negative attack advertising aired by an opposing candidate. The candidates benefiting from the advertising were the same candidates for whom Triad had solicited contributions and advised on campaign and fundraising strategy. *Id.* at 6304.

143. The sole purpose of the advertising was to influence voters in favor of conservative Republican candidates in those races. *Id.* at 6301.

144. Bank records reviewed by the Committee on Governmental Affairs revealed that two secret trusts together contributed $2.34 million to Citizens for Reform and Citizens for the Republic, over 83 percent of the total money received by the organization. Triad's attorneys publicly confirmed that Triad entered into written agreements to keep the identity of funding sources secret. *Id.* at 6309.

145. Triad succeeded in pouring millions into televised advertisements designed to attack particular candidates in hotly-contested races, while concealing the identities of the individuals and companies that provided the moneys. *Id.* at 6313.

146. In 1996, The AFL–CIO announced its plans to spend $35 million to counter the Republican "Contract with America." *Id.* at 7522–23.

147. In 1996, the AFL–CIO spent about $25 million on media advertising in 44 congressional districts. *Id.*

148. The majority of the AFL–CIO–funded issue ads aired during the 1996 election cycle criticized Republican House freshmen who won office in 1994. *Id.*

149. In April of 1996, a coalition of 32 business groups called The Coalition: Americans Working for Real Change, spent $5 million on issue ads and mailed two million letters to members. Annenberg Study at 28–29 [JEx. 29]. The Coalition raised funds from its member groups, including $1 million from the National Restaurant Association. *Id.*

150. In 1995 and 1996, Coalition for Our Children's Future ("CCF") ran a series of "issue ads" on such subjects as Medicare and the balanced budget. In August 1995, CCF received a $500,000 donation from the National Republican Congressional Committee, part of the RNC. Additional money for the issue ads was raised by RNC Chairman Barbour and Speaker Gingrich. Among the donors were major Republican contributors, including large corporations. Minority Report at 5981 [JEx. 21].

151. In 1995 alone, CCF spent $3.18 million on advertisements supporting the Republican positions on the Balanced Budget Amendment and Medicare. Even after the demise of the Republican Balanced Budget legislation prior to the government shut-down in 1995, CCF continued to air advertising in key congressional races. *Id.* at 6772.

152. The purpose of CCF was to raise funds from corporate interests to fund a media campaign in support of Republican legislation on the balanced budget and Medicare reform. *Id.* at 6772.

153. After a very active fundraising campaign through the summer of 1995,

CCF commenced its advertising campaign. Between August and December 1995, CCF funded four waves of advertising totaling at least $3.18 million. The advertisements aired during this period include a Medicare advertisement featuring one Senator, a Balanced Budget ad featuring a second Senator, an advertisement entitled "Meet Priscilla," which focused on the federal debt and the need for a balanced budget for the future, and a fourth advertisement urging support for the Republican Medicare plan. *Id.* at 6774.

154. A memo produced by a Stevens & Co. employee contains a list of media markets where CCF's 1995 advertising aired. The memo shows that ads were targeted to air in particular congressional districts, many of which were the districts of vulnerable Republican freshman. *Id.* at 6775.

155. Shortly before the November 1996 election, the RNC gave $4.6 million to Americans for Tax Reform, $650,000 to the National Right to Life Committee, and $600,000 to the American Defense Institute. This direct payment to tax-exempt organizations is an unprecedented amount. *Id.* at 5976.

156. Americans for Tax Reform—the largest recipient of RNC funds—used this money to conduct a massive "issue advocacy" campaign aimed at helping the Republicans. *Id.* at 5978–79.

157. Shortly before the November election, RNC Chairman Barbour acknowledged, in effect, that the RNC's contribution to Americans for Tax Reform made it possible for the party to circumvent the campaign finance laws. At an October 1996 press conference, Barbour was asked about the RNC's $4.6 million transfer to ATR and he made the following statement:

> You'll see in our FEC report ... that we've made contributions to a number of organizations that are like-minded, share our views, promote our ideas.... [W]hen we do advocacy, no matter what we do, we typically have to pay for it, either totally with FEC dollars or a mixture of FEC and non-FEC dollars.... [W]e often find ourselves in the position where we cannot match up non-FEC funds with enough FEC funds. So, when we came to that point, we decided we would contribute to several groups who are like-minded and whose activities we think, while they're not specifically political, we think are good for the environment for us. *Id.* at 5979.

158. The FEC has instituted no civil actions under 2 U.S.C. § 437g(a)(6)(A) with regard to any issue advertisements aired during the 1996 election cycle. *See* Transcript of Oral Argument, *Mariani v. United States* (M.D.Pa. Mar. 12, 1999) at 16–17 [PSEx. 5].

159. In 1998, FEC auditors investigated the alleged coordination between the Clinton and Dole campaigns and their respective national party committees on issue ads during the 1996 election cycle. The auditors ultimately recommended that the campaigns be required to repay $7 and $17.7 million, respectively, of federal matching funds. *See* FEC Agenda Document No. 98–85, "Report of the Audit Division on Clinton/Gore '96 Primary Committee, Inc." at 72 (1998); FEC Agenda Document No. 98–87, "Report of the Audit Division on the Dole for President Committee, Inc. (Primary)" at 112 (1998); FEC Agenda Document No. 98–88, "Report of the Audit Division on the Dole/Kemp '96 and Dole/Kemp Compliance Committee, Inc. (General)" at 61 (1998) [JEx. 42].

160. The Commission unanimously rejected the recommendation of the auditors. "Statement of Reason of Vice Chairman Darryl R. Wold and Commissioners Lee Ann Elliott, David M. Mason and Karl J. Sandstrom On The Audits Of 'Dole For President Committee, Inc.' (Primary), 'Clinton/Gore '96 Primary Committee, Inc.,' 'Dole/Kemp '96, Inc.' (General), 'Dole/Kemp '96 Compliance Committee, Inc.' (General), 'Clinton/Gore '96 General Committee, Inc.,' and 'Clinton/Gore '96

General Election Legal And Compliance Fund' " (June 24, 1999) [JEx. 43].

## V. *NATIONAL AND STATE PARTY ORGANIZATIONS COOPERATE TO SPEND LARGE SUMS OF SOFT MONEY IN CONNECTION WITH CAMPAIGNS FOR FEDERAL OFFICE*

161. National party "issue advocacy" advertising is often bought by state parties but funded by national party committees, who transfer the funds needed to the state parties. These transfers allow a far higher percentage of soft money to be used to pay for the advertising, under the different allocation formulas applicable to state parties. FEC Statement of Material Facts II at ¶ 369 [PSEx. 2]; Herrnson Dep. at 111 [JEx. 36].

162. Much of the party money used to finance issue advocacy campaigns originates at the national level and is transferred to state party committees. Herrnson Statement at 43 [JEx. 17].

163. By transferring large sums to the state or local level, national parties can also avoid effective disclosure. Under federal regulations, the committees are only required to report the amounts transferred to other committees; they do not have to account for how these funds were ultimately spent. Herrnson Dep. at 113–114 [JEx. 36].

164. During the 1996 elections, soft money enabled the national parties to wage a coordinated campaign that supplemented, and in some cases replaced, the voter mobilization efforts of presidential and other candidates. The national committees assist their candidates' campaigns by distributing both hard and soft money to state parties that they use to finance voter mobilization drives and party-building activities. The DNC transferred more than $76 million, roughly $11 million more than its Republican counterpart. Most of these funds were distributed in accordance with the strategies of their presidential candidates. Herrnson Statement at 21

[JEx. 17]; FEC Statement of Material Facts II at ¶ 66 [PSEx. 2].

165. In election years, the national party committees transfer more soft money to state and local party committees in states with closely contested races for federal office. Joint Stip. ¶ 103.

166. During the 1996 election cycle, the national party committees reported transferring a combined $14.3 million in soft money to state and local party committees in California, an important battleground state in the Presidential election. FEC Notice of Proposed Rulemaking at 37727 [JEx. 39].

167. During the 1996 election cycle, the national party committees reportedly transferred a combined sum of $325,332 to state and local party committees in New York, where polls indicated that President Clinton had a substantial lead. *Id.*

168. During the 1996 election cycle, the RNC transferred funds to state Republican party committees, who used soft money to publish and pay for issue advocacy advertisements critical of President Clinton and/or supportive of Senator Robert Dole. Huyck Decl. at ¶ 4 [JEx. 7]

169. State Democratic Party committees generally received funds from the DNC in order to pay for the broadcast of issue advertisements. Sandler Decl. ¶ 5 [JEx. 8].

170. A memorandum dated March 18, 1996 apparently from the RNC's Political Director Curt Anderson to RNC Chairman Haley Barbour regarding "Ballot Allocation of States" stated, in part: "The following chart clearly demonstrates what we already know, that any media we place in the target presidential states should be placed through state parties. The average ballot allocation in the top 17 target states is 37% federal–63% non-federal, this obviously contrasts very well with our 65% federal—35% non-federal allocation . . . . Some have voiced concern that buying through the state parties could result in a

loss of control on our part. There is absolutely no reason to be concerned about this. As was demonstrated in our efforts recently in the CA and OR special elections, our field staff is fully able to insure that state parties make good on any arrangement we make with them. This is simply a book keeping hassle, but not in anyway [sic] a reason not to proceed." March 18, 1996 Memorandum from "Curt" to "the Chairman" [JEx. 163]; FEC Statement of Material Facts II at ¶ 389 [PSEx. 2].

171. A memorandum dated May 24, 1996 from the Republican National Finance Committee's Al Mitchler to RNC Finance Chairman Howard Leach, Team 100's Tim Barnes and other RNC personnel stated: "Over the next two weeks, we are going to have to raise $4 million [handwritten correction from $2 million], minimum, in soft money that has to be transferred to the CA State Party. If this money does not come from CA donors, then we must have donors from other states agree to be listed as a major donor in CA .... Let me stress how critical it is that this money be raised and assigned as quickly as possible so that *we can get on the air* and stay on the air for the next three months in CA. Anyone who is going to give $50,000, $100,000, or $200,000 should be looked at as a potential major donor for the state of CA." May 24 1996 Memorandum from Al Mitchler to Howard Leach, et al. [JEx. 162] (emphasis in original); FEC Statement of Material Facts II at ¶ 403 [PSEx. 2].

## VI. *DONORS RECEIVE ACCESS IN EXCHANGE FOR LARGE SOFT MONEY DONATIONS AND CANDIDATES BENEFIT FROM RAISING IT*

### A. *Large Donors Obtain Access to Officeholders and Candidates*

172. Soft money donations have resulted in donors getting access to elected federal officials and to candidates for federal elective office. Joint Stip. ¶ 107; Affidavit of Daniel H. Murray, *Mariani v. United States* ("Murray Aff't") ¶ 14 [JEx. 2]; Herrnson Statement at 57 [JEx. 17]; FEC RNC Mem. at 35 [PSEx. 3]; Minority Report at 4573 [JEx. 21];.

173. The success of contributors in affecting policy depends on the quality and extent of the access they gain. Large contributors, especially if they are repeat contributors, inevitably gain a special or privileged access. Repeated giving establishes deep and enduring relationships with public officials and party committees, relationships formed and enhanced by face to face conversations and the social familiarity of the "occasions" to which the parties invite contributors. The access of those contributors is also often reinforced by the skilled and experienced lobbyists they employ. It is very common, for example, for the PAC of a union, a corporation, or an association to coordinate its contributions with the goals and strategies of the lobbyists of its parent organization.

174. Most of the largest contributors to the party committees customarily have received more access to a member than individuals who contributed only $1,000, or average constituents who gave little or not at all. FEC Statement of Facts I at ¶ 162 [PSEx. 1]; Declaration of Former Senator Timothy E. Wirth, *FEC v. CRFCC* ("Wirth Decl.") ¶ 1 [JEx. 10].

175. Contributions help contributors gain access and have their phone calls taken. And access can influence action, since the totality of the information a Member has is significantly affected by which people gain access to the Member. FEC Statement of Facts–I at ¶ 168 [PSEx. 1]; Declaration of Leon Billings, *FEC v. CRFCC* ("Billings Decl.") ¶ 13 [JEx. 11].

176. Small contributions are typically raised using direct-mail and telemarketing solicitations, which do not require personal contact between the party and its contributors. FEC Statement of Material Facts II at ¶ 62 [PSEx. 2]; Herrnson Statement at 1 [JEx. 17].

177. Daniel H. Murray served from 1982–1995 as a government relations specialist for Sprint, GTE and BellSouth Corporations. Murray Aff't ¶ 3 [JEx. 2]; Joint Stip. ¶ 65.

178. Mr. Murray assisted these companies and their PACs in selecting candidates and political groups for financial support through both hard and soft money. Murray Aff't ¶ 3 [JEx. 2]; Joint Stip. ¶ 66.

179. This support was offered in order to gain access to and build relationships with lawmakers and their staffs, including efforts to gain the opportunity to persuade them to support or oppose legislation that was of interest to his employers. Murray Aff't ¶ 3 [JEx. 2]; Joint Stip. ¶ 67.

180. From the point of view of the individuals Mr. Murray's employers were financially supporting, no difference was perceived between hard and soft money. Murray Aff't ¶ 3. No recipient ever asked that Mr. Murray try to give more of either hard or soft money as opposed to the other. Murray Aff't ¶ 3 [JEx. 2].

181. On the basis of the financial support his employers provided to the Democratic and Republican parties, Mr. Murray had the opportunity to serve on the Democratic Business Council of the DNC, the Advisory Council of the Democratic Leadership Council, the 1988 and 1992 DNC Convention Site Selection Committees, the Democratic Senate Campaign Committee Leadership Circle, the Democratic Congressional Campaign Committee Annual Dinner Committee, the Republican Senate Campaign Committee Annual Dinner Committee, and steering committees for many House and Senate campaigns. Murray Aff't ¶ 4 [JEx. 2].

182. As part of his current work as a government relations consultant, Mr. Murray develops legislative plans designed to foster relationships between a given client and key legislators in order to advance the client's legislative goals. Murray Aff't ¶¶ 5–6 [JEx. 2]; Joint Stip. ¶ 68.

183. Mr. Murray also develops a parallel political financial support plan in which he advises his clients as to which federal office-holders (or candidates) they should contribute to and in what amounts, in order to best use the resources they are able to allocate to such efforts to advance their legislative agendas. Murray Aff't ¶ 7 [JEx. 2]; Joint Stip. ¶ 69

184. Such plans include soft money contributions to political parties and interest groups associated with political issues. Murray Aff't ¶ 7 [JEx. 2]; Joint Stip. ¶ 70.

185. "In recent years, contributions of soft money ... has proven to provide excellent access to federal officials and to candidates for federal elective office. Since the amount of soft money that an individual, corporation or other entity may contribute has no limit, soft money has become the favored method of supplying political support." Murray Aff't ¶ 14 [JEx. 2]; FEC Statement of Material Facts II at ¶ 283 [PSEx. 2].

186. As a lobbyist, Daniel Murray would, where appropriate, arrange meetings between employees of his corporate clients and executive and legislative staff members. Murray Dep. at 69–70 [JEx. 37].

187. If a client had been a regular contributor to a party, and Mr. Murray did not have a relationship with an official whom that client sought to contact, Mr. Murray would sometimes "call the Senate or House Campaign Committee and say, 'I really need an appointment to see Senator X or Congressman X,' and they would...arrange those meetings." Murray Dep. at 70 [JEx. 37].

188. Daniel Murray described the development of a campaign contribution plan to serve a client's legislative agenda as follows:

> You know how much the PAC has and you know how much the company will spend in soft money and then you decide the priorities of where you are going to give the money during the campaign.

On the House side they are always up for re-election, but some of the Senators would be out of the cycle. There is only one-third up in any particular two year period. But if they were Chairman of a major committee, it didn't matter where in the cycle they were.

So, you would lay out your plan that way and make sure to attend fund-raising events or even host fund-raising events and gather people from the telecommunications industry or whatever. It would be a steering committee type operation. You would contact their fundraiser and say we would like to do something for Senator X or the Majority Leader, whatever, and you usually got a very favorable response and went forward.

Murray Dep. at 76–77 [JEx. 37].

189. According to Mr. Murray, this access translates into opportunities to discuss issues and obtain information from the candidates, officials and staff. *Id.* at 35.

190. Membership on not just one committee but on "a series of them" begets lobbyists or donors membership in additional committees, like the Republican and Democratic Site Selection Committees, as well as the opportunity to participate in formulating policy papers. Murray Aff't ¶¶ 14–15 [JEx. 2]; Murray Dep. at 59 [JEx. 37].

191. One benefit available to large contributors is the opportunity to give input on policy issues through the drafting of "white papers." The drafting process entails gathering representatives of contributors from a certain industry along with party and/or government officials so that those present can share their views about issues. Murray Dep. at 104 [JEx. 37] Once a white paper was written, it would be distributed under DNC letterhead "as a DNC white paper." *Id.* at 107.

192. At some party fund-raisers, donors may select the officeholder(s) with whom they wish to be seated. Such donors often select officeholders with committee memberships relevant to their business interests. FEC RNC Mem. at 38 [PSEx. 3].

193. Large donations to party committees may actually provide a more efficient means of gaining access to legislators and regulators than smaller donations directly to the candidates, since a single large party donation can buy the opportunity to attend party events involving and make connections with many of the party's key office holders during party events. FEC RNC Mem. at 39 [PSEx. 3].

194. Parties are allowed to collect large, individual soft-money donations. Fundraisers attempt to cultivate big donors by, for example, providing them and their guests an opportunity to meet public officials at special events. Joint Stip. ¶ 109.

195. Political parties and candidates play to the motives of individual and group donors when they organize fund-raising events. For this reason, the parties provide their big donors with the opportunity to meet with high-ranking officials who are in the strongest position to influence public policy. These individuals include the president (or a party's presidential candidate), cabinet members, congressional party leaders, committee chairs, or other well-known policy entrepreneurs. FEC Statement of Material Facts II at ¶ 116 [PSEx. 2]; Herrnson Statement at 55 [JEx. 17].

196. The parties enlist the help of elected officeholders and high-ranking political appointees in their fund-raising efforts because contributors respond to these officials' appeals. The opportunity to be briefed by, meet with, or talk to a high-ranking official is a major draw for many who make contributions to the parties. Contributors who are motivated by material incentives, for example, usually want access to political decision makers who are in a position to influence the environment in which their organizations conduct their business. FEC Statement of

Material Facts II at ¶ 206 [PSEx. 2]; Herrnson Statement at 57 [JEx. 17].

197. In recent years, both major parties have offered soft money donors access to elected leaders in exchange for contributions. White House officials and congressional leaders have been asked to appear at fundraisers, participate in party-sponsored policy briefings, attend weekend retreats with donors, and play a role in other small group meetings. Elected officials have even been recruited by the party committees to solicit soft money donations from potential contributors, especially from their own financial supporters and others with whom they have a relationship. Federal officeholders have thus assisted their parties in raising funds for issue advocacy advertising, voter registration, election day turnout drives, and other activities that directly benefit their own campaigns for office. FEC Statement of Material Facts II at ¶ 221 [PSEx. 2]; CED Report at 27 [JEx. 23].

198. Most party committees rely on their office holders and candidates to raise funds, hard and soft, for the party. Raising large donations often requires powerful officeholders and party officials to solicit donors personally. FEC RNC Mem. at 26 [PSEx. 3].

199. Party committees gain a significant portion of their total revenue from major donor programs with a large soft money component. FEC Statement of Material Facts II at ¶ 117; January 27, 1996 Letter from Nancy Brinker re Team 100 Contributions for 1994 [JEx. 92]; February 27, 1996 Letter from Nancy Brinker to Linda Wachner [JEx. 93]; 1997 Team 100 Summary Report [JEx. 94]; FEC RNC Mem. at 36 n.39 [PSEx. 3].

200. The extensive, personal involvement of high-ranking federal officials is a necessary component of raising soft money from major donors. FEC Statement of Material Facts II at ¶ 186 [PSEx. 2]; Shays Decl. ¶ 12 [JEx. 5]; Bumpers Decl. ¶¶ 7–8 [JEx. 3]; Meehan Decl. ¶ 6 [JEx.

4]; Simon Decl. ¶ 4 [JEx. 9]; Kolb Decl. ¶ 8 [JEx. 16].

201. Former Senator Tim Wirth has stated that when he was a Senator he would from time to time introduce large donors to the national party committees. The Democratic Party was then the majority party in Congress and often these donors making large contributions to the party wanted to become acquainted with party leaders. The introductions also served as a mechanism for donors to meet chairmen of important congressional committees, such as the House Ways and Means Committee and the House Armed Services Committee. Democratic leaders, such as Representative John D. Dingell, chairman of the House Energy and Commerce Committee, and former Representative Tony Coelho, House Majority Whip, hosted dinners for large party donors to dine with Democratic Members of Congress. Former Representative Coelho also formed a House campaign committee called something like the "Chairman's Circle," which hosted dinners which supported the Democratic Congressional Campaign Committee. Wirth Decl. ¶ 14; FEC Statement of Facts I at ¶ 163 [PSEx. 1].

202. The Democratic national campaign committees sometimes asked Sen. Wirth to meet with large donors to the party whom he had not met before. At the party's request, he met with the donors. He understood that the donors' goal in making the large contributions was often to have occasional meetings with prominent Democratic congressional leaders to press their positions on legislative issues. On these occasions, sometimes all the Senator knew about the donor would be the issue in which he was interested and that he was a donor to the party. Wirth Decl. ¶ 15 [JEx. 10]; FEC Statement of Material Facts II at ¶ 197 [PSEx. 2].

203. There are a number of factors that contribute to an industry's power and influence in Washington, including the amount of soft money it donates and the

amount of money it spends on lobbying. FEC Statement of Material Facts II at ¶ 268 [PSEx. 2].

204.    Groups that follow access strategies are likely to be most responsive to fundraising appeals by incumbents, especially high-ranking members of the executive branch and legislators who chair committees or subcommittees, occupy party leadership positions, or are policy entrepreneurs with influence over policies that are of importance to the groups. FEC Statement of Material Facts II at ¶ 266 [PSEx. 2]; Herrnson Statement at 54 [JEx. 17].

205.    Consultant Daniel Murray advised his business governmental relations clients to join the Democratic Business Council for $15,000 annually in order to have access to "Party and political leaders." Murray Aff't ¶ 8 [JEx. 2]. Substantial contributions also "invariably lead" to invitations to special political events involving members of Congress and the Executive branch, as well as appointments to advisory panels. Id. ¶ 12; FEC Statement of Material Facts II at ¶ 280 [PSEx. 2].

206.    The reason many large donors give the party so much money is to build and maintain relationships with the party's candidates and officeholders, with the ultimate purpose of influencing policy in a way that favors their business interests. FEC RNC Mem. at 26–27 [PSEx. 3].

207.    Both office holders and party fund-raisers have sometimes explicitly conditioned access to government officials on financial support for their party. FEC RNC Mem. at 30 [PSEx. 3].

### B.    *Donors Give in Order to Obtain Access and Influence Over Candidates and Officials*

208.    Many major donors give soft money for the purpose of influencing federal elections. FEC Statement of Material Facts II at ¶ 114 [PSEx. 2]; April 30, 1999 Letter from J. Patrick Rooney to Jim Nicholson [JEx. 91].

209.    The act of making a contribution can have other motives, including influencing the way a member votes, maintaining access so one could try to influence a Member's vote, and maintaining access to influence the development of legislation even before a vote. FEC Statement of Material Facts II at ¶ 262 [PSEx. 2].

210.    There is often a symbiotic relationship between contributors and candidates. A contributor gives to have the opportunity to influence a Member, and the Member is willing to provide this opportunity in order to raise more money. FEC Statement of Facts I ¶ 94 [PSEx. 1]; Rozen Decl. ¶ 11 [JEx. 13].

211.    Soft money donors sometimes explicitly link their donations to their legislative goals. In a 1996 letter to RNC Chairman Haley Barbour, one donor stated: "Dear Haley: As a [RNC major donor program] Team 100 Member, I am seeking your help in sharing our grave concerns with the Republican leadership regarding the Senate's federal mental health parity mandate (attached to the VA/HUD appropriations bill). We at New York Life are opposed to this provision . . . ." FEC RNC Mem. at 28 n.21 [PSEx. 3].

212.    Major donors can even use the threat to cut off donations to induce the party leadership to abandon legislation contrary to their business interests. For example, in a 1995 letter to RNC Finance Chairman Howard Leach an MCI official stated:

> As I am sure you are aware, [MCI CEO Bert] Roberts has been a life long supporter of Republican positions and values, but events over the last several months have changed his views dramatically. ¶ The telecommunications legislation currently pending before congress written and supported by the Republican leadership is extremely bad for MCI, its employees, and its stockholders. I am sure you can understand that, in Mr. Roberts' present frame of mind, a contribution to the RNC is out of the

question. However, if events change, I am sure Mr. Roberts will reconsider this position.

FEC RNC Mem. at 28 n.21 [PSEx. 3].

213. Companies that are directly affected by the federal regulations, such as those involved in national defense or tobacco products, have reason to believe that they must participate in the soft money system in order to succeed. FEC Statement of Material Facts II at ¶ 275 [PSEx. 2]; Hassenfeld Decl. ¶¶ 19–20 [JEx. 14].

214. Parties have told prospective donors that they should donate because their business competitors have. FEC Brief at 33.

215. A 1998 internal RNC memorandum to Chairman Nicholson discussed a planned fundraising call to Jack Pellicci, Vice President of Oracle Corporation, about joining the RNC's Team 100 major donor program:

> You met with Jack in March. Mel Sembler has given up on Oracle because their decision-maker, Ellison, is a Democrat. You should follow up with Jack regarding their contribution to the RNC. You should mention that Microsoft joined earlier in the year.

This document contained a handwritten note indicating that a voicemail ["VCML"] had been left: "hope you'll join T–100— 'Netscape and Microsoft have' . . . ." FEC RNC Mem. at 33 n.34 [PSEx. 3].

## C. *Elected Officials Assist Parties in Raising Soft Money.*

216. When a corporation contributed a large amount to a party committee that, in turn, used its funds to support its candidates' campaigns, the corporation would obtain influence over these candidates. This occurred because the candidates were acutely aware of the sources of the funds that enabled the party committee to support their campaigns. FEC Statement of Facts I at ¶ 164 [PSEx1]; Wirth Decl. ¶ 17 [JEx. 10].

217. Former Senator Paul Simon summarized the system as follows:

> If this were a DSCC event, the money raised would be credited to Senate candidates based on the DSCC's tally system. Donors would be told the money they contributed could be credited to any Senate candidate. The callers would make clear that this was not a direct contribution, but it was fairly close to direct. So contributors would have the sense that this would benefit my campaign, if they contributed to the party.

Simon Decl. ¶ 6 [JEx. 9].

218. Candidates often solicit donors who have already contributed the maximum hard dollar amount directly to the candidate and suggest donations to their political parties as another way to assist the candidate's run for office. FEC Statement of Material Facts II at ¶ 166 [PSEx. 2]; Bumpers Decl. ¶¶ 8–9 [JEx. 3]; Meehan Decl. ¶ 6 [JEx. 4]; Wirth Decl. ¶ 9 [JEx. 10]; Billings Decl. ¶ 12 [JEx. 11]; Sorauf/Krasno Report at 13–14 [JEx. 19].

219. Some party committees use the amount of a candidate's fundraising for the party as an important factor in determining the amount of party support that candidate will receive FEC RNC Mem. at 34–35 [PSEx. 3].

220. Members of Congress who planned to seek re-election also understood that, all other things being equal, it would be helpful if they cast their votes in a way that helped their party, party committees, and thus these large donors. This was never explicitly stated; but it was certainly helpful to the party and therefore to one's own opportunities in the next election cycle. Wirth Decl. ¶ 18 [JEx. 10]; FEC Statement of Facts I at ¶ 165 [PSEx. 1].

221. One aspect of the whole fund-raising nexus called "tallying" exemplifies the close and complex relationships among donor, party committee, and officeholder. Much of the fundraising for the congressional legislative campaign committees

("LCCs") is done by the Members of Congress themselves; thus they know donors because they recruit and solicit them. At least one of the Senate party committees, the DSCC, assigned fundraising quotas to incumbents up for reelection, and apparently kept careful "tallies" of the Senators' fundraising successes and failures. FEC Statement of Material Facts II at ¶ 196 [PSEx. 2]; Hickmott Decl. ¶¶ 8, 13, 15, 17, 34 [JEx. 12]; Simon Decl. ¶¶ 6,7 [JEx. 9]; Wirth Decl. ¶ 7 [PSEx. 10]; Sorauf/Krasno Report at 13 [JEx. 19].

222. Under the DSCC's tally system, all Senators were expected to help raise money for the party. They could solicit contributions directly or sponsor fund raising events on behalf of the DSCC. DSCC also sponsored its own events, using Senators as a draw. FEC Statement of Material Facts II at ¶ 184 [PSEx. 2]; Rozen Decl. ¶ 7 [JEx. 13].

223. Senator Wirth understood that when he raised funds for the DSCC, donors expected that he would receive the amount of their donations multiplied by a certain number that the DSCC had predetermined, assuming that the DSCC had raised other funds. For example, a donor might expect that for every dollar contributed to the DSCC Wirth would receive $3 from the DSCC. Wirth Decl. ¶ 8 [JEx. 10]; FEC Statement of Material Facts II at ¶ 214 [PSEx. 2].

224. Senators who solicited money for the DSCC could not promise that the money would be used directly to support their own or another particular campaign because earmarking is prohibited. But there appeared to be an understanding between the DSCC and the Senators that the amount of money they received was related to the amount of money they raised for the DSCC. Sens. Kennedy, Jackson and Metzenbaum all had unwritten commitments that they would get back as much as they raised as a way to encourage Senators to raise money for the party. FEC Statement of Material Facts II at ¶ 215

[PSEx. 2]; Billings Decl. ¶¶ 7, 10 [JEx. 11].

225. Candidates expect that they will be able to direct how the party spends money on their behalf. A September 6, 1995 letter from Cong. David Funderburk to the NRCC asks "for the remainder of the NRCC Incumbent Support Funds for my reelection" and explains "I would like to use *my* coordinated money to back buy TV and radio. Our local TV stations have changed their policy and are now demanding payment when the ads are placed. Because of that policy, and because of competition for TV time in October from the Helms, Gantt, Hunt, Hayes, Dole and Clinton campaigns, the funds are urgently needed at this time to place these buys. An amount of $30,000 would cover about a half of the last week of the campaign TV buys." (emphasis added). FEC Statement of Material Facts II at ¶ 216 [PSEx. 2]; September 6, 1995 Letter from David Funderburk to NRCC [JEx. 126]; September 18, 1996 Letter from John Hostetler to Hon. Mike Crapo [JEx. 127].

## VII. POLITICAL PARTIES ORGANIZE PROGRAMS AND EVENTS THAT PROVIDE LARGE SOFT MONEY DONORS WITH ACCESS TO CANDIDATES AND ELECTED OFFICIALS

### A. Party Committees: An Overview

226. Party committees have open and reciprocal relationships with the PACs and individuals who give them money, and they openly cultivate relationships between those contributors on the one hand and candidates and officeholders on the other. Money passing through the party committees and spent on behalf of candidates is not cleansed of either the giver's identity or interests. Rather, the parties create opportunities to bring donors and candidates together and therefore provide a degree of access to party donors that is difficult to match through other venues. FEC Statement of Facts I at ¶ 3 [PSEx. 1].

227. The identities of major contributors to party committees are not secret, hidden, or obliterated. On the contrary, the parties go to great pains to make sure that legislators and other public officials know exactly who donates substantial sums of money. Contributors to party committees are widely recruited for donor clubs; the six national party committees all have exclusive clubs, membership in which is open only to major contributors. The advertised reward for giving more is the opportunity to meet with leading congressional and administration officials, particularly in progressively smaller groups. Some of these meetings occur in fundraising events where the presence of various officials is the main drawing card for contributors. Other encounters occur after the election when parties organize retreats for donors and officeholders to come together for the express purpose of establishing friendships and lines of communication. FEC Statement of Facts I at ¶ 4 [PSEx 1].

228. Most of the money that national party organizations spend in coordinated campaigns is targeted to states and localities that are critical to their presidential, senatorial, or congressional candidates' success. These expenditures, which are largely made with soft money, enable party organizations in the nation's capital to influence locally executed, grassroots activities that benefit the entire party ticket. Herrnson Statement at 40–41 [JEx. 17].

229. As the advent of public funding for Presidential campaigns has freed presidential candidates from the need to raise funds for their own campaigns, they have turned to fundraising for the parties. These efforts are coupled with the same opportunities for contributor access at the executive level that are provided at the legislative level. FEC Statement of Material Facts II at ¶ 15 [PSEx. 2]; Sorauf/Krasno Report at 27–30 [JEx. 19].

230. RNC Chairman Haley Barbour has intervened with legislative and executive officials on behalf of large donors. FEC RNC Mem. at 40 [PSEx. 3].

231. Party committees operate, or at least appear to serve, as conduits through which donors can make donations to benefit, and curry favor with, the party's candidates. FEC RNC Mem. at 41 [PSEx. 3].

B. *Party Committees Are Instrumental In Raising Both Hard And Soft Money For the Benefit of Candidates*

### National Party Committees

232. In Presidential election years, the two national party committees, the Democratic National Committee (DNC) and the Republican National Committee (RNC), are controlled by and operated for the benefit of the parties' Presidential nominees. For at least a century, the national party committees have been melded into their party's presidential campaign every four years, often assuming a subsidiary role to the presidential candidate's personal campaign committee. The presidential candidate has traditionally been conceded the power to shape and use the committee, at least for the campaign. Given the newfound power and resources of the national committees, they have become vastly more useful to the presidential candidates in recent campaigns. FEC Statement of Material Facts II at ¶ 14 [PSEx. 2]; Sorauf/Krasno Report at 27 [JEx. 19].

233. The Democratic National Committee and the Republican National Committee focus most of their efforts on presidential elections and strategically deliver resources to parts of the country that could be decisive in determining the outcome of presidential elections. FEC Statement of Material Facts II at ¶ 25 [PSEx. 2]; Herrnson Statement at 14 [JEx. 17].

234. According to the Thompson Committee Report, during the 1996 federal election cycle, the DNC became a shadow re-election campaign, allowing the President to spend more than the federal limits

to which he had agreed in accepting partial public funding for his campaign. "In short, the President used the DNC for an end-run around restrictive federal campaign laws." Majority Report at 58–59 [JEx. 21]; FEC Statement of Material Facts II at ¶ 410 [PSEx. 2].

235. The RNC has assisted certain federal candidates by engaging in coordinated expenditures on behalf of those candidates. FEC Statement of Material Facts II at ¶ 44 [PSEx. 2].

### The Hill Committees

236. The parties' national committees play important roles in presidential elections, and the congressional and senatorial campaign committees, sometimes referred to as the "Hill committees," have developed into major support centers for House and Senate candidates. The congressional campaign committees focus their efforts on House races, and the two senatorial campaign committees focus on Senate contests. Statement of Material Facts II at ¶ 27 [PSEx. 2]; Herrnson Statement at 15 [JEx. 17].

237. The national parties' congressional and senatorial campaign committees provide selected candidates with assistance in specialized campaign activities, such as management, gauging public opinion, issue and opposition research, and communications. They also provide transactional assistance, acting as brokers between candidates and the PACs, individual contributors, political consultants, and powerful incumbents who possess some of the money, political contacts, and campaign expertise that candidates need. Herrnson Statement at 30 [JEx. 17].

238. The Hill committees furnish PACs and other Washington insiders with information that they can use when formulating their contribution strategies and selecting individual candidates for support. Herrnson Statement at 36 [JEx. 17].

239. The Republican Hill committees and the DSCC even furnish some candidates with contributor lists, with the provi-

so that the candidates surrender their own lists to the committee after the election. Herrnson Statement at 36 [JEx. 17].

240. The Hill committees are important intermediaries in the fund-raising process because they help needy challengers, open-seat candidates, and incumbents raise money from other PACs, other candidates, and individuals who make large contributions. Herrnson Statement at 39 [JEx. 17].

241. One of the more controversial ways that the Hill committees raise money for needy candidates is by "leveraging" it. Campaign committee staff organize functions and clubs that promise PAC managers, lobbyists, and others access to congressional leaders in return for large contributions. Herrnson Statement at 38 [JEx. 17].

### C. Democratic Donor Programs Provide Access To Corporations and Individuals In Exchange For Large Donations of Soft Money

### Democratic Business Council

242. In 1981, Robert Hickmott became the Executive Director of a new DNC entity, the Democratic Business Council ("DBC"). The Democrats had just lost the White House, and the DBC was an attempt to be more aggressive in its outreach to solicit contributions from the business community. Towards this end, the DNC set a new $10,000 contribution level to join the DBC. Up to that time, it was $5,000. The $10,000 could include both corporate and non-corporate money. What contributors got in return was three or four weekend events throughout the country, in which they got together with party officials and Members of Congress to talk about issues, and to socialize. These were not fundraising events, but rather sustaining donor events where no additional money was raised. However, donors were asked to invite prospective donors, who might later decide to join the DBC. FEC Statement of Material Facts II

at ¶ 153 [PSEx. 2]; Hickmott Decl. ¶¶ 2–4 [JEx. 12].

243. Potential donors were told of these fundraising events in advance, as an incentive to join the DBC. There was a brochure that spoke about meeting other like-minded business leaders, as well as Members of Congress. For example, the Philadelphia Stock Exchange hosted DBC members at the Democratic Party's 1982 mid-term convention, and different Members of Congress came by and discussed business and economic issues with donors. DBC also had dinners and receptions attended by Members of Congress. Every now and then contributors would go to a nice resort like Palm Springs or Nantucket, and Members of Congress would come and talk with donors. Most events attracted in the range of 35–50 donors, out of an eventual total of about 150 donors. FEC Statement of Material Facts II at ¶ 154 [PSEx. 2]; Hickmott Decl. ¶ 5 [JEx. 12].

244. According to a Democratic Business Council ("DBC") brochure, membership in the DBC requires an individual contribution of $10,000 annually, or an annual contribution of $15,000 from a corporation or PAC. DBC Brochure (Murray Aff't Ex. 1) [JEx. 2(a)]; Joint Stip. ¶ 71.

245. A DBC brochure states: "DBC members interact with Party leaders through issues conferences/retreats, such as [the DBC's] annual Washington Issues Conference, annual retreat, and monthly issues briefings." DBC Brochure (Murray Aff't Ex. 1) [JEx. 2(a)]; Joint Stip. ¶ 72.

246. The 1998 DBC calendar of events included: a "Political Strategy Session" where the scheduled speakers included Governor Roy Romer, General Chair of the DNC, Craig Smith of the White House, Jill Alper, DNC Political Director; a retreat where the scheduled speakers included Vice President and Mrs. Gore and various members of Congress and White House staff; a celebration of the DNC's 150th birthday where the scheduled participants included President and Mrs. Clinton, Vice President and Mrs. Gore and various other party leaders; a "Washington Issues Conference" where the scheduled participants included the Clintons, the Gores, Senators and Representatives; and various other meetings and briefings. DBC 1998 Calendar of Events (Murray Aff't Ex. 2) [JEx. 2(b)]; Joint Stip. ¶ 74.

247. Groups of DBC members prepare "white papers" on policy issues, which are submitted to the chairman of the DNC. Murray Aff't ¶ 9 [JEx. 2]; Joint Stip. ¶ 75.

### Women's Leadership Forum

248. A brochure on the Women's Leadership Forum ("WLF") of the DNC invited members to participate in "issues and political briefings." The WLF's Honorary Chair was Tipper Gore. WLF Brochure (Murray Aff't Ex. 3) [JEx. 2(c)]; Joint Stip. ¶ 76.

249. According to a WLF brochure, membership in the WLF requires an annual contribution of $1,000; general membership is also attainable by raising $2,000 annually. According to the brochure, the WLF Finance Council is comprised of individuals who personally contribute $5,000 and the Executive Council is made up of individuals who contribute $10,000 or corporations who contribute $15,000. [JEx. 2(c)]; Joint Stip. ¶ 77.

### Major Supporter Program

250. The Major Supporter program of the DNC requires a corporate contribution of $50,000 and is also available to individuals who raise $50,000. Murray Aff't ¶ 11 [JEx. 2]; Joint Stip. ¶ 78.

### Majority Trust & Leadership Circle

251. The larger the contribution, the smaller and more exclusive the group of people who attended the get togethers with the Senators. For example, at the Democratic Convention in New York in 1992, the Majority Trust got better seats in Madison Square Garden, and they also got a luncheon with Senator Mitchell and the Democratic Leadership. This was smaller and more intimate than the Leadership Circle functions, which were smaller

than the $5,000 donor functions. FEC Statement of Material Facts II at ¶ 151 [PSEx. 2]; Hickmott Decl. 139 [JEx. 12].

### Jefferson Trust

252. The Jefferson Trust is another DNC donor program. Membership in the Jefferson Trust is available to corporations who donate (or individuals who raise) $100,000. Murray Aff't ¶ 11 [JEx. 2]; Joint Stip. ¶ 79.

### Advisory Panels

253. Financial support often leads to appointments to advisory panels through which donors can contribute substantive ideas on policy questions that are consistent with their interests. Murray Aff't ¶ 12 [JEx. 2].

### Steering Committees

254. Financial supporters of parties and political committees often participate on steering committees for individual campaigns. As a member of a steering committee, a donor would typically agree to raise a stipulated amount of money and to host a fund-raiser. Murray Aff't ¶ 13 [JEx. 2]; Joint Stip. ¶ 80.

### Other Opportunities for Access to Democratic leadership for large donors

255. Substantial contributions to national parties lead to invitations to special political events involving members of Congress and the executive branch. Murray Aff't ¶ 12 [JEx. 2].

256. Political events to which donors are invited provide the opportunity to schedule private meetings at which a donor may further discuss particular issues of interest to him. Murray Aff't ¶ 12 [JEx. 2].

257. DNC Vice–Chair Martha Phipps listed in May 1994 the following activities that could be made available to DNC donors:

- seats on air force one and air force two;
- permission to play on the White House tennis courts;
- seats at private White House dinners;
- admission to Rose Garden ceremonies;
- joining official delegations traveling abroad;
- appointments to boards and commissions; eating at the White House mess;
- visits to and overnight stays in the White House residence;
- "guaranteed" Kennedy Center event tickets;
- seats at the President's weekly radio addresses;
- photo ops with POTUS, VPOTUS, FLOTUS and Tipper Gore;
- seats at Presidential lunches with corporate CEOs;
- "phone time" from VPOTUS;
- seats in the White House movie theater;
- monthly lunches with FLOTUS or White House aides;
- using the President's box at two local theaters; and meetings w/VPOTUS.

Majority Report at 200–01, 367–68 [JEx. 21].

258. Businessman Roger Tamarz made contributions totaling $300,000 to the Democratic Party and obtained access to high government officials and to six events at the White House. FEC Statement of Material Facts II at ¶ 516 [PSEx. 2]; Thompson Committee Report at 2920 [JEx. 21]; Minority Report at 8224–28, 8233–34 [JEx. 21].

### D. Republican Donor Programs Provide Access To Corporations And Individuals In Exchange For Large Donations Of Soft Money

259. The Republican National Committee offers its donors a range of different donor programs, for a range of different donor financial levels and interests. Summary of RNC Donor Programs [JEx. 96]. The RNC President's Club requires a $1,000 annual contribution and offers at

least one meeting per year, which includes policy briefings and discussions led by Republican Congressional and other leaders. *Id.* The Chairman's Advisory Board requires a $5,000 annual hard money contribution and offers an active schedule of national and regional meetings between Board members and Republican Party leaders. *Id.* The Republican Eagles requires an annual contribution of $15,000 (individual) or $20,000 (with spouse or corporate). *Id.;* RNC Contribution Guidelines [JEx. 97]. The Eagles program offers an extensive series of national and regional meetings with Republican leaders, special access to Republican events, and other benefits. Brochure re: The Benefits of Eagle Membership [JEx. 98]; Brochure re: Republican Eagles Membership Benefits [JEx. 99]. The Team 100 program requires a donation of $100,000 upon joining and every fourth year thereafter, with $25,000 donations required in each of the three intervening years; because of federal contribution limits, a large portion of these donations must be soft money. August 3, 1994 Letter from Henry Barbour [JEx. 100]. The Team 100 program offers members national and regional meetings with the Republican Party leadership throughout the year, special events, membership in the Eagles program, the opportunity to participate in international trade missions, and other benefits. Summary of RNC Donor Programs [JEx. 96]. The Season Ticket program requires a donation of $250,000 upon joining and renewals thereafter; because of federal contribution limits, all or the vast majority of these donations must be soft money. December 20, 1995 Letter from Timothy Barnes to Thomas Collamore [JEx. 95]; Flier re: RNC Season Ticket Program [JEx. 89]. The "Season Ticket" or "Season Pass" program offers the greatest and most exclusive range of RNC donor program benefits, including one Team 100 membership, two Eagles memberships, special access to a range of Republican Party events, and the assistance of RNC support staff. *Id.;*

FEC Statement of Material Facts II at ¶ 120 [PSEx. 2].

### *Republican Eagles*

260. The Republican Eagles is an RNC donor program which requires members to contribute $15,000 annually. Minority Report at 7981 [JEx. 21]; Joint Stip. ¶ 19.

261. In 1975, the Republican Eagles held their first meeting in the Roosevelt Room of the White House with President Gerald Ford. 1995 Republican Eagles Brochure at 7986 [JEx. 65]; Joint Stip. ¶ 20.

262. A September 16, 1982, memorandum on White House stationery indicates that, in 1982, a telephone call by President Reagan to an RNC event for the Eagles held in an auditorium at the Department of Commerce was approved. *See* Memorandum from A. Morgan Mason to Michael K. Deaver, 9/16/82 [JEx. 66]; Presidential Talking Points: Phone Call to Eagles Meeting, 9/17/82 [JEx. 67]; Joint Stip. ¶ 21.

263. President Reagan's talking points for his September 16, 1982 call to the Eagles stated:

Hello to all of you high flying Eagles. I am genuinely sorry I couldn't be there in person with you today. Events here at the White House and the trip to New Jersey this afternoon have prevented me from coming over. But we have the Eagles down to the White House quite often so I will be seeing you soon.

In the meantime, I'm sending Secretary Shultz, Secretary Regan and other members of the Cabinet over to keep you abreast of what's going on. In fact, you will be seeing more of my Cabinet today than I will.

Let me say to you Eagles how important your contributions are to the Republican Party. I know a lot of people must tell you that, but we tell you so often because it is so true. We are so appreciative. You are pillars of the party.

Presidential Talking Points [JEx. 67]; Joint Stip. ¶ 22.

264. A Republican Eagles brochure distributed during the 1996 election cycle contained photographs of Eagles members meeting with former President George Bush, former Vice President Dan Quayle, Governor Pete Wilson, Senators Connie Mack and Kay Bailey Hutchison, and Mayor Rudolph Giuliani. 1995 Republican Eagles Brochure [JEx. 65]; Joint Stip. ¶ 23.

265. The Eagles Brochure stated:

Each year Eagles receive invitations to four national meetings. At least two of these meetings take place in Washington, D.C., and feature strategy and issue committee sessions with prominent elected Party leaders from the U.S. Senate and House on such topics as the budget and tax reform, international trade and regulatory reform, health care and foreign policy. Other participants have included Republican Presidents (at the White House), Governors and former Administration officials.

1995 Republican Eagles Brochure at 7999 [JEx. 65]; Joint Stip. ¶ 24.

266. The Eagles Brochure stated the following under the heading, "International Trade Missions":

Reflecting the unequaled position enjoyed by Republican Eagles, foreign economic and trade missions to Europe and Asia are also periodically scheduled. We have been welcomed enthusiastically by heads of state, such as Premier Li Peng of the People's Republic of China and King Carl XVI Gustaf of Sweden, as well as high-ranking government and business officials in London, Paris, Budapest, Vienna, Beijing, Taipei, and Hong Kong.

1995 Republican Eagles Brochure at 8000 [JEx. 65]; Joint Stip. ¶ 25.

267. According to the Eagles Brochure, active participation on the "Eagles Issues Committees" provides members the "opportunity to communicate their views directly to the elected leadership of the Party and the Congress." 1995 Republican Eagles Brochure at 7989 [JEx. 65]; Joint Stip. ¶ 26.

268. According to the Eagles Brochure, the Eagles Issues Committees prepare reports which are "distributed to the leadership of the Republican National Committee, members of the United States Senate and House of Representatives, Republican Governors, the National Policy Forum and the 1996 Republican Platform Committee." 1995 Republican Eagles Brochure [JEx. 65] at 7989; Joint Stip. ¶ 27.

269. The tentative agenda for the Republican Eagles meeting held in conjunction with the 1996 RNC Annual Gala on January 23 and 24, 1996 included a "legislative update" where the scheduled participants were Senate Majority Leader Bob Dole and House speaker Newt Gingrich, a "private pre-Gala cocktail reception" where the invited guests included Republican governors, and "Eagles Issues Discussions" where the invited speakers included six senators and eight representatives. Republican Eagles 1996 Annual Gala Agenda [JEx. 68]; Joint Stip. ¶ 28.

*Team 100*

270. Another one of the RNC's donor programs is Team 100. According to a Republican National Finance Committee Summary of Programs, membership on the RNC Team 100 requires an initial contribution of $100,000 upon joining, and $25,000 in the subsequent 3 years. Republican National Finance Committee Summary of Programs [JEx. 64]; Joint Stip. ¶ 29.

271. The RNC has described its Team 100 donor program as the "premier fundraising group of the Republican Party," 1996 Team 100 Brochure [JEx. 85], and "the most exclusive donor group" of the Party. April 15, 1996 Letter from Haley Barbour [JEx. 103]. Team 100 requires a donation of $ 100,000 upon joining and every fourth year thereafter, with $25,000 donations required in each of the three intervening years. 1996 Team 100 Brochure [JEx. 85]. Because of federal con-

tribution limits, a large portion of these donations must be soft money. *Id.;* FEC Statement of Material Facts II at ¶ 123 [PSEx. 2].

272. Team 100 benefits are "designed to give TEAM 100 members the greatest opportunity possible to meet and talk informally with Party leaders, foreign dignitaries and special guests." 1996 Team 100 Brochure [JEx. 85]. Specifically, Team 100 members are invited to 44 "exclusive" international business missions abroad. June 21, 1995 Memorandum from Tim Barnes to Nancy Brinker [JEx. 83]. "Team 100's stature enables [members] to meet with some of the highest-ranking government and business officials during these international exchanges." *Id.* Team 100 members are invited to "working business sessions in which the latest developments on a host of policies and issues are reviewed and discussed." 1996 Team 100 Brochure [JEx. 85]. They enjoy "access to National Political Figures" and "access to exclusive events with Political leaders," June 21, 1995 Memorandum from Tim Barnes to Nancy Brinker [JEx. 83], as well as a "special relationship with Republican Party leaders." Brochure re: Team 100 [JEx. 117]. RNC staff provide assistance for Team 100 members "wanting to meet with Senators and Representatives." June 21, 1995 Memorandum from Tim Barnes to Nancy Brinker [JEx. 83]. RNC staff also "assist in directing [Team 100] members to respective Senator or Representative [sic] to help with specific legislative issues." *Id.;* FEC Statement of Material Facts II at ¶ 143 [PSEx. 2].

273. A 1994 RNC Team 100 brochure stated that those who became Team 100 members would "enjoy a full package of membership benefits," including "[i]nvitations to national and regional TEAM 100 business meetings and social events" that "feature working business sessions in which the latest developments on a host of policies and issues are reviewed and discussed." 1994 Team 100 Brochure (hereinafter "Team 100 Brochure") [JEx. 70]; Joint Stip. ¶ 30.

274. According to the Team 100 Brochure, invited participants for 1995–96 Team 100 meetings included:

Former Presidents Gerald Ford and George Bush, Dan Quayle, Bob Dole, Phil Gramm, Trent Lott, Newt Gingrich, Dick Armey, Lamar Alexander, Richard Lugar, Jack Kemp, Dick Cheney, and other Republican leaders. Past participants include: Connie Mack, Bob Packwood, Alfonse D'Amato, Thad Cochran, Pete Wilson, Bill Paxon, Bill Archer, Susan Molinari.

Team 100 Brochure [JEx. 70]; Joint Stip. ¶ 31.

275. The Team 100 Brochure also listed "International TEAM 100 Business Missions" among the membership benefits. The brochure added:

In recent years, TEAM 100 members have enjoyed exclusive missions abroad including meetings in China, Rome, Paris, Moscow, St. Petersburg, Prague, Vienna, Warsaw and Madrid. TEAM 100's stature enables them to meet with some of the highest ranking government and business officials during these international exchanges.

Team 100 Brochure [JEx. 70]; Joint Stip. ¶ 32.

276. On December 15, 1995, RNC Chairman Haley Barbour wrote a letter to Republican members of the Senate Finance Committee that stated:

[T]he RNC's premier fundraising organization, Team 100, will hold its Winter National Meeting on [January 24, 1996]. The members of Team 100 have requested to meet with the Senate Finance Committee. I hope you will plan to participate in this discussion on the budget from 10:00 a.m. to 11:00 a.m. in the Dirksen Senate Office Building, Room 106. You are also invited to attend a luncheon hosted by Speaker Newt Gingrich and Senate Majority Leader Bob Dole following the discussion.

Letter from Haley Barbour to Bob Dole of 12/15/95 [JEx. 71]; Joint Stip. ¶ 33.

277. The 1996 Team 100 Gala Speakers Agenda listed meetings that were scheduled for January 24, 1996 between Team 100 members and Senator Dole, Speaker Gingrich, Republican presidential candidates, Republican Senators on the Finance Committee, and Republican members of the House Ways and Means Committee. *See* Team 100 Gala Speakers Agenda [JEx. 72]; Joint Stip. ¶ 34.

278. In a July 10, 1996 letter, John Palmer, chairman of the board of Mobile Telecommunication Technologies wrote to a prospective Team 100 member:

> I feel we have a rare opportunity with Haley [Barbour], Trent [Lott], and Thad [Cochran] in the positions they are today.
>
> Ed Lupberger, CEO of Entergy, joined Team 100 earlier this year, and this past Spring I saw Haley escort him on four appointments that turned out to be very significant in the legislation affecting public utility holding companies. In fact, it made Ed a hero in his industry.
>
> If you have been considering this or if there is a chance you might, I feel it significant to Haley and the Senators if you could do this . . . .

Letter from John N. Palmer (addressee redacted) of 7/10/96 [JEx. 73]; Joint Stip. ¶ 35.

279. In an undated memo from an RNC aide to Team 100 chairman Tim Barnes relating to Ole Nilssen, a contributor Barnes referred to as "hot," the aide informed Barnes, "We are working on getting him an appointment with [Representative] Dick Armey, so we can get his other $50,000. We had a meeting set up for this week, but Armey canceled his Florida leg of his trip." Memorandum from Kevin Kellum to Tim Barnes and Kelley Goodsell [JEx. 79]; Joint Stip. ¶ 60.

280. A letter dated February 27, 1996 from RNC Finance Chairman Howard Leach and Team 100 Chairman Nancy Brinker to Linda Wachner stated, in part: "As you know, the RNC has a challenging fundraising goal of $125 million that is needed to win the White House and maintain our majorities in Congress. Team 100 is responsible for *twenty-six percent* of that budget and as members of the RNC's premier fundraising organization, we must work hard to meet that goal so we will be able to enjoy the fruits of our labor for the next four years." February 27, 1996 Letter from Nancy Brinker to Linda Wachner (emphasis in original) [JEx. 93]; FEC Statement of Material Facts II at ¶ 119 [PSEx. 2].

281. A letter dated June 12, 1996 from Team 100 Chairman Nancy Brinker to "John Doe" regarding Team 100 events at the upcoming Republican National Convention stated that "the Team 100 Convention program provides an unparalleled opportunity for you to meet informally with the senior elected leadership of our Party, from Speaker of the House Newt Gingrich, who will join Team 100 members Sunday evening, to governors, congressional leaders and Party figures from across the country." June 12, 1996 Letter from Nancy Brinker to "John Doe" [JEx. 118]; FEC Statement of Material Facts II at ¶ 144 [PSEx. 2].

282. A memorandum dated April 8, 1996 from Team 100's Kevin Kellum to Phil Phillips regarding "Meeting with Senator Dole" discussed Secret Service and other logistics related to Phillips' upcoming meeting with Dole at a college gymnasium "where you will be able to present your Team 100 dues in full." April 8, 1996 Memorandum from Kevin Kellum to Phil Phillips [JEx. 133]; FEC Statement of Material Facts II at ¶ 230 [PSEx. 2].

283. A letter dated October 27, 1997 from Frank E. Richardson of F.E. Richardson & Co. to Team 100's Julie Finley about a provision in "the budget agreement" that apparently limited the ability of physicians to obtain Medicare reimbursements stated, in part: "Perhaps you could

bring [this issue] to the attention of Trent Lott and Newt Gingrich .... I think you are in a good position to get the attention of people who can get rid of this ridiculous and very harmful provision." October 23, 1997 Letter from Frank E. Richardson to Julie Finley [JEx. 153]; FEC Statement of Material Facts II at ¶ 332 [PSEx. 2].

284. According to RNC documents, Team 100's 1993 net revenue was over $2.2 million, with a paid membership of 6; Team 100's 1994 net revenue was over $4.4 million, with a paid membership of 16; Team 100's 1995 net revenue was over $6.6 million, with a paid membership of 33; Team 100's 1996 net revenue was over $35.5 million, with a paid membership of 343. Other RNC documents indicate that 1994 Team 100 donations totaled over $5.6 million, with a fundraising cost of only 4%. January 17, 1995 Memorandum from Henry Barbour to Nancy Brinker re: Team 100 Contributions for 1994 [JEx. 92]; FEC Statement of Material Facts II at ¶ 125 [PSEx. 2].

### Season Ticket (or Season Pass)

285. Members of a donor group called "RNC Season Pass" were offered various special benefits in connection with the 1996 Republican National Convention, including: a private meeting with Presidential nominee Bob Dole, the Vice Presidential nominee, Speaker Newt Gingrich and RNC Chairman Haley Barbour; passes to Speaker Gingrich's skybox for each evening Convention session; and "24–hour access to RNC Senior Staff to answer questions and assist with scheduling." June 24, 1996 Letter from Haley Barbour to Richard M. DeVos, Jr. [JEx. 102]; FEC Statement of Material Facts II at ¶ 122 [PSEx. 2].

286. An undated letter from RNC Chairman Haley Barbour to John Gartland of Amway stated: "I personally believe the Season Ticket program is ideal for our very best (and most loyal) donors like Jay [Van Andel] and Rich [DeVos of Amway]." Undated Letter from Haley Barbour to John Gartland [JEx. 104].

The Season Ticket program requires a donation of $250,000 upon joining and renewals thereafter. December 20, 1995 Letter from Timothy Barnes to Thomas Collamore [JEx. 95]; Flier re: RNC Season Ticket Program [JEx. 89]. Because of federal contribution limits, a large portion of these donations must be soft money. FEC Statement of Material Facts II at ¶ 124 [PSEx. 2].

287. Season Ticket benefits include one Team 100 membership, two Eagles memberships, special access to a range of Republican Party events including the annual RNC Gala and the quadrennial national convention, and the assistance of RNC support staff. Flier re: RNC Season Ticket Program [JEx. 89]; FEC Statement of Material Facts II at ¶ 134 [PSEx. 2].

### President's Dinners

288. During the Reagan and Bush years, the RNC sponsored "President's Dinners." A document entitled "Benefits for Tablebuyers and Fundraisers" lists benefits for "Tablebuyers" at a Bush Administration President's Dinner:

- "Private reception hosted by President and Mrs. Bush at the White House" or a "[r]eception hosted by The President's Cabinet."

- "Luncheon at the Vice President's Residence hosted by Vice President and Mrs. Quayle."

- "Senate–House Leadership Breakfast hosted by Senator Bob Dole and Congressman Bob Michel."

- "Option to request a Member of the House of Representatives to complete the table of ten. With the purchase of a second table, option to request one Senator or one Senior Administration Official."

Benefits for Tablebuyers and Fundraisers for the President's Dinner (hereinafter "Fundraiser Benefits Brochure") [JEx. 74]; Joint Stip. ¶ 36.

289. According to the Fundraiser Benefits Brochure, "Top Fundraisers" got the "[o]pportunity to be seated at a head table with The President or Vice President based on ticket sales." Fundraiser Benefits Brochure [JEx. 74]; Joint Stip. ¶ 37.

290. The Fundraiser Benefits Brochure concluded, "Benefits based on receipts." Fundraiser Benefits Brochure [JEx. 74]; Joint Stip. ¶ 38.

### Republican Senate Council

291. A 1993 fundraising letter of the Republican Senate Council, a fundraising arm of the National Republican Senatorial Committee ("NRSC"), stated:

The standard membership in the Republican Senate Council is $5,000 a year and the Policy Board is $15,000. The standard membership entitles you to monthly meetings while the Senate is in session. Our program generally consists of discussion on current pending legislation with the ranking Republican on the pertinent committee addressing the membership.

The Policy Board level is entitled to all the standard membership benefits in addition to quarterly dining with this smaller group and the Republican Senators. The meetings serve as a virtual one-on-one as the Senators may outnumber the Policy Board members.

Letter from Senator Christopher Bond, NRSC Vice Chairman, of 7/1/93 [JEx. 75]; Joint Stip. ¶ 39.

292. An August 3, 1995 letter signed by Kit Bond welcoming donors to the NRSC Republican Senate Council advised that, for an annual donation of $15,000 in PAC funds, a donor can become a Policy Board member: "This venue serves as a unique opportunity for extensive dialogue between Policy Board members and Senators." August 3, 1995 Letter from Kit Bond [JEx. 53]; Joint Stip. ¶ 44.

### NRSC Group 21

293. At least in 1996, the NRSC's "Group 21" program, which required a $100,000 annual donation, offered donors "small dinners with [then-NRSC Chairman] Senator D'Amato and other senators" and other "VIP benefits." FEC Statement of Material Facts II at ¶ 147 [PSEx. 2].

### NRSC Senatorial Trust

294. A 1996 solicitation brochure from the NRSC encourages individuals to join the Senatorial Trust by donating $10,000 in personal funds to the NRSC. The brochure states that "The Senatorial Trust is a vital resource the Republican Senate Leadership depends on ..., and as a result, close, personal relationships often develop between [Senatorial] Trust members, Republican senators and top-level party leaders." 1996 NRSC Senatorial Trust Brochure [JEx. 49]; Joint Stip. ¶ 40.

295. Some donor programs, such as the RNC's Team 250 and the NRSC's Senatorial Trust, permit contributors to make some of the required contributions to other campaign committees and receive "credit" for the donations just as if they had been made to the sponsoring committee. During 1996, the NRSC Senatorial Trust, for example, permitted 1995 Senatorial Trust members to make their required $10,000 annual contribution for membership in the Senatorial Trust directly to Senate candidates who were running in the 1996 cycle. November 1, 1995 Letter from Senator Al D'Amato to "SAL" [JEx. 101]; FEC Statement of Material Facts II at ¶ 121 [PSEx. 2].

296. Annual benefits of the NRSC's Senatorial Trust include four national meetings featuring Republican Senators and party leaders, as well as regional events. FEC Statement of Material Facts II at ¶ 137 [PSEx. 2].

297. For example, a 1996 solicitation brochure from the National Republican Senatorial Committee (NRSC) invited individuals to join the "Senatorial Trust" by donating $10,000 to the NRSC. The brochure noted that: "The Senatorial Trust is a vital resource the Republican Senate Leadership depends on ..., and as a re-

sult, close, personal relationships often develop between Trust members, Republican senators and top-level party leaders." Herrnson Dep. at 123 [JEx. 36].

### Chairman's Foundation of NRSC

298. "The [NRSC's] Chairman's Foundation was established in 1989 to provide the Senate Republican Leadership with direct access to the viewpoints and concerns of America's most talented entrepreneurs, dynamic business owners, and visionary corporate chieftains." Annual benefits include invitations to four or five policy briefings and dinners featuring Republican senators, all four Senatorial Trust meetings which also feature Republican Senator and leaders, and a number of other regional Foundation meetings. "Members of the Chairman's Foundation are invited to four or five intimate and informative meetings each year to share views, experiences, and concerns with senior Republican Senators. These special occasions are designed to promote the free flow of ideas and discuss issues that will shape our nation's destiny into the next century." A late 1996 document stated: "[s]ince membership [in the Chairman's Foundation] is limited to 60, the opportunity for close and personal conversations with the Senators and staff exist at each meeting." September 12, 1996 Letter from Nancy Thawley [JEx. 113]. An early 1995 document stated: "[t]he meeting structure is a 'working' dinner where we try to have a one-to-one ratio, Senator to Foundation member. Membership in the Chairman's Foundation is limited to 100 CEO's of America's top corporations, giving members the ability to serve in an advisory capacity and work closely with the key Republican decision makers of our country." FEC Statement of Material Facts II at ¶ 136 [PSEx. 2].

299. A 1996 solicitation by the NRSC for the Chairman's Foundation describes that donor program as reserved for the highest corporate officers of leading corporations, with an invitation only membership limited to 60 individuals. Members must contribute a minimum of $25,000 in either personal, PAC or corporate funds, and are entitled to attend "three private 'working' dinners a year with Republican Senators and, often, with Republican Chairmen of critical Senate committees such as Budget or Finance. These small dinners are special occasions when Foundation members can share their ideas and recommendations directly with Republican Senators on key policy initiatives." 1996 NRSC Chairman's Foundation Brochure [JEx. 50]; Herrnson Dep. at 124 [JEx. 50]; Joint Stip. ¶ 41.

300. A September 27, 1995 NRSC memo entitled "Chairman's Foundation News" described the September 12, 1995 Chairman's Foundation meeting as follows: "Thirty Foundation members and guests were briefed on the issues before the Senate Finance Committee by the Chief of Staff and General Counsel, the International Trade Counsel and the Tax Counsel. Following the briefings, Foundation members had the opportunity for in-depth, personal discussions on the issues during a reception and working dinner with Senators D'Amato, Bond, Simpson, Chafee, Murskowski, Pressler, Grassley and Nickles, as well as the new Finance Committee Chairman, Senator Roth, and the Finance Committee staffers. We were very pleased to have fully eight of the ten Republican Senators on the Finance Committee in attendance." NRSC Memorandum of September 27, 1995 [JEx. 54]; Joint Stip. ¶ 45.

301. Lists of attendees at NRSC Chairman's Foundation Briefing/Dinner (5/22/96: Banking, Housing, and Urban Affairs Committee; 7/25/96: Budget Committee) include names of donor corporations, names of corporate representatives attending, "prospects" attending (with corporate affiliation) and lists of Republican Senate committee members and top committee staff attending. NRSC Chairman's Foundation List of Attendees. ¶ 59 [JEx. 55]; Joint Stip. ¶ 46.

302. A February 13, 1996 NRSC letter to "Dick" at ConAgra suggesting member-

ship for ConAgra in the Chairman's Foundation stated: "ConAgra should really be involved with one of our membership programs because of the year round benefits. The Chairman's Foundation hosts three to five meetings a year here in Washington, D.C., along the lines of the one described in the attached newsletter. The meetings are more business than social, and our members have the opportunity to discuss the impact of pending legislation with the Senators and committee staff members who shape it. Our next meeting is . . . to focus on the Energy Committee. . . . Foundation members are also invited to all Senatorial Trust events, making for a total of 8–10 chances annually to meet in small groups with the leaders of the Republican Senate Majority . . . Dick, ConAgra is exactly the type of company that this group is designed for. The fact that corporate dollars are accepted makes it much more attractive to many people." NRSC February 13, 1996 Letter to "Dick" at ConAgra [JEx. 56]; Joint Stip. ¶ 47.

303. A memorandum dated August 26, 1997 from NRSC Chairman Senator McConnell and Chairman's Foundation Chairman Senator Frist to [addressee redacted] regarding the Chairman's Foundation Fall National Meeting stated, in part: "Chairman's Foundation members are vital to the NRSC for the corporate support they provide to the Committee for Republican senate candidates. The Foundation, with its ability to accept unlimited corporate contributions, is essential to the party-building and voter turnout activities that will propel our GOP senate candidates to victory next year." FEC Statement of Material Facts II at ¶ 130 [PSEx. 2].

304. An April 19, 1996 NRSC form letter (to be signed by Senator D'Amato) invited addressees to a New York fundraising lunch seeking contributions to the Chairman's Foundation: "This program is a way you and your company can make your views known on issues being considered in the U.S. Senate. . . ." April 19, 1996 Letter from Senator D'Amato [JEx. 52]; Joint Stip. ¶ 43.

### NRSC Presidential Roundtable

305. A 1996 NRSC Presidential Roundtable solicitation stated: "Today, with a Republican Majority Congress, there are even greater opportunities for Roundtable members to advise and counsel Republican Senate leaders on legislation to roll back government and restore America's greatness." "Members are encouraged to contact the Roundtable staff, through a special toll-free number, . . . for any assistance they might need in planning their visits to Washington." 1996 NRSC Presidential Roundtable Brochure [JEx. 51]; Joint Stip. ¶ 42.

### NRCC Congressional Forum and House Council Programs

306. The National Republican Congressional Committee offers two major donor programs developed to "open the channels of communication between the business community, PACs, and Republican House Members." Brochure re Congressional Forum and House Council [JEx. 110]. These are the Congressional Forum and House Council programs. The Congressional Forum requires an annual donation of $15,000 (individuals and PACs) or $25,000 (corporate). The House Council requires a donation of $5,000 (PACs) or $10,000 (corporate). January 6, 1995 Letter from Jack Fields to "House Council Member" [JEx. 105]; FEC Statement of Material Facts II at ¶ 127 [PSEx. 2].

307. A 1996 election cycle NRCC flyer describes the benefits of joining the NRCC Congressional Forum and House Council: "The Congressional Forum and House Council programs of the National Republican Congressional Committee have been developed to open the channels of communication between the business community, PACs, and Republican House Members. The programs involve its [sic] participants in the policy-making process through an unprecedented level of dialogue with House Republicans and party leaders.

These programs offer an unprecedented number of quality events which allow you to develop important relationships not only with Republican Members of Congress, but also with others in the business community. Regular meetings permit Congressional Forum and House Council members to voice their opinions and exchange information regarding the issues directly affecting their industry." The Congressional Forum is described as "the NRCC's major donor program for the business community. This program has been designed to give its members an intimate setting to develop stronger working relationships with the new Republican Congressional majority" through such activities as "Monthly private dinners with the Chairmen and Republican Members of key Congressional committees." Membership is $15,000 annually for individuals and PACs; $25,000 annually for corporations. Donors are informed: "Membership dues go directly to fund House races." (emphasis in original). Membership in the House Council is $5,000 annually for individuals and PACs, $10,000 annually for corporations, and entitles donors to activities such as "Regular briefings with key Republican Members and staff who work directly on the discussion topic. This year's topics will include the Contract with America Legislation, welfare reform, Superfund regulatory reform, as well as topical issues as they come before Congress." October 6, 1995 Letter from Jack Fields [JEx. 114]; FEC Statement of Material Facts II at ¶ 139 [PSEx. 2].

308. "The Congressional Forum and House Council programs of the National Republican Congressional Committee [ ("NRCC") ] have been developed to open the channels of communication between the business community, PACs, and Republican House Members. The programs involve its participants in the policy-making process through an unprecedented level of dialogue with House Republicans and party leaders." Congressional Forum and House Council Announcement (hereinafter "NRCC Announcement") [JEx. 76]; Joint Stip. ¶ 51.

309. A House Council brochure states that membership costs $5,000 per year for individuals and PACs, and $10,000 per year for corporations. NRCC Announcement [JEx. 76]; Joint Stip. ¶ 52.

310. Benefits of House Council membership, as set forth in the NRCC Announcement, include:

• Regular briefings with key Republican members and staff who work directly on the discussion topic.

• Regular political briefings focusing on national trends and activities crucial to maintaining Republican control of the House in 1996.

• Invitations to the NRCC Winter and Summer Meetings. Each two-day event features political and legislative discussions with key House members and keynote addresses by prominent GOP leaders.

NRCC Announcement [JEx. 76]; Joint Stip. ¶ 53.

311. The NRCC Congressional Forum "has been designed to give its members an intimate setting to develop stronger working relationships with the new Republican Congressional majority," Brochure re: Congressional Forum and House Council [JEx. 110], and the "benefit that attracts most Forum members are the dinners with Committee Chairmen and the Republican members from each Committee." July 18, 1995 Memorandum from Nydia Bonnin to Senator Henry Hyde [JEx. 111]. These dinners "average about 75 people including Members—that means at least two Committee Members at every table." Talking Points for October 25, 1995 Congressional Forum/House Council Meeting [JEx. 112]. "In addition to the monthly dinners, we offer two annual meeting weekends, a golf tournament and a dinner with the Elected Leadership and all the Committee Chairs is included as a benefit of ... Forum membership." *Id.* Forum benefits include all the Benefits of the NRCC's House

Council program. Brochure re: Congressional Forum and House Council [JEx. 110]; FEC Statement of Material Facts II at ¶ 135 [PSEx. 2].

312. A Congressional Forum brochure describes membership costs of a $15,000 annual contribution for individuals and PACs, and a $25,000 annual contribution for corporations. Congressional Forum and House Council Announcement [JEx. 76]; Joint Stip. ¶ 54.

313. Prospective members of the Congressional Forum were advised in the NRCC Announcement that *"Members of the Congressional Forum receive all the benefits of the House Council program in addition to [the following] Congressional Forum benefits:"*

- "Monthly private dinners with the Chairmen and Republican Members of key Congressional Committees."
- "Private dinner with Speaker Newt Gingrich and the GOP House Leadership."
- "Private dinner with House Committee Chairmen."
- "An invitation to the Chairman's Skeet and Trap Shoot."
- "VIP preference at House Council and NRCC events."

Congressional Forum and House Council Announcement (emphasis in original) [JEx. 76]; Joint Stip. ¶ 55.

### House Majority Trust

314. In 1995, Newt Gingrich became the Chair of the House Majority Trust, a donor program for those giving $5,000 annually to the NRCC. A May 22, 1995 letter from Gingrich to "Rod" welcomed "Rod" as a contributor to the House Majority Trust and suggested that, "Between meetings, if you have any suggestions or insights you want to give me please call my assistant Mary Margaret Cranz [phone number provided]. She will see to it that I receive your thoughts and ideas without delay." An August 20, 1995 letter to "Rod" signed by Gingrich announces the next House Majority Trust meeting and states: "As I have traveled the country, I have had the opportunity to see and talk to a number of you. Consequently, I've got some idea of what's on your mind, but I would appreciate your input before our meeting on the 26th. Let Mary Margaret know at least three topics that are important to you that you would like to see added to the agenda." May 22, 1995 Letter from Newt Gingrich to "Rod" [JEx. 59]; August 20, 1995 Letter from Newt Gingrich to "Rod" [JEx. 60]; Joint Stip. ¶ 56.

### NRSC/NRCC Majority '98

315. In 1998, the NRSC and the NRCC created a joint program called "Majority '98." Membership required a donation of $100,000 in individual or corporate funds, which was split evenly between the NRSC and the NRCC. The purpose of the program was "to coordinate the fundraising for House and Senate candidates." FEC Statement of Material Facts II at ¶ 129 [PSEx. 2].

316. Benefits of the NRSC/NRCC "Majority '98" program included: invitations to two annual Majority '98 meetings with Republican leaders, and bimonthly conference call updates on current legislative issues affecting American business with Republican leaders; annual membership in the NRCC Congressional Forum and the NRSC Chairman's Foundation; and tables at the 1998 Republican House–Senate Dinner and NRSC and NRCC dinners. FEC Statement of Material Facts II at ¶ 138 [PSEx. 2].

### RNC 1996 Annual Gala

317. For its 1996 Annual Gala, the RNC offered those who would raise or contribute $250,000 the following "benefits:"

- a private reception and photo opportunity with the Republican presidential candidates;
- lunch and photo opportunity with the Speaker of the House of Representa-

tives Newt Gingrich and Senate Majority Leader Bob Dole;

- a "private meeting" with members of selected Senate and House of Representatives Committees; and
- an "[e]xclusive reception with Governor Pete Wilson and Republican Governors in private residence/yacht."

1996 RNC Annual Gala; Benefits for Gala Leadership Brochure [JEx. 69]; Joint Stip. ¶ 57.

318. The invitation to the RNC's 1997 Annual Gala offered those raising $250,000 similar benefits, including a separate lunch with the "Republican Senate and House Committee Chairmen of your choice." 1997 RNC Annual Gala [JEx. 77]; Joint Stip. ¶ 58.

### RNC Official 1995 Republican Inaugural

319. In connection with the "Official 1995 Republican Inaugural," contributors of $150,000 would be offered:

- a "private reception" and photo opportunity with U.S. Senate and House Leadership;
- an invitation to a "Speaker of the House VIP reception"; and
- breakfast in the U.S. Capitol with Senate Majority Leader Bob Dole and Speaker of the House Newt Gingrich.

Tentative Structure and Benefits for the Official 1995 Republican Inaugural [JEx. 78]; Joint Stip. ¶ 59.

### Other Opportunities for Access for Large Donors

320. On February 27, 1997, Senate Majority Leader Trent Lott sent out a fundraising letter on behalf of the NRSC offering contributors "plenty of opportunities to share [their] personal ideas and vision with some of [the] top Republican leaders, senators, and panel members." Letter of Trent Lott, February 27, 1997 [JEx. 57]; Joint Stip. ¶ 48.

321. According to Senator Lott's aforementioned February 27, 1997 NRSC letter, failure to contribute meant that "you could lose a unique chance to be included in current legislative policy debates—debates that will affect your family and your business for many years to come." Letter of Trent Lott, February 27, 1997 [JEx. 57]; Joint Stip. ¶ 49.

322. In 1997, Senator Mitch McConnell of Kentucky signed or authorized his name to appear on an NRSC fundraising letter which stated:

You'll be invited twice a year to attend high-level Washington policy briefings, receptions and special dinners with my Republican Senate colleagues as well as the top leaders of our Republican Party. These are names you know well ... Senator Lott and the entire leadership of Senate Chairmen and Subcommittee Chairmen who are driving the national Republican agenda .... By signing on today, you will also be able to join in on our Fall Briefing and attend one of our small dinners hosted by Republican Senators and dignitaries. Over the years, these intimate gatherings have become the hallmark events of our Inner Circle membership.

1997 NRSC Fundraising Letter from Mitch McConnell [JEx. 58]; Joint Stip. ¶ 50.

323. In a memo to an RNC fundraiser, Tim Barnes wrote:

Kim White of Mr. Louis Bacon's office (Moore Capital Management), has been trying to reach Dennis Shea recently with no success. Kim is trying to establish a contact in Senator Dole's office for Mr. Bacon. As you know, Mr. Bacon has been very generous to the RNC. If there is any way you can assist, it would be greatly appreciated.

Memorandum from Tim Barnes to Royal Roth of 3/2/95 [JEx. 80]; Joint Stip. ¶ 61.

324. The RNC arranged for major contributors to gain special access to Senate Majority Leader Bob Dole. Minority Report at 7973 [JEx. 21].

325. On August 15, 1994, Fred Volcansek, a fundraiser for the National Policy Forum ("NPF") "think tank" founded by RNC Chairman Haley Barbour, wrote a

memo asking that the Young Brothers Development Corporation ("YBD") extend a loan guarantee to the NPF. The memo concluded: "The timing of this effort is crucial. The loan needs to be arranged and funded in the next two weeks. Chairman Barbour, Senator Dole and Congressman Gingrich, who are committed to the NPF, will make themselves available to express their support for your participation on this project." August 15, 1994 Memorandum from Fred Vocansek to Young Brothers Development Corp. [JEx. 61]; Joint Stip. ¶ 62.

326. After YBD provided the $2.1 million loan guarantee, YBD Chairman Ambrous Young met with and had his photograph taken with Speaker Gingrich and Senator Dole. Minority Report at 7974 (citing Ambrous Young deposition, 6/24/97, pp. 50–51, 71) [JEx. 21].

327. RNC Chairman Barbour wrote to Young, "I am delighted you were able to meet with both Senator Dole and Speaker Gingrich. They were pleased to hear your views on developments in Asia . . . . Your role as a key advisor on Asian policy is essential to both me and the NPF." Letter from Haley Barbour to Ambrous Young of 1/31/95 [JEx. 81]; Joint Stip. ¶ 63.

328. An April 30, 1998 letter from J. Patrick Rooney of the Golden Rule Insurance Company to RNC Chairman Jim Nicholson stated: "We decided that our greatest concern is for the House of Representatives. ¶ Therefore, we gave this week to the NRCC $100,000." April 30, 1999 Letter from J. Patrick Rooney to Jim Nicholson [JEx. 91]; FEC Statement of Material Facts II at ¶ 115 [PSEx. 2].

329. In 1994 Amway gave the RNC a donation of $2.5 million, the vast majority, if not all of which was soft money. April 20, 1995 Memorandum from "Jay" to "Chairman" [JEx. 129]. This donation was used to build and operate for one year an RNC television studio. *Id.* A letter dated January 26, 1995 from Barbour to Amway's Richard DeVos invited DeVos to the RNC's February 1995 Inaugural Gala, stating that "[o]ur tremendous victory on

November 8th would not have been possible without your generous support" and that Barbour wanted to invite DeVos and two other Amway executives "to join me, Bob Dole and Newt Gingrich and our events [sic] top fund-raisers on the Dais at the Gala." January 26, 1995 Letter from Haley Barbour to Richard DeVos [JEx. 130]. A memorandum dated March 28,-1995 from Team 100 Director Tim Bames to Barbour regarding "Amway Dedication" discussed various events related to the dedication of the donated studio, noting that the three Amway executives "would like to do the dedication in the afternoon of Monday, May 8. The following day they would like a breakfast with Speaker Gingrich and then an invite to the Senate policy luncheon, where [the executives] would be recognized. They would like to do the dedication around the May 9 Team 100 meeting." March 28, 1995 Memorandum from Tim Barnes to Haley Barbour [JEx. 131]. An April 11, 1995 Memorandum from Tim Barnes to Haley Barbour regarding "Team 100 Items" stated that Gartland "still" wanted to do the studio dedication on May 8 and wanted DeVos to be able to "address and thank" the House and Senate Republicans on May 9, asking: "Can Rich DeVos address the Senate and House as John wishes? I mentioned other dates to John, but he still wants to look at the 8th and 9th." April 11, 1995 Memorandum from Tim Barnes to Haley Barbour [JEx. 132]. A January 4, 1996 letter from Barbour to DeVos and Jay Van Andel of Amway stated: "Your generosity in 1994 clearly was a major factor in the historic Republican capture of majorities in the House and Senate." FEC Statement of Material Facts II at ¶ 229 [PSEx. 2].

## VIII. THE SOFT MONEY SYSTEM CAUSES CORRUPTION OF THE POLITICAL SYSTEM

### A. Donations to Party Committees Can Influence Policy and Legislation

330. Since candidates play a central role in raising funds for party committees,

a large donation to a party to be used to support a candidate with effective advocacy, even if it does not include express advocacy, provides almost the same opportunity for a corrupt *quid pro quo* as a large contribution directly to the candidate. FEC RNC Mem. at 2–3 [PSEx. 3].

331. The opportunity for such arrangements to result in a *quid pro quo* may be no less than if a contribution had been given directly to the candidate for such purposes. The candidate may well be beholden to those whose large donations to the party made possible the party's increased spending on a media campaign that, although not expressly advocating the election of the candidate, substantially enhances the candidate's election chances. FEC RNC Mem. at 41 [PSEx. 3].

332. Large donations to parties can effectively influence federal policy. FEC RNC Mem. at 45 [PSEx. 3].

333. Very large donations to the party committees, on the order of twenty-five, fifty, or one hundred thousand dollars from one company or individual, have a corrupting influence. FEC Statement of Material Facts II at ¶ 498 [PSEx. 2]; Meehan Decl. ¶ 15 [JEx. 4].

334. Money donated to political party committees has the ability to confer unusual opportunities for influence. Sorauf/Krasno Report at 53 [JEx. 19].

335. Money donated to political party committees has the ability to corrupt the democratic, representational processes. Sorauf/Krasno Report at 53–54 [JEx. 19].

336. Large soft money donations buy access, can influence federal policy, and are corrupting to federal officeholders and to donors. Hassenfeld Decl. ¶ 16 [JEx. 14]; FEC Statement of Material Facts II ¶ 494 [PSEx. 2].

337. It is not unusual for large contributors to seek legislative favors in exchange for their contributions. A good example of that occurred on the next to last day of the 1995–96 legislative session. Federal Express wanted to amend a bill being considered by a Conference Committee, to shift coverage of their truck drivers from the National Labor Relations Act to the Railway Act, which includes airlines, pilots and railroads. This was clearly of benefit to Federal Express, which according to published reports had contributed $1.4 million in the last 2–year cycle to incumbent Members of Congress. Sen. Paul Simon opposed this in the Democratic Caucus, arguing that even if it was good legislation, it should not be approved without holding a hearing, Senators should not cave in to special interests. One senior colleague got up and said, "I'm tired of Paul always talking about special interests; we've got to pay attention to who is buttering our bread." This was a clear example of donors getting their way, not on the merits of the legislation, but just because they had been big contributors. Sen. Simon does not think there is any question that this is the reason it passed. Simon Decl. ¶¶ 10–11 [JEx. 9]; FEC Statement of Facts I at ¶ 179 [PSEx. 1].

338. Abuses are pervasive on the part of both the Democratic and Republican parties. Minority Report at 4573 [JEx. 21].

339. Abuses are pervasive in both presidential and congressional fundraising. Minority Report at 4573 [JEx. 21].

340. Senator Simpson stated:

The impact of the easy availability of soft money in unlimited amounts can hardly be overstated. Who, after all, can seriously contend that a $100,000 contribution doesn't alter the way you think about—and quite possibly vote on—an issue? And even if that's not true, as former Vice President Walter Mondale put it before the Thompson Committee last fall, "It looks like hell."

Simpson Aff't ¶ 4 [JEx. 1]; Joint Stip. ¶ 110.

341. Senator Feingold on the floor of the United States Senate explains how he has witnessed large soft money contribu-

tions by telecommunications corporations to political parties to affect legislation:

> The 1996 Telecommunications Act covered a huge field from cable to cellular service to long distance. There was massive lobbying involved. It was the biggest overhaul of our communications law since 1934, and a Center for Responsive Politics analysis showed that cable companies, local telephone companies, and long distance companies gave more than $12 million in soft money and PAC contributions just during the 1996 election cycle.
>
> When the bill finally passed in February 1996, all these corporate concerns supported it while consumer groups opposed it. There was very, very little in the way of consumer protections in that bill. Today, cable rates continue to go up, and merger mania has hit all parts of the telecommunications industry. We have yet to see any of those pro-consumer effects of competition that the corporate donors who so strongly supported the bill had promised us at the time.

144 Cong. Rec. S821 (daily ed. Feb. 23, 1998); FEC Statement of Material Facts II at ¶ 553 [PSEx. 2].

## IX. *THE SOFT MONEY SYSTEM CREATES THE APPEARANCE OF CORRUPTION OF THE POLITICAL SYSTEM*

### A. *The Availability of Access in Exchange for Large Donations Creates the Appearance of Corruption*

342. Soft money creates the appearance of corruption: large contributions appear to be traded for access to government officials or favored treatment. Minority Report at 7519–20 [JEx. 21].

343. Soft-money and issue-advocacy spending have caused a loss in public confidence in the integrity of our campaign finance system. Minority Report at 7519–20 [JEx. 21].

344. Large contributions from wealthy donors or organized interests to candidates or elected officials generate the appearance of corruption. Minority Report at 7519–20 [JEx. 21]; FEC RNC Mem. at 3, 42 [PSEx. 3].

345. The availability of access to officials and candidates in exchange for contributions creates the appearance of corruption. FEC Statement of Material Facts I ¶¶ 184, 292–302 [PSEx. 1]; FEC RNC Mem. at 50 [PSEx. 3].

346. Soft money fund-raising by federal officeholders and national party committees has contributed to a pervasive perception among the general public that current federal political campaign fund-raising practices improperly rely on large donors seeking influence. While in 1980 the two major parties raised a combined total of only $9 million in soft money, by 1996 that figure had increased some 30–fold, to $262 million. The party committees are raising this money in very large amounts from corporations, labor unions and wealthy individuals. FEC Statement of Material Facts II at ¶ 473 [PSEx. 2]; Shays Decl. 40 ¶ 10 [JEx. 5].

347. Corporate and union treasury contributions to national party organizations give the appearance of corruption because these entities give large sums of soft money, because these donations are unregulated in most respects, and because they are solicited by federal officials and candidates and—although they go to the party committees—are spent on campaign activities or donated to groups that engage in campaign activities. The specter of powerful elected officials raising money at White House coffees or other such gatherings creates the appearance of corruption in the view of most people. Herrnson Dep. at 84 [JEx. 36].

348. The American public believes that our campaign finance system is broken. The vast majority of citizens feel that money threatens the basic fairness and integrity of our political system. Two out of three Americans think that money has an "excessive influence" on elections and gov-

ernment policy. Substantial majorities in poll after poll agree that "Congress is largely owned by the special interest groups" or that special interests have "too much influence over elected officials." Fully two-thirds of the public think that "their own representative in Congress would listen to the views of outsiders who made large political contributions before a constituent's views." Herrnson Dep. at 86–87 [JEx. 36].

349. These findings, typical of the results of public opinion surveys conducted in recent years, indicate a deep cynicism regarding the role of money in politics.

350. The public perceives party committees as "machines" and assumes that the campaign contributions they receive influence the policies supported by elected officials.

351. Increases in the amount of party spending, including unlimited coordinated expenditures, heighten public cynicism and distrust of government, and add to an already widespread view that public officials are corrupt. FEC Statement of Facts I ¶ 294 [PSEx. 1]; Wilcox Statement at 3 [JEx. 20].

352. The specter of the President, the Speaker of the House, and other high ranking federal policy makers holding private meetings with wealthy individuals and those who represent moneyed interests for the purpose of collecting millions of dollars in large contributions does little to inspire the confidence of the American people. Instead, it encourages citizens to believe that politicians find ways to cheat the system when raising money for federal campaigns. It also encourages them to believe that their government is responding to special wealthy interests rather than themselves. Herrnson Statement at 2 [JEx. 17].

353. It has been reported that the White House has acknowledged using dinners at the White House in the DNC's fundraising program. White House Press Secretary Mike McCurry said: "The fact

is that Clinton enjoys having interesting, bright, successful people into the residence for dinner. The dinners also were a perk that were given to people who had demonstrated some level of success in building support." Los Angeles Times, Feb. 24, 1997 [JEx. 179]; Joint Stip. ¶ 91.

354. According to the national news media, during 1995 and 1996, the DNC sponsored 103 "coffees" with the President, the Vice–President, and the First Lady as part of its overall 1995–96 fundraising effort. At some of these coffees, regulators met with members or representatives of the industries they regulate. Following the coffees, some of the participants were solicited for contributions to the DNC and President Clinton's re-election campaign. All in all, the coffees raised a reported $27 million from 358 of the participants. (Boston Globe, Feb. 10, 1997) [JEx. 180]. A news report said that 72 of the attendees were registered lobbyists. (Richmond–Times Dispatch, Feb. 5, 1997) [JEx. 180]; Joint Stip. ¶ 92.

355. It has been reported that the DNC has described the coffees as "events held for a limited amount of time, one to one-and-a-half hours, for individuals, usually donors—who were invited for a conversation with the president. The forum was midway between a one-on-one conversation and a larger group." (Wall Street Journal, December 24, 1996 (quoting Amy Weiss Tobe, DNC press secretary)) [JEx. 182]. The White House has stated that "White House coffees were held with the hope the president's friends and supporters would be encouraged to support his reelection and to provide critically needed financial support." (Lanny J. Davis, USA Today, April 10, 1997) [JEx. 183]; Joint Stip. ¶ 93.

356. It has been reported that a number of coffee participants have stated that they discussed a matter of pending legislation or other public policy at the coffee. One report devoted to the coffees described it this way: "Imagine yourself at the White House gabbing with the president of the United States, who is looking

you in the eye and furiously scribbling notes as you offer opinions about everything from tax policy to highway repair. It's heady stuff and it's exactly the way many of the hundreds of Democratic Party contributors describe what happened at the now notorious coffee clatches that they attended last year." (Los Angeles Times, Feb. 10, 1997) [JEx. 184]; Joint Stip. ¶ 94.

357. It has been reported that 56 financial supporters of the President were among the 477 guests who flew on Air Force I during the 1995–96 election cycle. (Los Angeles Times, April 15, 1997) [JEx. 185]. During the same period, seventeen contributors rode on Air Force II. (*Id.*) Each donor gave at least $5,000 to the DNC or raised $25,000 or more for either the DNC or the Clinton–Gore campaign. *Id.; see generally* Michael Kranish & Brian Megrory, Rides Aboard Air Force One Were Perks For Big Donors: White House Girding For More Criticism, The Boston Globe, Mar. 3, 1997 [JEx. 186]; John F. Harris, White House Lists 56 Fund–Raisers, Donors Who Flew on Air Force One, (Washington Post, April 15, 1997) [JEx. 187]; Joint Stip. ¶ 95.

358. It has been reported that Elliott Seiden of Northwest Airlines, attended a coffee with the Vice–President. Seiden said he discussed Northwest's trade concerns at the White House event. "Everyone around the table was given the opportunity to bring up an issue with the vice-president.... I brought up the issue of air service to Japan." (MSNBC, Jan. 27, 1997) [JEx. 190]; Joint Stip. ¶ 97.

359. In early 1996, the national news media reported widely on the May 13, 1996 DNC-sponsored White House coffee involving Comptroller of the Currency Eugene A. Ludwig. According to news reports, executives from seventeen banks attended the hour-long coffee, along with the President, Comptroller Ludwig, Treasury Secretary Robert Rubin, and Rosen and Fowler of the DNC. "Eight of the 17 bankers, or their companies, gave about $330,-000 to the Democratic Party, with 90% of

that money coming after the coffee." (The Boston Globe, Feb. 10, 1997) [JEx. 180]; Joint Stip. ¶ 99.

360. Another coffee was held on May 1, 1996 in the Oval Office with President Clinton. Five individuals attended, and each contributed $100,000 to the DNC. FEC Statement of Material Facts II at ¶ 511 [PSEx. 2]; Majority Report at 201–05 [JEx. 21].

361. It has been reported that at least some donors who were invited to White House coffees understood that their donation ensured the coffee invitation. Former Congressman Thomas Tauke, now NYNEX's executive vice president for government affairs, was quoted in the *New York Times* as stating "I think it is fair to say that there was an understanding that if we became a trustee member, there was going to be an invitation to a White House coffee." NYNEX reportedly contributed $100,000 to the DNC several days after the coffee which Congressman Tauke attended. Don Van Natta, Jr., *Courting Donors: Party Workers; Some Democratic Fund-raisers Say They Sold Access to Clinton,* New York Times, February 26, 1997 [JEx. 252]; FEC Statement of Material Facts II at ¶ 532 [PSEx. 2].

362. The DNC program of seeking permission to allow donors to spend a night at the White House resulted in approximately 178 individuals from 114 different families staying at the executive mansion. These individuals, or their companies, gave the DNC more than $5 million, amounting to an average per-family gift of $44,000.00. FEC Statement of Material Facts II at ¶ 535 [PSEx 2]; Majority Report at 199 [JEx. 21].

363. There is a strong feeling among the public that soft money is corrupting the political process and influencing elections. FEC Statement of Material Facts II at ¶ 499 [PSEx. 2]; Meehan Decl. at ¶ 15 [JEx. 4].

364. Members of Congress have indicated that constituents perceive that soft

money diminishes their influence on the political process, and noted that soft money contributes to public cynicism about the political system. FEC Statement of Material Facts II at ¶ 483 [PSEx. 2]; July 9, 1997 Letter from Asa Hutchinson to Jim Nicholson [JEx. 166].

365. The public views companies that make soft money donations to political parties at the same time as when they have legislative interests pending before Congress as buying a legislative outcome. Members of the public have said that it is hardly a level playing field, compared to the influence of the average person or interest group without such financial leverage, when those companies make large donations, and at the same time advocate specific changes in policy that will have a financial effect on the companies. Meehan Decl. at ¶ 17 [JEx. 4]; FEC Statement of Material Facts II at ¶ 491 [PSEx. 2].

366. There is an appearance of a corrupt system when officeholders help their parties raise large contributions. FEC Statement of Material Facts II at ¶ 496 [PSEx. 2].

367. Given the size and source of most soft money contributions, the public cannot help but believe that these donors enjoy special influence and receive special favors. The suspicion of corruption deepens public cynicism and diminishes public confidence in government. CED Report at 27 [JEx. 23]; FEC Statement of Material Facts II at ¶ 477 [PSEx. 2].

368. The American public has become very cynical about soft money fundraising. Our President and Vice President and Members of Congress as well make telephone solicitations for soft money contributions that are in reality campaign contributions. Groups run campaign ads with no limitations, disclosure or oversight, by saying the ads are issue advocacy. Shays Decl. at ¶ 4 [JEx. 5]; FEC Statement of Material Facts II at ¶ 612 [PSEx. 2].

369. National news reports indicate that at the end of the Senate session before the 1996 elections the Senate conferees approved an amendment, never considered by the Senate, to the Federal Aviation Authorization Act that contained a labor benefit for Federal Express. Sen. Simon stated that Federal Express was able to win the amendment because it had contributed more than $1 million to the political parties during the 1995–96 election cycle. The following December, Majority Leader Trent Lott threatened Federal Express, saying he had noted that Federal Express had contributed to the Democrats and warning that business PACs should "squirm considerably" for crossing party lines. FEC Statement of Material Facts II at ¶ 520 [PSEx. 2]; January 29, 1997 Letter from Hon. Frank Wolf to Jim Nicholson [JEx. 244]; Bill Lambrecht, *Simon Takes Leave—With Warning on Campaign Finance*, St. Louis Post–Dispatch, November 26, 1996 [JEx. 245]; Brian McGrory & Jill Zuckman, *Lott's Roles as Leader, Fund-raiser Questioned*, The Boston Globe, March 26, 1997 [JEx. 246].

370. It has been reported that Johnny Chung, a businessman, in an interview by NBC news anchor Tom Brokaw, said he was solicited to make contributions to the DNC in exchange for invitations to events where he could meet government officials to discuss business concerns. Without contributions he would not have met those officials. At his request to the DNC, the DNC set up meetings with President Clinton. MSNBC, Tom Brokaw Interview with Johnny Chung (partial transcript of interview) [JEx. 171]. Chung's experiences "deepen the cynicism of Americans." New York Times, Editorial, August 22, 1997 [JEx. 172]; Joint Stip. ¶ 85.

371. It has been reported that Stephen Hilbert, chairman of Conseco, Inc., an Indiana-based corporation, saved $10 million when Congress enacted the Economic Growth and Regulatory Paperwork Reduction Act. The huge Act contained an amendment crafted by Republican Senator Faircloth of North Carolina that reversed

a judgment involving a rent dispute that was on appeal. Nine days after the bill was signed, Mr. Hilbert contributed $100,000 to the Republican Party. Robert Levy, a Cato Institute senior fellow, concluded that this is an example of "politicians perverting the rule of law." Legal Times, *Winning Congressional Favors*, May 5, 1997, p. 28–29 [JEx. 173]. Commentator Stephen Glass concluded, after obtaining Senator Faircloth's explanation, "The only question in the end, then, may be whether the Senator sold the same quid twice." The New Republic, *Gold Diggers*, July 7, 1977 [JEx. 174]; Joint Stip. ¶ 86.

372. It has been reported that former DNC Chairman Donald Fowler considered it part of his job at the DNC to call a Cabinet Secretary and convey requests from donors: "I would ask somebody to look at the case without [making] any suggestion of what they should do with it." The Washington Post, *Dialing The Cabinets' Extension*, by Sharon LaFraniere. 2/23/97, page A6 [JEx. 175]; Joint Stip. ¶ 87.

373. It has been reported that during Chairman Fowler's tenure at the DNC he routinely passed along requests from DNC contributors to federal agencies and the White House:

— to obtain for MJ Parker a seat on a trade mission to Bosnia (DoC said no)

— to obtain for Johnny Chung a meeting between Hazel O'Leary and a Chinese petrochemical executive

— to get the Interior Department to kill a competing gaming proposal for the Wisconsin and Minnesota tribes.

Washington Post, Feb. 23, 1997 [JEx. 176]; Joint Stip. ¶ 88.

374. It has been reported that Wayne Rogers, CEO of Synergics Energy Development, Inc., an independent power producer, was invited to go with Energy Secretary O'Leary on a trip to Pakistan where Rogers' Company had tried to obtain business but had gotten nowhere. As a result of efforts by Secretary O'Leary and others, the company was awarded a $750,000,000 project. Rogers contributed $202,250 personally, and through his company, to the Democratic Party and specific Democratic candidates in 1995–96. This gave the impression that the contribution to the Democratic Party was in exchange for administration officials' assistance in obtaining a foreign contract. Baltimore Sun, "Who Gave What in 96, and Why?," 3/10/97 [JEx. 177]; Joint Stip. ¶ 89.

375. It has been reported that "Court transcripts indicate U.S. diplomats intervened in a Saudi Arabian business dispute for a lobbyist the same week one of the lobbyist's clients gave $100,000 to the Democratic National Committee." New York Times, January 7, 1998 [JEx. 178]; Joint Stip. ¶ 90.

376. It has been reported that Vance Opperman, President of West Publishing, was a major contributor to state Democratic parties in 1995 and 1996. When the Justice Department was considering taking a position that threatened to cut the profits of West Publishing, Opperman sought out President Clinton at a Democratic fundraiser and asked him "can you get the Justice Department off my back?," according to Democratic officials. Time, "The Cheerful Giver," by Viveca Novak and Michael Weisskoph, 2/21/97, page 80 [JEx. 188]. In 1997, Opperman needed Clinton administration approval of a $3.4 billion dollar deal. A group representing consumers met with Justice Department officials. "We were outside the main Justice building," said Eleanor Lewis, Executive Director of the American Association of Legal Publishers. "And we said, 'We think this is wired to go through, it is wired from the highest levels … from the White House.'" CNN, "Moving Money Through State Capitols", by Brooks Jackson, 4/11/97 [JEx. 189]; Joint Stip. ¶ 96.

377. It has been reported that John Huang, DNC Vice Chairman, lobbied President Clinton to reverse his immigration

policy to bring it in line with the views of Asian Americans who donated at least 1.5 million dollars to the DNC. President Clinton's decision to reverse his immigration policy, thereafter, gave the impression that he did so as a result of those contributions to the DNC. The Boston Globe, "Clinton Policy Shift Followed Asian–American Fundraiser," by Michael Kranish, 1/16/97, page A1 [JEx. 191]; *see* The Economist, "Money and Politics: Politicians For Rent," 2/8/97, page 24 [JEx. 192] ("Americans suspect a similar sort of quid pro quo in the case of the Asian contributions that flowed last year to the Democratic National Committee"); Joint Stip. ¶ 98.

378. The Los Angeles Times reported extensively on the discussion between Sacramento developer Angelos K. Tsakopoulos and the President at a White House coffee in September 1995. According to the report, Tsakopoulos complained about "how the bureaucrats were going wild" with regard to 800 acres of pasture Tsakopoulos wanted to develop into vineyards in southern California. The newspaper account details how Tsakopoulos, a "longtime Democratic contributor" who had donated $165,000 to the DNC in 1996, ultimately "received a series of accommodations from three federal agencies involved in the issue." Los Angeles Times, April 14, 1997 [JEx. 194]; Joint Stip. ¶ 100.

**B. *Neither constituents nor candidates distinguish between hard and soft money***

379. Constituents do not distinguish between money that candidates raise for their own campaigns and money they raise for the party committees. Bumpers Decl. ¶ 17 [JEx. 3].

380. For Members of Congress there would not be any real difference if the funds they solicited were for themselves or for the party committees or if they were hard or soft money donations. FEC Statement of Material Facts II at ¶ 187 [PSEx. 2]; Bumpers Decl. ¶ 13 [JEx. 3].

**C. *Issue ads create the appearance of corruption***

381. While FECA bans corporate contributions to political campaigns, it allows huge corporate soft money donations to be used by the parties for "issue ads" that affect election outcomes. FEC Statement of Material Facts II at ¶ 596 [PSEx. 2]; Meehan Decl. ¶ 15 [JEx. 4].

382. The ability of wealthy contributors to finance million-dollar advertising blitzes without disclosing their identity to voters fundamentally undermines the spirit and letter of current campaign finance laws. Minority Report at 6290 [JEx. 21].

383. Most issue ads are financed in large part with soft money that is raised outside of the federal system from sources and in amounts that the FECA was meant to prohibit. As is the case with other soft money transactions in general, issue ads give individuals and interest groups that have the ability to make very large contributions to parties the opportunity to have a disproportionate voice in the election process. These individuals and groups also increase their access to and perhaps influence with political decision-makers. Issue ads, like other large soft money contributions and expenditures, do little to boost public confidence or trust in the political system. FEC Statement of Material Facts II at ¶ 378 [PSEx. 2]; Herrnson Statement at 61 [JEx. 17].

**D. *Surveys reflect that soft money creates the appearance of corruption***

384. A March 6–10 NBC/*Wall Street Journal* poll reveals that 53 percent of respondents believed that contributions from the Chinese government did influence the decisions of the United States government. The fact that these donations went to a political party has hardly rendered them benign in the eyes of the public. Sorauf/Krasno Report at 35–36 [JEx. 19].

385. The public currently believes that the government is unduly influenced by affluent interests, and that corruption is widespread. In the 1996 National Election Study ("NES") conducted by the University of Michigan, nearly three quarters of Americans reported that they believed the government is run for a "few big interests" instead of for the benefit of all, and a substantial minority believed that "quite a few" elected officials are corrupt. FEC Statement of Facts I ¶ 295 [PSEx. 1].

386. A poll conducted for NBC News and the Wall Street Journal in April, 1997 by the Hart–Teeter team found that a majority of respondents thought special fundraising by both parties was cause for at least "fairly major concerns." Respondents of both parties were concerned about "foreigners contributing money to the Democratic party," and of GOP moves to offer large donors special access to committee chairs and to a private briefing in Palm Beach. A narrow majority was also greatly concerned about the Clinton administration allowing big donors to sleep in the Lincoln Bedroom. Fully 40% were worried about Clinton having coffee with wealthy donors. Statistical analysis of the data from this survey shows that public concern crosses party lines, and that all social groups are concerned—the young and the old, the wealthy and the poor, blacks and whites, men and women. Although most Americans seldom think about campaign finance, when they do consider it because of stories in the media or by survey questions, they report that they are worried about the fundraising practices of parties. FEC Statement of Facts I at ¶ 297 [PSEx. 1]; FEC Statement of Material Facts II at ¶ 593 [PSEx. 2]; Wilcox Statement at 3–4 [JEx. 20].

387. A recent survey conducted by the Princeton Survey Research Associates found that two-thirds of respondents thought it was a major problem that political contributions had too much influence on government policy. An almost identical percentage thought it a major problem

that elected officials seek or receive contributions while making decisions about issues of concern to those giving money. This belief was common among those who contributed money and those who did not, among those who were very interested in politics and those who were not, and among Republicans and Democrats alike. A poll reported in the New York Times on April 8, 1997 found that 75 percent of respondents estimated that "many public officials" generally made or changed policy positions as a result of political donations. FEC Statement of Facts I ¶ 298 [PSEx. 1].

388. The Princeton Survey Research Associates poll showed that two-thirds of respondents believed that an out-of-district contributor would get more attention from their representative than a constituent who had not contributed, and 77 percent believed that an in-district contributor would get more attention than a non-contributor. Three in four respondents thought that questionable fundraising occurs in most campaigns. And fully 71 percent thought that the fundraising problems occur equally in the two parties. Once again, these results were true of contributors and those who did not give, of those who were very interested in politics and those who were not, and for Republicans and Democrats. FEC Statement of Facts I ¶ 299 [PSEx. 1].

389. These and other survey data show that the public believes candidates accept money from donors and make policy decisions favorable to those donors as a consequence—one of the classic definitions of corruption. The public is unlikely to believe that parties are immune from corruption, or that they somehow cleanse interest group money when they aggregate it and spend it on behalf of candidates. In the Princeton Research Associates Survey, a majority favored limits on the amounts that can be given to parties, suggesting that a majority of Americans believe that parties could be corrupted by large donations. And many polls show majorities in favor of eliminating soft money, presum-

ably because they believe that large donations to parties would lead to policy favors. Yet the public does not see only soft money contributions as potentially corrupting: the Princeton Associates poll asked respondents what size of gift would start to look like someone is trying to buy special favors. More than a third listed an amount of $20,000 or less, well within the contribution limits of an individual in a year, or a PAC in the two years of a campaign cycle. Half listed a figure of $50,000 or less, an amount easily within the hard money contribution limit of an industry with a couple of PACs and some bundling of individual contributions. Once again there are no real differences among contributors and non-contributors, those interested in politics and those who are not, and between Democrats and Republicans. A sizable minority of Americans believe parties are corrupt, and a majority believes them to be corruptible. If they were asked to consider a situation where a party had received large contributions from an interest group or set of interests, and had spent that money on behalf of candidates, they would believe that party leaders would pressure legislators to deliver policy favors for the interests that donated the money. FEC Statement of Facts I ¶ 301 [PSEx 1].

390. Most of the general public believes that campaign contributors receive more than access for their donations. A Gallup Poll taken in 1997 asked respondents the extent to which they believed that campaign contributions "influence the policies supported by incumbents;" 53 percent responded a "great deal" and 33 percent responded a "moderate amount." An NBC/*Wall Street Journal* poll shows that voters are also very concerned about the parties offering donors special access to congressional leaders. Herrnson Statement at 59–60 [JEx. 17].

### E. *Reports in the media add to the impression that soft money causes corruption*

391. Many political commentators have publicly criticized what appears to them to have been inappropriate actions due to the influence of contributors to parties and party committees on Senators, Representatives and members of the administration. *See, e.g.,* Paul Glastris, Julian Barnes, Kent Jenkins, Nancy Shute, U.S. News & World Report, April 14, 1997 [JEx. 197]; Kevin Phillips, Richmond Times Dispatch, April 20, 1997 [JEx. 198]; Gerald Seib, Wall Street Journal, April 2, 1997 [JEx. 199]; Meg Greenfield, Newsweek, March 24, 1997 [JEx. 200]; Michael Kinsley, Time, March 17, 1997 [JEx. 201]; Ben Wattenberg, Washington Times, April 3, 1997 [JEx. 202]; Elizabeth Drew, Washington Post, March 23, 1997 [JEx. 203]; Albert Hunt, Wall Street Journal, May 15, 1997 [JEx. 204]; Michael Kelly, Washington Post, February 16, 1997 [JEx. 205]; Rena Pederson, Dallas Morning News, February 9, 1997 [JEx. 206]; Ross Mackenzie, Richmond Times–Dispatch, March 13, 1997 [JEx. 207]; R.W. Apple, New York Times, February 9, 1997 [JEx. 208]; Jack Germond, Jules Witcover, National Journal, February 22, 1997 [JEx. 209]; Molly Ivins, Fort Worth Star–Telegram, February 6, 1997 [JEx. 210]; Charles Cook, Roll Call, March 6, 1997 [JEx. 211]; Kevin Phillips, Los Angeles Times, February 23, 1997 [JEx. 212]; R.W. Apple, New York Times, February 26, 1997 [JEx. 213]; Alan Morrison, Legal Times, June 23, 1997 [JEx. 214]; Joint Stip. ¶ 111.

392. Others have commented on the deleterious effects of soft money fundraising and the use of that money. *See, e.g.,* Jill Abramson, *Election Panel Refuses to Order Repayments by Clinton and Dole,* New York Times, Dec. 11, 1998, at A1 [JEx. 215] (explaining that "[t]he commission's vote . . . seriously erodes the spending and contribution limits that have been a cornerstone of the post-Watergate election laws"); *id.* (quoting Fred Wertheimer, president of non-profit public policy organization Democracy 21, that "we've returned to the law of the jungle when it

comes to campaign spending" for "[t]here are really no limits left"); James Bennet, *Dropping Campaign Inquiry, Reno Eases Clinton's Load,* International Herald Tribune, Dec. 9, 1998 [JEx. 216] (describing "the one unbendable campaign finance rule for any presidential aspirant who hopes to be competitive: Almost anything goes"); *id.* (quoting Rep. Christopher Shays, R–Conn., that "[t]he system is broken .... Soft money is the loophole that ate the law"); Ken Foskett, *Campaign Funding Focus Predicts More Attack Ads, Soft Money,* Atlanta J. & Const., Dec. 6, 1998, at 2B [JEx. 217] (summarizing the "one point" upon which all members of a panel including academics, political consultants, and journalists "agreed: the federal system of contribution limits enacted after Watergate is dead," and quoting noted Republican media consultant, Alex Castellanos, who said that "[r]eally, there are no rules"); Cokie & Steven Roberts, *Presidential Campaign Loophole Must Be Closed,* Times–Picayune, Dec. 5, 1998, at B7 [JEx. 218] (commenting that "now, thanks to soft money, the limits are off, and the law has collapsed"); Warren Buckler, *Voters to Pols: We're Serious About Campaign Finance Reforms,* Courier–Journal (Louisville, Ky.), Nov. 22, 1998, at 2D [JEx. 219] (commenting that "[s]oft money turns elections into bazaars for buying and selling influence"); *Panetta Testifies Espy 'Undermined Standards,'* USA Today, Nov. 19, 1998, at 9A [JEx. 220] (stating that "[t]he law says the [soft] money can't be used to help elect candidates to Congress or the White House, but court opinions and loopholes have largely obliterated those restrictions"); *A Principled Win,* Washington Post, Nov. 5, 1998, at A22 [JEx. 21] (stating that "[t]he national party organizations are used to raise and spend on behalf of their candidates funds that the candidates are forbidden to raise and spend themselves. It's a fictional distinction."); *A Campaign Finance Breakout,* Washington Post, Oct. 29, 1998, at A26 [JEx. 222] (declaring that "[t]he figures are dire. They bespeak the collapse of campaign finance laws that have never been more than frail.... [The money] distorts the democratic process"); *The Soft–Money Dodge in 1998,* New York Times, Oct. 28, 1998, at A28 [JEx. 223] (arguing that the contribution limits, including the ban on corporate contributions "have all been rendered meaningless by the soft-money evasion"); Jim Drinkard, *'THE ASK' Loopholes in Campaign Law are Gifts That Keep on Giving,* USA Today, Oct. 26, 1998, at 1A [JEx. 224] (explaining that "court opinions and creative political minds have discovered loopholes—so many, in fact, that the restrictions have for all practical purposes been obliterated"); Michael Tackett, *Incumbents in Trouble; GOP May Boost Senate Power,* Chicago Trib., Oct. 23, 1998, at 1 [JEx. 225] (quoting Sen. Russ Feingold, D–Wis., remarking about the campaign finance system that "[i]t is legalized bribery"); Joint Stip. ¶ 112.

393. The public perceives the soft money as a corrupting influence based on news stories about companies that donate one or two hundred thousand dollars in soft money to the party committees and at the same time have interests before the federal government and the Congress. Meehan Decl. ¶ 16 [JEx. 4]. The Boston Globe has run articles about companies that make large donations to party committees at the same time they have legislative interests pending before Congress. The Globe has reported on top soft money donors to the Republican Party in the insurance, securities and investments, oil and gas, and telecommunications industries, all with significant legislative interests before the Congress involving issues such as oil royalties, bankruptcy reform, financial services reform, patients' rights and managed care reform, and electronic data encryption reform. *Id.;* FEC Statement of Material Facts II at ¶ 492 [PSEx. 2].

394. Political commentators have noted what appears to be inappropriate actions due to the influence of donors to parties

and party committees on Senators, Representatives and members of the administration. Gloria Borger, *Just A Little Respect*, U.S. News and World Report, October 26, 1998 [JEx. 237]; Albert Hunt, *The Bipartisan Money Chase*, Wall Street Journal, July 23, 1998 [JEx. 238]; Bob Herbert, *The Donor Class*, New York Times, July 19, 1998 [JEx. 239]; Norman Ornstein, *More Than Ever, Cash, Ads Win Elections*, U.S.A. Today, October 29, 1998 [JEx. 240]; *Send Congress A Message*, The Hartford Courant, August 3, 1998 [JEx. 241]; FEC Statement of Material Facts II at ¶ 505[PSEx. 2].

395. *USA Today* reported, "Lawmakers killed anti-smoking legislation this year in the Senate, a day after tobacco companies gave $220,000 in soft money to Republicans. In all, the companies have given $3.6 million since the last election, 83% of it to the Republicans who control Congress." *"Soft Money" a Sure Bet in Key Races*, U.S.A. Today, October 26, 1998 [JEx. 247]; FEC Statement of Material Facts II at ¶ 523 [PSEx. 2].

396. The public perception that companies that make soft money donations to political parties at the same time as when they have legislative interests pending before Congress as buying a legislative outcome is fueled by press reports of federal subsidies going to companies that have donated significant amounts of soft money. Meehan Decl. at ¶ 18 [JEx. 4]; FEC Statement of Material Facts II at ¶ 525 [PSEx. 2].

## X. *DUE TO THE EFFECTS OF SOFT MONEY ON THE POLITICAL SYSTEM, FECA IS NOT SERVING THE GOALS THAT IT WAS INTENDED TO SERVE*

397. Skyrocketing soft money transactions have drastically changed the financing of federal elections. Herrnson Dep. at 55 [JEx. 36].

398. The use of soft money and issue ads have essentially rendered the contribution and spending limits of FECA mean-ingless. Anthony Corrado, *Financing the 1996 Elections*, in *The Election of 1996* 135, 148 (Gerald M. Pomper, *et al.* eds., 1997) [JEx. 34].

399. FECA has failed to avoid the appearance of corruption, influence peddling, and access for the wealthy in connection with campaign financing. Simpson Dep. at 66 [JEx. 38].

400. The simultaneous prohibition on corporate and union contributions to candidates for federal office, coupled with the ability of those entities to donate unlimited amounts of soft money to the political parties with whom candidates for federal office are affiliated, make it impossible for the laws which currently prohibit contributions by corporations and unions to candidates for federal elective office to have any real impact in terms of avoiding the appearance of corruption or avoiding undue influence by large accumulations of wealth. Simpson Aff't ¶ 3 [JEx. 1].

401. Soft money makes FECA's limitations on the involvement of corporations and unions ineffective and prevents these limitations from achieving their purposes. Simpson Aff't ¶ 6 [JEx. 1].

402. Soft money spent on issue ads is a way to circumvent the campaign contribution restrictions. Bumpers Decl. ¶ 19 [JEx. 3]; FEC Statement of Material Facts II at ¶ 598 [PSEx. 2].

403. Soft money contributions—the unlimited sums given to political parties by individuals, corporations, unions or other interest groups, and then funneled to candidates for federal office—permit parties and donors to do indirectly what the law clearly forbids them to do directly. Shays Decl. ¶ 5 [JEx. 5].

404. National party committees use large soft money contributions in ways that unavoidably influence federal elections. This is inconsistent with the policy goals of FECA, which seeks to limit corruption and the appearance of corruption that is created when large individual con-

tributions and corporate, labor organization and federal contractor funds are used to influence federal elections. FEC Notice of Proposed Rulemaking [JEx. 39].

405. In the 1996 elections, $262 million of soft money was raised by both parties—much of it in single checks, some as large as $500,000. Such donations strike at the heart of campaign laws intended to favor small contributions from individuals over piles of cash from wealthy groups. FEC Statement of Material Facts II at ¶ 61 [PSEx. 2]; Shays Decl. ¶ 6 [JEx. 5].

406. The raising and spending of tremendous amounts of soft money, in particular, destroys the basic tenet of the campaign finance law, which is to deter corruption and the appearance of corruption. Minority Report at 7519 [JEx. 21]; FEC Statement of Material Facts II at ¶ 619 [PSEx. 2].

407. Soft-money and issue-advocacy have together eviscerated the contribution limits and disclosure requirements in federal election laws. Minority Report at 4565 [JEx. 21].

## CONCLUSION

### A. *Factual Conclusions*

In summary, the detailed factual findings made above support the following ultimate factual conclusions:

● Mariani is being prosecuted for violating the statutory bans on corporate and conduit contributions to candidates for federal elective office by funneling corporate funds through individuals to various campaign committees of candidates for federal elective office.

● The purpose of the corporate and conduit contribution bans is to avoid corruption and the appearance of corruption in the federal elective process that may occur when large and/or undisclosed contributions are made to candidates seeking federal elective office. Contributions made or expenditures on behalf of candidates for federal elective office are referred to a "hard money."

● Corporations have the ability to make large contributions to political parties and to fund "issue advocacy." Such contributions are referred to as "soft money."

● There are important theoretical distinctions between hard and soft money. These distinctions, which include preventing a candidate from deciding how to spend soft money, are intended to avoid the corrupting influence of large contributors supporting a particular candidate.

● Soft money is easier to raise than hard money because it can be donated in large sums and it can originate in corporate treasuries.

● Soft money has grown tremendously, from about $19 million in 1980 to more than $260 million in 1996.

● Soft money is used in part to fund "issue advocacy." While "issue advocacy" is supposed to be distinguishable from "candidacy advocacy," the distinction is often illusory.

● "Issue advocacy" funded by soft money has increased substantially

● Sponsors of "issue advocacy" are able to avoid FECA contribution limits and disclosure requirements applicable to candidate ads.

● Candidates for federal elective office are involved in raising "soft money." Candidates raising soft money are often rewarded by having allocated to their campaigns all or part of the soft money they raise.

● Candidates for federal elective office know which corporations are large contributors of soft money.

● The contribution of corporate treasury funds secures for corporate officials access to high government officials, including elected officials, as well as candidates for federal elective office.

• Access to candidates and high federal government officeholders is often the *quid pro quo* for large soft money contributions.

• Corporations are often motivated to make large soft money contributions by the access it buys.

• Access to candidates for federal elective office provided by soft money corporate contributions has the same appearance of corruption as would access provided by corporate hard money contributions to those candidates.

• Soft money contributions from corporate treasuries can influence the outcome of federal elections.

• Soft money contributions from corporate treasuries in connection with federal elections, both by way of donations to political parties and by way of issue advocacy, have the same ability to corrupt and give rise to the same appearance of corruption as would contributions from corporate treasuries to the campaign committees of candidates for federal elective office.

• The public does not perceive any meaningful distinction between hard money and soft money.

• Corporations are now able to make expenditures that influence the outcome of federal elections without the public having a clear understanding that a particular corporation is making substantial contributions with the intent to promote the chances of a particular candidate for federal elective office.

• Corporate soft money contributions enable corporations to do that which the corporate hard money contribution ban is intended to avoid: corporate support of candidates for federal elective office.

• Corporations are now able to make expenditures in connection with federal elections that have the ability to corrupt and cause an appearance of corruption that the ban on corporate contributions to candidates for federal elective office was intended to avoid.

### B. *Certified Questions of Law*

Based upon these ultimate conclusions of fact, I certify for appellate court consideration the following issues of law:

A. Whether the prohibition in 2 U.S.C. § 441b on contributions by corporations from corporate treasury funds to candidates for federal office, in the context of the presently existing law that otherwise permits corporations to expend unlimited amounts of corporate treasury funds that influence the outcome of federal elections, violates the First Amendment.

B. Whether the prohibition in 2 U.S.C. § 441b on contributions by corporations from corporate treasury funds to candidates for federal elective office is over broad and therefore unconstitutional on its face.

C. Whether the prohibition in 2 U.S.C. § 441f on contributions in the name of another to candidates for federal elective office violates the First Amendment.

D. If the answer to question A or B is "yes" but the answer to question C is "no":

(a) Whether 2 U.S.C. § 441f is unconstitutional when it prohibits conduit contributions of corporate funds to candidates for federal office.

(b) Whether 2 U.S.C. § 441f is inseverable from 2 U.S.C. § 441b and should therefore be invalidated in light of the unconstitutionality of the latter provision.

An appropriate Order is attached.

### *ORDER*

NOW, THEREFORE, THIS _____ DAY OF OCTOBER, 1999, in accordance with the foregoing Memorandum, **IT IS HEREBY ORDERED THAT:**

1. Pursuant to 2 U.S.C. § 437h the Clerk of Court is directed to certify to the United States Court of Appeals for the Third Circuit the following questions:

A. Whether the prohibition in 2 U.S.C. § 441b on contributions by corporations

from corporate treasury funds to candidates for federal office, in the context of the presently existing law that otherwise permits corporations to expend unlimited amounts of corporate treasury funds that influence the outcome of federal elections, violates the First Amendment.

B. Whether the prohibition in 2 U.S.C. § 441b on contributions by corporations from corporate treasury funds to candidates for federal elective office is overbroad and therefore unconstitutional on its face.

C. Whether the prohibition in 2 U.S.C. § 441f on contributions in the name of another to candidates for federal elective office violates the First Amendment.

D. If the answer to question A or B is "yes" but the answer to question C is "no":

(a) Whether 2 U.S.C. § 441f is unconstitutional when it prohibits conduit contributions of corporate funds to candidates for federal office.

(b) Whether 2 U.S.C. § 441f is inseverable from 2 U.S.C. § 441b and should therefore be invalidated in light of the unconstitutionality of the latter provision.

3. The Clerk of Court is directed to mark this matter in this Court **CLOSED.**